## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

EQULLA M. BROTHERS, as the Personal )
Representative and Administratrix of the Estate )
of Daryl Clinton, Deceased )
                                            )
       Plaintiff, )         Case No. CIV-21-418-SLP
                                            )
v. )
                                            )
(1) BOARD OF COUNTY COMMISSIONERS )
OF OKLAHOMA COUNTY; )
                                            )
(2) TOMMIE JOHNSON III, in his official )
Capacity as Oklahoma County Sheriff; )
                                            )
(3) TURNKEY HEALTH CLINIC, )
LLC, an Oklahoma limited liability company; )
                                            )
(4) DR. KENT KING, individually; )
                                            )
(5) JOHN DOES I-X, individually )
                                            )
       Defendants. )

## COMPLAINT

Plaintiff Equlla M. Brothers, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, Deceased, for her causes of action against Defendants (1) Board of County Commissioners of Oklahoma County, State of Oklahoma, (2) Tommie Johnson III, in his official capacity as Oklahoma County Sheriff, (3) Turnkey Health Clinics, LLC, an Oklahoma limited liability company, (4) Dr. Kent King, individually, and (5) John Does I-X, individually, states as follows:

## The Parties

1.     Plaintiff Equlla M. Brothers ("Brothers" or "Plaintiff") is an individual and a resident of the Western District of Oklahoma. Brothers was the sister of Daryl Clinton, deceased ("Clinton"). On August 23, 2019, Brothers was appointed as the Personal Representative and Administratrix of Clinton's Estate in Case Number PB-2019-991 in the District Court of Oklahoma County, following Clinton's death on August 10, 2019.

2.     Defendant Board of County Commissioners of Oklahoma County ("Board") is a political subdivision of the State of Oklahoma, and its current county seat is in Oklahoma City, Oklahoma, which is in the Western District of Oklahoma. Defendant Board is responsible for overseeing governmental functions of and for Oklahoma County, including the Oklahoma County Jail (the "Jail").

3.     Defendant Tommie Johnson III ("Sheriff"), in his official capacity, is the acting Sheriff for Oklahoma County and, at all times relevant hereto, was responsible for ensuring the safety and well-being of inmates detained at the Jail. Under Okla. Stat. tit. 57, §47, Sheriff Johnson is obligated to ensure that the Jail conforms to applicable laws and regulations. Additionally, Sheriff Johnson is, and was at all times relevant hereto, responsible for creating, approving and enforcing the rules, regulations, policies and procedures of the Jail, including those pertaining to the safety and well-being of pretrial detainees.

4.     Defendant Turnkey Health Clinics, LLC ("Turnkey") is an Oklahoma limited liability company and private correctional health care company that contracted with Oklahoma County/Jail to provide medical staffing, supervision, and care at the Jail. Turnkey was at all times relevant hereto responsible, in part, for providing medical care to

Clinton while he was detained as a pretrial detainee at the Jail. Turnkey was also responsible for creating, implementing, and maintaining policies and procedures governing the medical care for inmates at the Jail. Additionally, Turnkey was responsible for training and supervising its medical personnel at all relevant times.

5.      Defendant Dr. Kent King ("Dr. King") was at all times relevant hereto an employee and/or agent of Turnkey, who was, in part, responsible for overseeing Clinton's health and well-being and for ensuring that Clinton received appropriate medical care while detained at the Jail. Dr. King was acting within the scope of his employment and under color of State law. Dr. King is being sued in his individual capacity.

6.      Defendants John Does I-X are individual jail and medical personnel who were at the relevant times at the Jail and responsible, in part, for ensuring that Clinton received appropriate medical care while detained at the Jail. Defendants John Does I-X are currently unknown to Plaintiff. Plaintiff will seek leave to amend the Complaint when these persons are known and ascertained by Plaintiff through discovery.

## Jurisdiction and Venue

7.      Plaintiff brings this action under 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

8.      This Court has federal question jurisdiction under 28 U.S.C. § 1331.

9.      Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to adjudicate her claims arising under state law.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b).

