IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EQULLA M. BROTHERS, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-21-418-SLP |
| TOMMIE JOHNSON III, in his official Capacity, | ) ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT TOMMIE JOHNSON III'S MOTION IN LIMINE**

## INTRODUCTION

Plaintiff Equlla M. Brothers, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, Deceased, submits this Response in Opposition to the Motion in Limine filed by Defendant Tommie Johnson III. Defendant's Motion must be denied. In support of this Response, Plaintiff shows this Court the following:

## ARGUMENTS & AUTHORITIES

**I.  Defendant's Requested Relief is Overbroad and is an Attempt to Hamstring an Essential Element of Plaintiff's Monell-Based Custom, Practice, or Policy Theories.**

Defendant has attempted to bar admission of any and all references to deficient sight check and detainee/inmate supervision practices at the Oklahoma County Detention Center ("OCDC"). Defendant argues that such deficient historical practices at OCDC are not relevant to the claims at bar regarding Daryl Clinton. Nothing could be further from

the truth. Indeed, Defendant's request is overbroad, oversimplified, and seeks to pre-emptively defend against Plaintiff's Monell custom, practice, or policy claims at bar through a second Motion for Summary Judgment disguised as a Motion in Limine.

Defendant is trying to slice a thinly veiled and erroneous line between prior sight check violations (where none were performed) and the supervision issues at bar (where sight checks were performed, but in a deficient manner). The problem with Defendant's argument is that this is a case regarding detainee supervision, and conducting a proper sight check **requires that the detainee/inmate be properly observed and supervised**, particularly in the event of an ongoing medical emergency that is not being treated properly and is deteriorating over the course of days. Indeed, Defendant's officers who monitor detainees and inmates must monitor their appearance and behavior for purposes of protecting the inmate and employee population. Regardless of how the issue is stylistically presented, the substantive matter at hand is whether detainees and inmates are being **adequately monitored** as a part of the sight check process. The historical deficiencies at OCDC regarding sight checks are tailored towards monitoring and supervision issues of inmates at risk. This is a basic and foundational duty held by Defendant that it cannot escape through a Motion in Limine.

II. **Defendant's Arguments are Refuted by the Factual Record, Including its own Deposition Testimonies, Policies and Practices, and Prior Conduct.**

Defendant's reasoning in the Motion is undermined by multiple deposition testimonies, the nature and implementation of detainee/inmate supervision policies, and Defendant's own prior attempts to remedy such matters internally. Plaintiff will discuss

these in turn. First, Defendant's written sight check policy provides that "Sight checks are established to ensure the safety and security of our inmate population." [Exhibit 1 (Sight Check Policy at p. 1)]. Specifically regarding the sight check policy and implementation of the same, Defendant testified in its Fed. R. Civ. P. 30(b)(6) deposition (through designee Eugene Bradley) to the following:

A. Given that **evaluating safety and security is one of the purposes and scopes of the sight check policy**, jail staff must pay attention to what they are observing regarding the inmate population. [Exhibit 2 (Depo. of Defendant via Fed. R. Civ. P. 30(b)(6) at 25:7-12)].

B. When performing a reasonable sight check, jail staff must pay attention to whether they can see flesh and **whether an inmate can move**, and that this procedure is about **"[h]ealth, safety, and security."** [Id. at 25:13 – 26:18].

C. In carrying out the sight check policy, there is usually a type of "briefing from one rover to the oncoming rover of concerns, red flags, that kind of stuff. There's nothing official, but they usually do a lot of pass-on to each other. Usually, if there's a concern, that rover that's identifying the concern deals with that concern right then and there." [Id. at 28:12-25].

D. In complying with the sight check policy, if there is a serious medical issue, it is going to be "notified to medical" by jail staff and could also be a part of the rollover information process between rovers changing shifts. [Id. at 29:18 – 30:5].

E. From the County's perspective, the relevance of the sight check policy and carrying that out to medical care for detainees/inmates is **"to reassure flesh and**

**movement, to evaluate if that individual is okay in the cell, is safe, secure, those kind of things, for escape reasons as well as medical reasons."** [Id. at 52:24 – 53:5].

F. When conducting sight checks, the expectation is that the jail staff **view and evaluate the inmate**. [Id. at 67:19-24].

G. Even if officers do an adequate number (or extra) sight checks, they must carry out the actual substantive check properly. [Id. at 74:10-16].

H. There is some expectation and some level of involvement that is expected of jail staff **when conducting sight checks to intervene to prevent harm to an inmate**. [Id. at 75:8-24].

I. In some instances, if an inmate is undergoing a medical emergency and is still alive, the failure to intervene and do a proper sight check could contribute to the inmate's death. [Id. at 83:5-9].