11.     Prior to filing this Complaint, Plaintiff complied with the tort claim notice provision of the Oklahoma Governmental Tort Claims Act ("OGTCA"). Okla. Stat. tit. 51, §151 *et seq*. This action is timely brought pursuant to Okla. Stat. tit. 51, §157.

<u>**Factual Allegations**</u>

12.     Plaintiff incorporates by reference all the above and foregoing allegations as though set forth in full herein.

13.     At relevant times before his death, Clinton suffered from type 2 diabetes mellitus. On July 16, 2019, Clinton was admitted to St. Anthony's after a diabetic ulcer infected his left foot. St. Anthony's amputated his left leg below the knee. St. Anthony's discharged Clinton on July 23, 2019.

14.     On August 5, 2019 (around 8:30 p.m.), just a few weeks after losing his left leg, Clinton was injured in a one-vehicle collision when he accidentally backed his car into a pole in a gas station parking lot in Oklahoma City. EMSA and officers from the Oklahoma City Police Department were dispatched to the scene.

15.     Oklahoma City Police Officers Paige Charter ("Officer Charter") arrived at the scene around 8:40 p.m. EMSA was at the accident scene when Officer Charter arrived.

16.     EMSA was standing by Clinton's driver door when Officer Charter approached the car. Officer Charter noticed Clinton was missing his left leg and asked if he needed assistance to the ambulance. Clinton, clearly disoriented and in pain, was unable to move from the vehicle, so EMSA removed him from the car onto a stretcher.

17.      While Clinton was being secured to the stretcher, he repeatedly stated in the presence of EMSA personnel and Officer Charter that he was unable to move his arms. In

4

the Incident Report, Officer Charter noted that Clinton complained of pain and partial paralysis.

18.     In the ambulance, EMSA checked Clinton's vitals to ensure that he was not in critical condition. Officer Charter was present in the ambulance during most of this time. In the ambulance, Clinton again stated on several occasions in the presence of the EMSA personnel and Officer Charter that he could not move his arms and was clearly in significant pain and discomfort. At one point, Clinton was clearly experiencing extreme discomfort and asked EMSA personnel to raise his arms for him.

19.     EMSA transported Clinton to St. Anthony's in Oklahoma City, and he arrived at St. Anthony's at 9:41 p.m. on August 5, 2019.

20.     St. Anthony's nurse, Heather Dyer (RN) ("Dyer"), noted in the medical records that Clinton complained of shoulder pain. Officer Charter noted in the Incident Report that Clinton complained of pain and partial paralysis to St. Anthony's medical personnel. Despite these complaints, Dyer noted at 9:57 p.m. that Clinton "will have blood draw done then be medically cleared."

21.     Due to his paralysis, Clinton could not sign multiple hospital documents. Further, Clinton told EMSA personnel, Officer Charter, and St. Anthony's medical personnel that he could not move his arms and hands. Regardless, Dyer noted at 9:58 p.m. that Clinton was "refusing to use his hands at this time to sign form to have legal blood draw performed." Another hospital document scanned at 12:09 a.m. on August 6th states that Clinton was "unable to sign."

22.     In the early morning hours of August 6th, Clinton was transferred to St. Anthony's Physician Assistant Sasa Koren Jackson. In the medical reports, the HPI Comments state that Clinton: "was just for legal blood draw and then reports that he is unable to move his arms or legs Pt states his arms just flop around." The HPI Comments further state: "Pt reports shoulder pain but points to mid back." The report later states under Review of Systems: "Can't move arms or leg."

23.     St. Anthony's and Jackson conducted a CT scan on Clinton's lumber spine, head, cervical spine, and thoracic spine. Clinton also received a chest x-ray. Impressions on the CT of Clinton's cervical spine indicate C5-6 and C6-7 degenerative changes with neural foraminal. The CT of Clinton's thoracic spine indicate multilevel degenerative changes of the thoracic spine and cervical spine. The CT of Clinton's lumbar spine indicate L4-5 and L5-S1 shallow disc bulges and mild facet arthropathy with mild neural foraminal narrowing.