Second, Defendant's Motion in Limine is inconsistent with its own prior treatment of the sight check issue when dealing with sight check and inmate observation matters internally. Indeed, in a June 27, 2016 Command Staff Concerns meeting, the Chief Deputy, Captains, and other medical personnel met to discuss problems reported by Defendant's personnel regarding (1) inmate deaths, (2) staffing, and (3) Armor Healthcare (the medical contactor at the time). After hearing these concerns, Defendant proffered recommendations for cadet training and "reiterate[d] to existing staff the importance of proper sight checks and **the importance of communicating with**

**supervisors about inmates at risk**." [Exhibit 3 (Minutes – Command Staff Concerns at p. 1)] (emphasis added). Indeed, when reviewing these particular Minutes in the deposition, Defendant's Fed. R. Civ. P. 30(b)(6) designee testified that sight checks and the importance of communicating with supervisors about inmates at risk "was a topic that we never stopped talking about. I mean, that was pretty much every meeting was the importance of sight checks, but also that – and we talked about this earlier – the communicating with supervisors. And that kind of plays that role, where if you're power struggling with medical about an at-risk inmate, then you involve your supervisor." [Exhibit 2 (Depo. of Defendant via Fed. R. Civ. P. 30(b)(6) at 59:6-22)].

Third, Mary Mulanax, who was a Corporal working at OCDC in August 2019 (now a lieutenant), conducted sight checks on Clinton on August 8 - 9. Mulanax testified that:

A. Medical staff's comments of "he's just faking it" and to ignore him **was "unsettling" because she knew that "it's our job to take care of these detainees and inmates."** [Exhibit 4 (Depo. of Mulanax at 16:23 – 18:1; 20:7-21; 23:1-16)].

B. When asked about the role of security staff in ensuring inmate safety when medical staff is not doing their job or neglecting the inmate, Mulanax testified that security staff should take matters "up the chain of command". [Id. at 31:12 – 32:10)].

Fourth, Christopher Hendershott (formerly a lieutenant at the Oklahoma County Jail during August 2019 and who was on shift when Clinton was found unresponsive), testified to the following in his deposition:

a. **In performing sight checks, officers must pay attention to inmate conditions, pay attention to potential medical emergencies, and have some involvement in medical issues**. [Exhibit 5 (Depo. of Hendershott at 10:7 – 12:22)].

b. Before August 2019, there was a pattern where detention officers were not doing their sight checks properly because the jail was "extremely shorthanded" and some officers "just neglected their duties". These issues ran all the way back to the 1990's (when he started working at OCDC) and existed as of December 2019 when he last worked at the OCDC. [Id. at 16:15 – 17:17)].

c. Over his time working at OCDC from 1995 to December 2019, Hendershott became increasingly concerned **about sight checks and the safety of the staff and everyone there.** Hendershott (as a lieutenant) raised concerns to his captains about these matters "almost weekly". Despite this, "[t]he captains knew that [they] were shorthanded. They knew the sight checks weren't getting done properly, and it just was going on repeat after repeat." [Id. at 17:18-18:7)].

Fifth, the Oklahoma State Department of Health ("OSDH") conducts regular inspections of OCDC. Over a span of many years, OSDH has substantiated a number of

deficiencies regarding supervision matters. The relevant reports (along with an appendix summarizing the reports) is attached as Exhibit 6. These violations regarding detainee/inmate supervision are all directly relevant to the deficient supervision of Daryl Clinton. [Exhibit 6 (OSDH Violations)].

Sixth, former Defendant Turn Key Health (the medical contractor at OCDC) gave deposition testimony under Fed. R. Civ. P. 30(b)(6) (through designee William Cooper, D.O.), who testified to the following:

A. Regarding security staff monitoring detainees/inmates, "medical staff can't be in every nook and cranny of the building, and the security officers spend much more time with these people, so they often know things about them that we don't…**they serve as our eyes and ears** a lot of times." [Exhibit 7 (Depo. of Turn Key Health via Fed. R. Civ. P. 30(b)(6) at 14:5 – 15:6)].

B. As a part of the "eyes and ears" process described above, **Turn Key relies on security staff to conduct proper sight checks**. [Id. at 15:7-12].

### III. Defendant's Motion is Undermined by Tenth Circuit Case Law Specifically Regarding Detainee/Inmate Supervision at OCDC.