24.     A St. Anthony's physician, Doctor Elizabeth Magann, evaluated Clinton and agreed with the treatment plan and to discharge Clinton. In the medical reports, it states that "Pt appears to be malingering to avoid jail." Clinton's Discharge Instructions state to follow up with his family physician in two days. Clinton was discharged from St. Anthony's and accompanied to the Oklahoma County Jail by the Oklahoma City Police Department. Because Clinton could not move his arms or hands, he did not sign his discharge papers.

25.     Clinton arrived at the Jail on the morning of August 6, 2019.

26.     Defendant Turnkey nurse Rebecca Cargill (LPN) ("Cargill") was the booking nurse for Clinton and notified Defendant Dr. King of Clinton's arrival at the Oklahoma County Jail. Upon information and belief, Cargill noted to Dr. King that Clinton had chronic incontinence and was in a wheelchair because of an amputation. Cargill further notified Dr. King that Clinton's amputation bandage looked filthy and had been neglected. Dr. King recommended that Clinton be placed in 23 Observation on the 13B Medical floor due to his amputation and need for a wheelchair. Defendant Dr. King and John Does I-X were on notice that Clinton was recently involved in a collision, had complained of paralysis, was a recent amputee, and had type 2 diabetes.

27.     Upon information and belief, Defendant Turnkey (including Dr. King and John Does I-X) did not receive results of the CT scans from St. Anthony's after Clinton was released to the jail. Upon information and belief, Defendant Turnkey (including Dr. King and other medical personnel at the jail) did not receive any medical treatment recommendations from St. Anthony's except that Clinton stop using drugs. Upon information and belief, Defendant Turnkey did not have adequate policies and procedures to ensure that Turnkey received all medical records, specifically the CT scans and note recommending follow-up medical attention in two days.

28.     Upon information and belief, on August 6, 2019, at 10:48 a.m., Clinton told Defendant Turnkey John Does I-X that he was unable to urinate since 2:45 a.m. Upon information and belief, a Defendant Turnkey chart note from August 7, 2019, around midnight, states that Clinton told medical personnel he was not able to urinate for two days and was experiencing paralysis from his neck down.

29.     Notwithstanding his paralysis, recent leg amputation, and diabetes, Defendant Dr. King and/or John Does I-X medically cleared Clinton from the observation wing of the Jail.

30.     Upon information and belief, Josue Chica (LPN) notified Dr. King that Clinton was still unable to urinate for several days, so Dr. King ordered a straight in/out catheterization.

31.     Upon information and belief, Clinton, who was experiencing significant pain, discomfort, and paralysis in his upper body, needed assistance from his cellmate to be able to eat. Clinton's cellmate assisted Clinton with feeding on several occasions.

32.     On August 9, 2019, Defendant Turnkey employee Olivia Heaton went to Clinton's cell to administer a fingerstick for Clinton's diabetes. However, Clinton, who had persistently complained of and exhibited symptoms of paralysis, could not physically move from his bed to receive the treatment. Defendant Turnkey personnel therefore required a Waiver of Treatment/Evaluation be signed. The Waiver, dated August 9, 2019, was signed by Olivia Heaton but only states "AM" under "Time." In the Waiver, it states that Clinton told medical personnel that "he cannot move from bed to come get fingerstick done." The Waiver also states that Clinton "refused to sign", even though Clinton repeatedly complained of and exhibited symptoms of paralysis and was a recent amputee and was thus not capable of signing. Rather than sending a physician to him on an emergent basis, Defendant Turnkey and John Does I-X refused to help Clinton and signed a waiver on his behalf in case he died from inability to receive treatment.