Lastly, it is also important to review Layton v. Bd. of County Com'rs of Oklahoma County, 512 Fed. Appx. 861 (10th Cir. 2013), which concerns official capacity claims specifically regarding access to medical care and inmate monitoring issues at OCDC. In Layton, the daughters of a deceased OCDC pretrial detainee sued Defendant and other parties alleging that the decedent's constitutional rights to accessing medical care at OCDC were violated by security and medical staff. Judge Cauthron granted summary

judgment for the Sheriff and County, and on appeal, the Tenth Circuit reversed the grant of summary judgment on the access to medical care claims. In reversing, the Tenth Circuit first found that material fact disputes precluded summary judgment. In Layton, the plaintiffs alleged that there were "grave deficiencies in the medical care provided to detainees, and that the problems were systemic and long-standing" based on prior medical incidents at OCDC and the 2008 DOJ Report. The Tenth Circuit then recounted, in detail, the relevant parts of the 2008 DOJ Report regarding medical care and inmate supervision. Id. at 864-865. The Tenth Circuit reviewed numerous investigation reports and complaints from the OSDH regarding medical care at OCDC from 2007-2009 and held that these "suggest a pattern of the jail failing to provide medical care...**[and] monitoring[ing] detainees with medical problems**." Id. at 866.

Indeed, in discussing the historical deficiencies of inmate supervision at OCDC, the Layton Court found that the plaintiffs "submitted evidence that tends to demonstrate longstanding, systemic deficiencies in the medical care that the jail provided to detainees – specifically, that the detainees were not being seen for medical care in a timely manner…that follow-up care was not being provided to seriously ill detainees, and that the jail's design prevented **effective monitoring and supervision of detainees with serious medical needs**." Id. at 869-870 (emphasis added). The Court again cited to investigations, OSDH citations, the 2008 DOJ Report, and an ADAC Report[1] and ruled

---

[1] After the DOJ Report, a report of the Oklahoma County Adult Detention Advisory Committee ("ADAC"), a body created by Oklahoma County in 2008, noted what ADAC perceived to be a myriad of ongoing constitutional violations. The ADAC cited the DOJ Report.

that "a reasonable jury could find that the County's willingness—demonstrated by inaction—to permit seriously ill inmates to remain unmonitored in their cells evinces deliberate indifference for purposes of establishing municipal liability." Id. at 871. The Court made a similar finding regarding the Sheriff. Id. at 872.

The same is true here. This case concerns an ongoing failure by security and medical staff to monitor Mr. Clinton's medical problems. Defendant's historical trends in how it carries out sight checks and monitoring of the detainee/inmates population is critical and highly relevant. Without this information, Plaintiff is hamstrung in proving one of the essential elements of her Monell theory. *See* Monell v. New York Dept. of Social Servs., 436 U.S. 658, 694-95 (1978) (Discussing that the municipal liability analysis requires proof of (1) the existence of a policy or custom by which Plaintiff was denied a constitutional right and (2) the policy or custom was the moving force behind the deprivation."); *See also* Bryson v. Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).

## **CONCLUSION**

With the foregoing established, the evidence at issue clearly satisfies standards for admissibility. As provided by Fed. R. Evid. 401, evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

In many ways, this case is simply about detainee and inmate supervision. The record is clear that Defendant did not properly supervise Daryl Clinton from August 6 to August 10 of 2019, and these failures led to Mr. Clinton's death. The record is also

replete with a myriad of historical deficiencies of Defendant failing to properly supervise and evaluate the status of its own detainee and inmate population. Defendant's Motion in Limine is a thinly veiled attempt to bar the use of critical evidence necessary for an essential element of Plaintiff's case. Thus, for the reasons stated herein, Plaintiff Equlla M. Brothers, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, Deceased, respectfully requests that this Court deny Defendant Tommie Johnson III's Motion in Limine.

Respectfully Submitted,

/s/ Geoffrey A. Tabor
Woodrow K. Glass, OBA #15690
Geoffrey A. Tabor, OBA#32880
**WARD & GLASS, LLP**
1601 36th Ave NW
Norman, Oklahoma 73072
woody@wardglasslaw.com
geoffrey@wardglasslaw.com
405-360-9700
405-360-7902 (fax)

-and-

Beau Williams
Beau Williams Law Office
4901 Richmond Sq.
Oklahoma City, Oklahoma 73118
beauwilliamsatty@gmail.com
ATTORNEYS FOR PLAINTIFF

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED

## CERTIFICATE OF SERVICE

I certify that on the above file-stamped date, a true and correct copy of this document was disseminated to the following ECF registrants of record:

Aaron Etherington
Rodney J. Heggy
Carri A. Remillard
Assistant District Attorneys
320 Robert S. Kerr, Suite 505
Oklahoma City, OK 73102
Telephone: (405) 713-1600
Facsimile: (405) 235-1567
aaron.etherington@oklahomacounty.org
rod.heggy@oklahomacounty.org
carri.remillard@oklahomacounty.org
ATTORNEYS FOR DEFENDANT OKLAHOMA COUNTY SHERIFF

/s/ Geoffrey A. Tabor