33.     Upon information and belief, in the late evening hours of August 9, 2019, or early morning hours of August 10, 2019, a Defendant Turnkey nurse P. Miller was notified by an officer that she needed to check on Clinton because he was asking the officer to feed him since he could not move his arms or hands. Miller further noted that Clinton was incontinent of stool and urine and that he was "refusing" to get up. Because Clinton was in pain and discomfort and was experiencing paralysis, Defendant Turnkey and John Does I-X had to help clean him up.

34.     Therefore, by August 10, 2019, it was plainly obvious, even to a layperson, that Clinton had serious and emergent health needs (inability to move or eat, frequent complaints of paralysis, inability to move to get potentially life-saving diabetes treatment, inability to urinate, a recent leg amputation, and other medical trauma). However, upon information and belief, rather than sending Clinton to the hospital or sending a physician on an emergent basis, Defendant Turnkey and Dr. King merely recommended Clinton receive a psychological consultation.

35.     Upon information and belief, Defendants Turnkey, Dr. King and John Does I-X, completely disregarded Clinton's symptoms of and complaints of paralysis (as well as his other serious medical needs such as diabetes and leg amputation) over the span of several days. Unfortunately, after Defendant Turnkey and jail personnel ignored these obvious signs that Clinton had serious medical needs, when they eventually returned to his cell in the early morning hours of August 10, 2019, Clinton was on the floor and in cardiac arrest.

36.     Upon information and belief, on August 10, 2019, around 3:45 a.m., Clinton went into cardiac arrest. EMSA was dispatched to the jail sometimes after 4:00 a.m. but noted in the EMSA report that they faced delays getting to the 13th floor to assist Clinton. EMSA officer Daryl Wood ("Wood") found Clinton unresponsive. Upon information and belief, Jail and Defendant Turnkey personnel did not notify Wood that Clinton was experiencing paralysis in his upper body. In the Patient Care Report, Wood noted that Clinton's back was "Stable." Upon information and belief, Wood did not receive proper information pertaining to Clinton's medical history and trauma to his back, especially concerning his frequent complaints of paralysis.

37.     Upon information and belief, Clinton was briefly resuscitated while on the way to St. Anthony's.

38.     Clinton was pronounced dead at St. Anthony's in the early morning hours of August 10, 2019.

39.     Eric Duvall (D.O.) ("Duvall") was the medical examiner. In the medical examiner report, Duvall listed the probable cause of death for Clinton as "Blunt Force Trauma of Cervical Spine."

40.     The medical report narrative by Duvall states that Clinton had 2 liters of blood around his spleen.

41.     The Report of Autopsy contains the following findings:

(a) Cervical spine fracture with spinal cord infarction

(b) Hemorrhagic cystitis

(c) Acute ischemic changes of liver and kidney

(d) Duodenal mucosal ulceration and gastrointestinal hemorrhage

(e) Cerebral swelling

(f) large serous effusion, peritoneal cavity; small serous pleural effusions

(g) Subcutaneous edema

(h) Coronary artery atherosclerosis, marked

(i) Aortic atherosclerosis, marked

(j) Diabetic nephropathy

(k) status-post left below knee amputation

(l) status-post recent motor vehicle collision on 8/05/2019, five days prior to death, per investigation

(m) status-post resuscitated cardiac arrest on 08/10/2019, per medical record.

## FIRST CAUSE OF ACTION – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS IN VIOLATION OF THE 14TH AMENDMENT

42.     Plaintiff incorporates by reference all of the above and foregoing allegations as though set forth in full herein.

43.     The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

44.     The deliberate indifference to a pretrial detainee's serious medical needs constitutes a violation of the Fourteenth Amendment.

45.     Clinton suffered from sufficiently serious medical needs, including type 2 diabetes, a recent leg amputation, back and shoulder pain, upper and lower body paralysis,

incontinence of stool and urine, inability to feed himself or move from his bed, and inability to move for personnel to provide potentially life-saving diabetes treatment.

46.     Clinton's medical needs were sufficiently serious because: (a) St. Anthony's Hospital recommended a follow-up appointment with a physician in two days after medical clearance from the hospital; and (b) Clinton's medical needs, symptoms, trauma, and complaints made it so obvious that he needed medical attention that even a layperson would easily recognize the necessity for emergent physician care.

47.     Defendants Turnkey, Dr. King, and John Does I-X knew of an excessive risk of harm to Clinton's health and safety as a result of his medical trauma. Chart notes and correspondence demonstrate that Turnkey, Dr. King, and John Does I-X were aware that Clinton was experiencing the foregoing medical needs and symptoms over the span of several days. Indeed, such notes state that Clinton was asking for assistance to eat and was experiencing paralysis. And Clinton was unable to move from his bed to receive potentially life-saving diabetes treatment, which also put Turnkey, Dr. King, and John Does I-X on notice that Clinton had sufficiently serious medical needs.

48.     Defendants Turnkey, Dr. King, and John Does I-X disregarded these known and obvious risks by failing to seek appropriate medical care. Indeed, Defendants Turnkey, Dr. King, and John Does I-X never provided emergent medical care or sent Clinton to the hospital until he was in cardiac arrest. Rather, Defendants Turnkey, Dr. King, and John Does I-X refused to help Clinton after he could not move to get diabetes treatment, ignored complaints of paralysis, cleared Clinton from observation, and even sent a psychological consult.

49.     Defendants Turnkey, Dr. King, and John Does I-X exhibited a deliberate indifference to Clinton's serious medical needs over the span of days, thus violating Clinton's constitutional rights.

50.     As a direct and proximate result of the actions and inactions of Defendants Turnkey, Dr. King, and John Does I-X as described herein, Clinton sustained pain, personal injuries, mental anguish, and ultimately death.

51.     Brothers, as the Personal Representative of the Estate of Clinton, seeks to enforce and recover all rights and remedies provided under 42 U.S.C. §1983 or otherwise available under the law.

52.     At all times relevant hereto, Clinton's constitutional right to receive medical care as a pretrial detainee under the Fourteenth Amendment was clearly and plainly established.

WHEREFORE, Plaintiff Equlla M. Brothers, as the Personal Representative of the Estate of Clinton, prays for judgment against Defendants Turnkey, Dr. King, and John Does I-X as follows:

(1)     For her actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)     For all those damages afforded to the Estate of Daryl Clinton for his wrongful death as provided by statute or law in an amount in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(3)     For punitive and exemplary damages as determined by the jury at the time of trial;

(4)     For interest thereon as provided by law;

(5)     For the costs and expert fees as provided by 42 U.S.C. §1983;

(6)     For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

## SECOND CAUSE OF ACTION—SHERIFF TOMMIE JOHNSON III IN HIS OFFICIAL CAPACITY

53.     Plaintiff incorporates by reference all of the above and foregoing allegations as thought set forth in full herein.

54.     Defendant Sheriff, as the duly elected Sheriff of Oklahoma County, was the final policy maker for all policies and decisions concerning the Jail, including all policies and decisions concerning the health and safety of detainees such as Clinton.

55.     The foregoing actions and inactions of Defendants Turnkey, Dr. King, and John Does I-X in being deliberately indifferent to Clinton's medical needs in violation of the Fourteenth Amendment are causally connected with customs, practices, and policies which the Board/Sheriff promulgated, created, implemented, and enforced. Sheriff in his official capacity is liable for the unconstitutional acts that culminated from these customs, practices, and policies. These policies include: understaffing medical personnel to the Jail; failure to implement appropriate policies for caring for and providing treatment to inmates in locked cells (for example, Clinton could not receive diabetes treatment in his cell because he was paralyzed); failure to receive medical documents and files from hospitals such as St. Anthony's Hospital that could help ensure proper medical treatment for

detainees; and improper protocol for clearing detainees from observation when suffering from serious medical needs.[1]

56.    The Board/Sheriff, through its ratification, approval, and maintenance of the foregoing customs, policies, and procedures, has been deliberately indifferent to detainees' (including Clinton's) medical needs.

57.    As a direct and proximate result of these actions and inactions, Clinton sustained pain, personal injuries, mental injuries, and ultimately death.

WHEREFORE, Plaintiff Equlla M. Brothers, as the Personal Representative of the Estate of Clinton, prays for judgment against Defendant Sheriff as follows:

(1)    For her actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)    For all those damages afforded to the Estate of Daryl Clinton for his wrongful death as provided by statute or law in an amount in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(3)    For punitive and exemplary damages as determined by the jury at the time of trial;

(4)    For interest thereon as provided by law;

(5)    For the costs and expert fees as provided by 42 U.S.C. §1983;

---

[1] Several of these issues with the policies and procedures have been widely recognized. Indeed, a former Turnkey employee who wished to stay anonymous complained that the reason she left was because the Jail was understaffed and medical personnel were unable to adequately care for inmates that needed medical attention, such as for diabetes treatment. Former Oklahoma County Jail Nurse Says Poor Conditions Led To Her Exit (news9.com). Further, Defendant Board/Sheriff's customs, policies and procedures at the Jail were so deficient that Turnkey threatened to terminate its contract.

(6)    For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

**THIRD CAUSE OF ACTION—MUNICIAPAL LIABILITY AGAINST TURNKEY**

58.    Plaintiff incorporates by reference all of the above and foregoing allegations as though set forth in full herein.

59.    At all times pertinent hereto, Turnkey was acting under color of State law. Turnkey is a "person" for purposes of 42 U.S.C. §1983.

60.    Turnkey has been granted by the Board/Sheriff with authority and powers governmental in nature. Therefore, Turnkey had authority governmental in nature to adopt, implement, and enforce policies at the Jail along with Defendants Board/Sheriff regarding the medical care for detainees.

61.    There is a causal connection between the foregoing actions and inactions by Defendants Turnkey, Dr. King, and John Does I-X resulting in violation of Clinton's Fourteenth Amendment rights and Turnkey's customs, policies, and procedures. These policies and procedures posed substantial risks to pretrial detainees such as Clinton and resulted in the deliberate indifference to Clinton's medical needs.

62.    As a direct and proximate result of these actions and inactions, Clinton sustained pain, personal injuries, mental injuries, and ultimately death.

WHEREFORE, Plaintiff Equlla M. Brothers, as the Personal Representative of the Estate of Clinton, prays for judgment against Defendants Turnkey as follows:

(1)    For her actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)      For all those damages afforded to the Estate of Daryl Clinton for his wrongful death as provided by statute or law in an amount in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(3)      For punitive and exemplary damages as determined by the jury at the time of trial;

(4)      For interest thereon as provided by law;

(5)      For the costs and expert fees as provided by 42 U.S.C. §1983;

(6)      For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

## FOURTH CAUSE OF ACTION—MUNICIPAL LIABILITY
## AGAINST DEFENDANT BOARD

63.      Plaintiff incorporates by reference all of the above and foregoing allegations as though set forth in full herein.

64.      As a municipality that oversees the Jail, Defendant Board has a constitutional duty to provide adequate training and appropriate training to its commissioned employees. Further, Defendant County is responsible for the actions of its Sheriff as the final policy maker for county jails.

65.      Defendant Board failed to provide appropriate and necessary training to John Does I-X and other Jail and medical personnel responsible for ensuring the health and safety of detainees, as required by Oklahoma and federal law. Defendant Board failed to ensure that the Sheriff implemented sufficient policies and procedures concerning the

health and well-being of detainees at the Jail and that such policies and procedures complied with applicable law.[2]

66.     The need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy-makers of the County can reasonably be said to have been deliberately indifferent to the need.

67.     The failure to provide proper and appropriate training represents a policy for which the County is responsible.

68.     Defendant Board's failure to train its Jail and medical personnel to properly respond to medical needs of detainees was a moving force and proximate cause of Clinton's death. Defendant Board's failure to ensure that the Sheriff had implemented sufficient policies and procedures ensuring the health and safety of pretrial detainees was also a moving force and proximate cause of Clinton's suffering and death.

69.     As a direct and proximate result of the actions of Defendant Board as described herein, Clinton sustained personal injuries, mental injuries, medical expenses, and ultimately death.

70.     Brothers, as the Personal Representative of Clinton's Estate, seeks to enforce and recover all rights and remedies provide under 42 U.S.C. § 1983 or otherwise available under the law.

---

[2] *See* the deficient policies and procedures discussed in ¶55.

WHEREFORE, Plaintiff Equlla M. Brothers, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, prays for judgment against Defendant Board as follows:

(1)     For her actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)     For all those damages afforded to the Estate of Daryl Clinton for his wrongful death as provided by statute or law in an amount in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(3)     For punitive and exemplary damages as determined by the jury at the time of trial;

(4)     For interest thereon as provided by law;

(5)     For the costs and expert fees as provided by 42 U.S.C. § 1983;

(6)     For any other such and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

## FIFTH CAUSE OF ACTION-NEGLIGENCE AND NEGLIGENCE PER SE

71.     Plaintiff hereby incorporates the above and foregoing allegations as though set forth in full herein.

72.     Plaintiff caused a Notice of Tort Claim pursuant to the Governmental Tort Claim Act to be served on Defendant Board, Sheriff, Turnkey and Oklahoma County Jail Staff and Employees on August 7, 2020.

73.     The Tort Claim was deemed denied by operation of law following the expiration of 90 days.

74.     The allegations and pendent claims for negligence and negligence per se are timely brought contemporaneously and as pendent claims within 180 days.

75.     Turnkey, Dr. King, and John Does I-X, owed a duty to Clinton and the other inmates at the Jail to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

76.     Turnkey, Dr. King, and John Does I-X breached that duty by failing to provide Clinton with prompt and adequate medical care despite his obvious medical needs.

77.     Turnkey, Dr. King, and John Does I-X's actions throughout the several days Clinton was at Jail were within the course and scope of their employment and contractor relationship with the Jail.

78.     Turnkey, Dr. King and John Does I-X's actions and inactions failed to conform to well-established health and safety standards applicable to Oklahoma County Jails as set forth in Okla. Stat. tit. 74, §§192-194 (and the implementing regulations set forth in Okla. Admin. Code §310:670-5-5), as well as the American's with Disabilities Act, which is applicable to state jails.

79.     As a direct and proximate result of Turnkey, Dr. King and John Does I-X's actions and inactions (including their non-conformance to state and federal law proscribing health and safety standards for jail detainees), Clinton suffered personal injuries, mental injuries, and ultimately death.

WHEREFORE, Plaintiff prays for judgment against Turnkey, Dr. King, and John Does I-X, individually, as follows:

(1) For actual damages in sum in excess of $75,000.00 and in accordance with proof

  at the time of trial;

(2) For interest thereon as provided by law; and

(3) For any other such and further relief as the Court deems just and proper, whether

  that is specifically requested herein or requested at a later date.

Respectfully Submitted,

*/s/* Travis E. Harrison
Woodrow K. Glass, OBA #15690
Tanner B. France, OBA #33171
Travis E. Harrison, OBA #33520
For the Firm: Ward & Glass, L.L.P.
1601 N.W. 36th Avenue, Suite 100
Norman, Oklahoma 73072
woody@wardglasslaw.com
tanner@wardglasslaw.com
travis@wardglasslaw.com
405-360-9700
405-360-7902 (fax)

-and-

Beau Williams
Beau Williams Law Office
4901 Richmond Sq.
Oklahoma City, Oklahoma 73118
beauwilliamsatty@gmail.com

**JURY TRIAL DEMANDED**
**ATTORNEY'S LIEN CLAIMED**