1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF OKLAHOMA

3   EQULLA M. BROTHERS, as the Personal     )
    Representative and Administratix of     )
4   the Estate of Daryl Clinton, Deceased)
                                            )
5       Plaintiff,                          )
                                            )
6   -vs-                                    ) No. 5:2021-cv-418
                                            )
7   (1) TOMMIE JOHNSON III, in his          )
    official capacity as Oklahoma County    )
8   Sheriff,                                )
                                            )
9       Defendant.                          )
    _____)

10

11              **CERTIFIED COPY**

12

13   30(b)(6) DEPOSITION OF TOMMIE JOHNSON, III, OKLAHOMA COUNTY
            SHERIFF, THROUGH ERNEST EUGENE "GENE" BRADLEY

14

15          TAKEN ON BEHALF OF THE PLAINTIFF

16

                IN OKLAHOMA CITY, OKLAHOMA

17

18              ON FEBRUARY 28, 2023

19

            COMMENCING AT 9:08 A.M.

20

21

22              INSTASCRIPT, LLC
            125 PARK AVENUE, LL
23      OKLAHOMA CITY, OKLAHOMA   73102
                (405) 605-6880
24              www.instascript.net

25      REPORTED BY:  LORI JOHNSTON HARSTAD, CSR

**Page 2**

```
 1              A P P E A R A N C E S

 2  FOR THE PLAINTIFF:

 3       Geoffrey Tabor
         Meagan Crockett-Edsall
 4       Attorneys at Law
         Ward & Glass, LLP
 5       1601 36th Avenue NW
         Suite 100
 6       Norman, OK  73072
         geoffrey@wardglasslaw.com
 7       Meagan@wardglasslaw.com
              -and-
 8       Beau Ann Williams
         Attorney at Law
 9       Beau Williams Law Firm
         4901 Richmond Square
10       Suite 104
         Oklahoma City, OK  73118
11       Beauwilliamsatty@gmail.com

12  FOR THE DEFENDANTS TOMMIE JOHNSON, III, in his official
    capacity as Oklahoma County Sheriff:
13
         Rodney J. Heggy
14       Assistant District Attorney
         Office of the District Attorney-Oklahoma County
15       320 Robert S. Kerr
         Suite 505
16       Oklahoma City, OK 73102
         Rod.heggy@oklahomacounty.org
17

18

19

20

21

22

23

24

25
```

**Page 3**

```
 1              I N D E X

 2              WITNESS
                                          PAGE:
 3  For Defendant:

 4  Ernest Eugene "Gene" Bradley 30(b)(6):
       Direct Examination by MR. TABOR        8:5
 5
                EXHIBITS
 6
    NO.:   DESCRIPTION:              PAGE:
 7
    For Deposition:

 8
     1    Plaintiff's Amended Notice for the
 9        Deposition to Tommie Johnson III via
          FRCP 30(b)(6), 7 pages:
10        For Identification             13:19

11  2A    9/6/2017 Quality Assurance Review Team
          Policy Statement 3750.04 with cover
12        letter dated 9/20/2018 from Gene
          Bradley, 6 pages:
13        For Identification             15:3

14  2B    6/13/2019 Inmate Classification
          Program 4105.04 Policy Statement, 6
15        pages:
          For Identification             17:15
16
    2C    5/16/2019 Inmate Housing Plan 4115.01
17        Policy Statement, 6 pages:
          For Identification             20:11
18
    2D    10/25/2016 Sight Checks Policy
19        4310.00, 7 pages:
          For Identification             24:15
20
     3    7/1/2018-6/30/2019 Agreement for
21        Comprehensive Services Between OK
          County Sheriff and Turnkey Health, 26
22        pages:
          For Identification             31:5
23
     4    First Amendment to Agreement for
24        Comprehensive Services between OK
          County Sheriff and Turnkey Health, 3:
25        For Identification             32:14
```

**Page 4**

```
 5
 1     5    7/31/2008 US DOJ CRIPA investigation
 2          notification to County of Oklahoma, 24
            pages:
 3          For Identification             40:8

 4   6      Jail Incident Report Form dated
 5          8/10/2019, 5 pages:
            For Identification             95:4
 6
 7   7      2/18/2020 Detention Facility
            Inspection Report, 15 pages:
            For Identification             43:3
 8
 9   8      11/30/2017 letter re: 11/7/2014
            Inspection Date Notice of Violation, 2
10          pages:
            For Identification             47:10
11
12   9      Duplicate exhibit:
            For Identification             50:10
13
14  11      9/17/2018 Department of Health
            Oklahoma County Jail Inspection
15          Report, 4 pages:
            For Identification             50:19
16
17  12      10/22/2008 Department of Health letter
            to Oklahoma County Sheriff re:
18          10/15/2008 inspection, 175 pages:
            For Identification             52:5
19
20  13      6/27/2016 Minutes of Command Staff
            Concerns, BROTHERS 839 to '840:
21          For Identification             58:12
22
23  14      9/20/2018 letter attaching Policy
            4450.05, Serious Incident Review
24          enacted 9/13/2017, 8 pages:
            For Identification             61:10
25
    15      1/3/2018 letter from Lt. Cunningham
            re: requested list of Oklahoma County
            Jail IA cases, BROTHERS 972 to '973:
            For Identification             64:3
```

**Page 5**

```
 1
 2  16      1/10/2018 Oklahoma County Sheriff's
            Office Serious Incident Review 3rd
 3          Quarter Meeting, BROTHERS 974 to '975:
            For Identification             67:5
 4
 5  17      5/10/2018 1st Quarter Meeting of
            Oklahoma County Sheriff's Serious
 6          Incident Review, BROTHERS 978 to '979:
            For Identification             68:5
 7
 8  18      10/18/2018 2nd and 3rd Quarter Meeting
            of Serious Incident Review, BROTHERS
 9          990 to '992:
            For Identification             69:16
10
11  19      5/24/2017 1st Quarter Review Serious
            Incident Review, BROTHERS 980 to '981:
12          For Identification             70:11
13
14  20      8/17/2016 2nd Quarterly Meeting
            Serious Incident Review, BROTHERS 986
15          to '987:
            For Identification             71:2
16
17  21      4/20/2012 1st Quarterly Meeting,
            Oklahoma County Sheriff's Serious
18          Incident Review, BROTHERS 976 to '977:
            For Identification             72:18
19
20  22      Serious Incident Review Quarterly
            Meeting Minutes dated 8/17/2011,
21          BROTHERS 984 to '985:
            For Identification             73:19
22
23  23      Serious Incident Review 3rd Quarter
            Meeting Minutes dated 10/12/2011,
24          BROTHERS 988 to '989:
            For Identification             76:3
25
    24      8/15/2019 report of 6/5/2019
            Department of Health inspection report
            for Oklahoma County Detention
            Facility, BROTHERS 908 to '913:
            For Identification             46:1
```

Page 6

25   NIC Operational Assessment of Oklahoma
     County Detention Center dated May
     2021, BROTHERS 1200 to '1269;
     For Identification            76:24

26   Special Investigations Division
     Administrative Investigation into
     death of Jordan England 6/28/2013,
     BROTHERS 957 to '971;
     For Identification            81:1

27   Special Investigations Unit
     Investigation into death of Daryl
     Clinton by Jennifer Peek, 23 pages;
     For Identification            97:23

Page 7

## STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of the Oklahoma County Sheriff's Office through Ernest Eugene Bradley may be taken on behalf of the Plaintiff on February 28, 2023, in Oklahoma City, Oklahoma, by Lori Johnston Harstad, Certified Shorthand Reporter within and for the State of Oklahoma, pursuant to notice and agreement.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question or the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

\* \* \* \* \* \* \* \* \* \*

Page 8

1    ERNEST EUGENE "GENE" BRADLEY,

2   Of lawful age, having been first duly sworn, deposes and

3   says in reply to the questions propounded as follows:

4       DIRECT EXAMINATION

5   BY MR. TABOR:

6       Q   Sir, would you state your full name for the

7   record, please.

8       A   Yes.  It's Ernest Eugene Bradley.

9       Q   And are you suffering from any medical

10  condition or have you taken any medication that would

11  prevent you from giving clear, honest testimony today?

12      A   No.

13      Q   Have you given deposition before?

14      A   Yes.  One.

15      Q   Okay.  And just very generally, what were the

16  circumstances of that deposition?

17      A   It was so long ago, I believe -- I believe it

18  was an inmate death.  I don't remember who the inmate was.

19  It was pretty early on in my career.  And then I ended up

20  having to testify in that same case based on policies.

21      Q   And I would take it, given your line of work,

22  you have probably given a lot of courtroom testimony.  Is

23  that right?

24      A   Unfortunately or fortunately, no.  I have not.

25  Yeah.

Page 9

1       Q   That might be fortunately.

2       A   I think so.

3       Q   I think I agree with you on the "fortunately"

4   part.

5       A   I think so.

6       Q   Well, I know you're well prepared.  You've got

7   good counsel, but I will just give you a quick refresh of

8   the rules.  I will try to be as brief as possible, and I

9   will let you finish your answers.  You let me finish my

10  questions.  You know, when we have a friendly conversation,

11  we interrupt each other in a real casual way.  A

12  deposition, we've got to be very mechanical so we have a

13  clean transcript with our court reporter, so there's no

14  breaks in the record.

15      Remember, if you can, give clear "yes" or "no,"

16  or if it's a narrative answer, answer that way rather than

17  an "uh-huh" or a nod of the head or something, because

18  that's a little harder for our court reporter to transcribe

19  that.  We just want the record to be clear.  And if you do

20  do that, I will kind of remind you.  I am not picking on

21  you.  I'm just making sure we've got a clear record.  So I

22  may say, "Is that a 'yes' or is that a 'no.'"  It happens

23  all the time.  I would -- I would be the worst offender of

24  that if I got deposed.  So...

25      What is your current job title?

Page 10

1      A   I am Lieutenant with the Oklahoma County
2   Sheriff's Office.  I am the mental health coordinator for
3   the County Sheriff's Office.
4      Q   Okay.  And if you could -- I know I am going to
5   give you a history quiz here.  If you can kind of walk
6   through your employment with me, kind of generally, let's
7   say, with the County, with Oklahoma County.  Kind of tell
8   me your trajectory you've had.
9      A   I started with the County Sheriff's Office in
10  2002.  Worked the floors, was what was called a floor
11  rover.  2003, I made corporal and was moved into the
12  accreditation department.  That was preparing the jail for
13  ACA accreditation and then, eventually, NCCHC
14  accreditation.
15         Did that.  Oh, I made sergeant in 2005, same
16  department.  And then made lieutenant in 2006 and was --
17  same department but, in addition, was considered the
18  administrative lieutenant.  2008, made captain.  Went to
19  the National Jail Leadership Academy at Sam Houston, the
20  Jail Administrators Academy through the National Institute
21  of Corrections, in preparation to kind of move into more of
22  an administrative role as being a captain.
23         Was a captain from 2008 until 2020.  The only
24  change, really, was from 2018, under Sheriff P.D. Taylor,
25  July 1st of 2018, to July 1st of 2020, I was considered the

Page 11

1   Assistant Jail Administrator.
2      Q   And could you tell me that last time frame when
3   you were considered the Assistant Jail Administrator?
4      A   July 1st, 2018 to July 1st, 2020, when we gave
5   up the jail to the Trust.
6      Q   As I understand, like you said, July 1 of 2020
7   is when the operation of the jail was handed over to the
8   Trust.  Was the decision made to do that handover in 2019?
9      A   The works were probably early on in 2019.  Over
10  -- over my tenure there, there was always kind of
11  conversations about doing either a financial trust or
12  something trying to appease some of the Department of
13  Justice concerns and that kind of stuff.  So I think the
14  beginning of 2019, it really started pushing that way.
15     Q   Tell me kind of, at least in your role here
16  today, your understandings why those conversations started
17  happening about a potential transfer.
18     A   So DOJ had been involved with us since 2003.
19  There were numerous standards that they wanted us to
20  improve on.  We were making vast improvement, but I think
21  -- I think the county commissioners -- and this is my
22  opinion.  I think the county commissioners viewed a change
23  to be something positive, a positive message to the
24  Department of Justice, even though, from our last audit in
25  2019 with the Department of Justice, we were found in

Page 12

1   complete substantial compliance with all of the standards.
2         But I think the cart had already been put
3   before the horse at that point, and they just were invested
4   in that change of the administration and control over the
5   jail.
6      Q   I am going to -- and I apologize.  I am going
7   to be getting up and kind of walking around here today with
8   our exhibits we have.  I am going to be putting some of the
9   exhibits for you, sir, here on our TV.  If you need me to
10  scroll, move anything around, blow it up, let me know.  But
11  I am -- got here marked as Exhibit 1 to your deposition the
12  notice for today's deposition under Federal Rule 30(b)(6).
13  Do you see that?
14     A   Yes.
15         MR. HEGGY:  No.  That's not the right one,
16  Counsel.
17         MR. TABOR:  Oh, you're right, Rod.  That's the
18  original one.  Huh?
19         MR. HEGGY:  Well, that's the one to somebody
20  else.  To Turnkey.
21         MR. TABOR:  Oh, gosh.  I pulled the wrong one.
22         MR. HEGGY:  Yeah.  So pull up the one to the
23  sheriff.  Or I can go get it if you...
24         MR. TABOR:  No.  I will pull it.  Sorry about
25  that.

Page 13

1         MR. HEGGY:  No worries.
2         MR. TABOR:  We can go off the record real
3   quick.
4         (Short Recess from 9:16 a.m. to 9:20 a.m.)
5      Q   (By Mr. Tabor) So while that's coming up on the
6   screen, sir.
7      A   Uh-huh.
8      Q   Are you -- is it your understanding you've been
9   designated under Federal Rule 30(b)(6) to give testimony on
10  behalf of the sheriff in his official capacity here today?
11     A   Yes.
12     Q   And have you reviewed the contents of the
13  amended notice filed in this case for your testimony here
14  today?
15     A   Yes.
16     Q   And are you prepared to give testimony on
17  behalf of the sheriff here today?
18     A   Yes.
19     Q   Okay.  Now I correctly have the notice for
20  today's deposition, the amended notice.  Now, as you know,
21  sir, at no point today am I going to be asking you to tell
22  me conversations you have had with the sheriff's counsel,
23  Mr. Heggy, anyone.
24         So with that in mind, I would ask you, tell me
25  everything you did to prepare for today's deposition.

Page 14

1     A   Of course, read this document.  There's a list

2  of policies that were identified in this.  I re-read those

3  policies to refresh my memory on the policies.  It's been

4  three years, and I've got another set of policies, so just

5  to refresh my memory on that.  I have read the

6  investigative report completed by Deputy Peek, and then the

7  update on the Serious Incident Review.

8     Q   And after reviewing all that information, you

9  feel that you are competent to give testimony on behalf of

10  the sheriff?

11     A   Yes.

12     Q   For the topics in the notice.  Correct?

13     A   Yes.

14     Q   Okay.  Now, you were mentioning some policies

15  reviewed.  As I understand, some of those have likely

16  changed since the time for the policies that were

17  applicable to our case here and after that.  Correct?

18     A   Correct.

19     Q   Okay.  Now, you mentioned you reviewed Peek's

20  investigative report and then the update to the Serious

21  Incident Review.  Is that -- is that accurate?

22     A   Yeah.  It's the Serious Incident Review that

23  was done, and I think it had -- it was the update because

24  it had the ME's findings on it.

25     Q   The ME findings as to Mr. Clinton's cause of

Page 15

1  death?

2     A   Yes.

3     Q   Okay.  I am introducing Exhibit 2A to your

4  deposition.  This is going to be the quality assurance

5  policy that was produced in this case.

6         Could you tell me very generally the purpose of

7  the quality assurance practices and policies of the

8  Sheriff's Department?

9     A   Yeah.  So quality assurance is, obviously, a

10  best practice that you do in lots of different things, but

11  certainly corrections.  So we had created a Quality

12  Assurance Review Team that was responsible in obtaining

13  documentation that would substantiate standards for ACA

14  accreditation, standards for NCCHC accreditation, and

15  standards for PREA accreditation.  And then they also

16  monitored any of the standards that DOJ had identified that

17  were deficiency, or even in compliance, just to maintain

18  that compliance.

19     Q   Now, was there ever any type of quality

20  assurance review undertaken regarding the death or care

21  given to Mr. Clinton in August of 2019?

22     A   There would have been a Serious Incident Review

23  for the death and there would have been a Mortality and

24  Morbidity Review, not necessarily a quality assurance

25  review.

Page 16

1     Q   So kind of tell me the differences, if any,

2  between those three and when you might have one or two of

3  those but not a third.

4     A   Sure.

5     Q   And kind of what happens there.

6     A   Well, quality assurance --

7         MR. HEGGY:  Object to the form.  It was a

8  compound question.

9         But go ahead.  Do your best.

10         THE WITNESS:  Quality assurance certainly would

11  be making sure that documentation throughout the facility

12  are substantiating standards for officers are doing what

13  they're trained to do, that time frames are met,

14  inspections are done, those kind of things.  So it's more

15  of a process of paperwork versus anything.

16         A Morbidity and Mortality Review, obviously, is

17  going to be specific to a death.  And that was completed by

18  Turnkey and always would reflect if there was any policy

19  failures, if there was things that needed to be changed by

20  them.  And then Serious Incident Review was by the

21  investigators, basically, to do the same thing:  To look at

22  what had happened, all the facts in the case, and was there

23  anything that needed to be changed/developed.

24     Q   (By Mr. Tabor) And so the Serious Incident

25  Review here came through the Peek investigation?

Page 17

1     A   Correct.

2     Q   And if there was a Morbidity and Mortality

3  Review, that was processed through Turnkey?

4     A   Correct.

5     Q   Now, in your understanding of Morbidity and

6  Mortality Review when Turnkey, or whatever medical entity

7  is contracted at the time, does that review, does that

8  review review any conduct of jail staff or is morbidity and

9  mortality always limited to the medical contractor's side

10  of things?

11     A   I don't recall it ever reflecting conduct on

12  security staff.  That would have been more Serious Incident

13  Review.

14     Q   Okay.  Now, are you familiar with -- well, let

15  me get it pulled up here first.  I am marking Exhibit 2B to

16  your deposition.  This is going to be the inmate

17  classification policy.

18     A   Uh-huh.

19     Q   Tell me the general parameters of this policy.

20     A   Sure.  So this is a policy that outlines the

21  classification process of all residents of the Oklahoma

22  County Detention Center.  It is a classification program

23  called the "Objective Jail Classification Program," created

24  by -- I believe the company is Northpointe.  And it's

25  sanctioned by the National Institute of Corrections.

Page 18

1  It is an objective jail classification system
2  to take out staff's perceptions, per se, and do a point
3  system for everybody that comes into the jail. So every
4  inmate that is booked into the jail, upon intake, is gone
5  through a classification based on their charges, their
6  history, history of being in the jail previously, any
7  disciplinary records previously, needs assessments, and
8  just current -- current charges.
9  And that comes up with a point scale that
10  allows the classification officer to place them either in
11  minimum, medium, or maximum security based on those points.
12  Q  Is part of this inmate classification policy
13  taking into account the health of the inmate when being
14  classified?
15  A  Yes, it is.
16  Q  And why is that?
17  A  Because of the -- the special needs that an
18  individual might have based on their health. If they are
19  in a wheelchair, if they have to have a cane to walk, of
20  course, they can't be placed in general population because
21  of those. So that would be a factor that would weigh into
22  their housing assignment.
23  Q  And when doing inmate classification, why does
24  the County review those types of health situations or
25  conditions of an inmate?

Page 19

1  A  Well, it's obviously to get needs met by the
2  individual to -- whole system is set up to protect the
3  inmate, to protect other inmates, and to protect facility
4  security. So if they're an escape risk, for instance,
5  that's going to weigh a factor of where we place them based
6  on those needs.
7  Q  And in carrying out the inmate classification
8  policies and practices, is detention staff involved in
9  that?
10  A  It's only detention staff.
11  Q  Only detention staff.
12  So the County expects detention staff, and
13  detention staff alone, to comply with this policy, 4105.04?
14  A  Correct.
15  Q  Okay. You mentioned, as an example earlier, a
16  detainee or an inmate being in a wheelchair being a factor
17  that the County would take into account in inmate
18  classification. Correct?
19  A  Correct.
20  Q  Would paralysis of limbs be a factor that would
21  be taken into account?
22  A  Yes.
23  Q  Would inability to walk be a factor that would
24  be taken into account?
25  A  Yes.

Page 20

1  Q  Would inability to eat or drink be a factor?
2  A  Yes.
3  Q  Would a detainee's inability to urinate or
4  defecate be a factor?
5  A  Yes.
6  Q  And would you agree that, under the
7  classification policies we have been reviewing, this policy
8  allows the jail staff to classify or reclassify a detainee
9  as a high-risk detainee for a health emergency?
10  A  Yes.
11  Q  I am next going to introduce Exhibit 2C to your
12  deposition. This is going to be the inmate housing plan
13  policy. Sir, tell me about the general nature and aims of
14  this policy.
15  A  So this is -- this kind of goes with the
16  classification policy. So once they're classified, then
17  the inmate housing plan actually takes effect. It outlines
18  all the different types of individuals that we will have in
19  the detention center and how they need to be housed, males
20  separate from females, juveniles separate from adults,
21  medical, your minimum, your mediums, and your maximums,
22  protective custody, and medical.
23  Q  And the third paragraph on page 1 of this
24  policy notes, in part, that the procedures for housing
25  inmates, among other things, is intended for the safety of

Page 21

1  inmates and the detention center staff. Is that correct?
2  A  That is correct.
3  Q  Now, similar to my questions before, on this
4  policy, 4115.01, is this intended to be used and carried
5  out by solely the detention staff?
6  A  Yes. The only caveat to that is 13 Baker. To
7  place an individual into 13 Baker, medical needs to be
8  approving that as well. So they play a role in that
9  because that's the infirmary. To take somebody out of 13
10  Baker, same thing applies. Medical needs to be involved in
11  that. So it's a joint decision for 13 Baker.
12  Q  So that would be -- and so -- and I know what
13  you're saying. Let's just have a clear record.
14  Tell me what 13 Baker is.
15  A  13 Baker is the infirmary, the medical
16  infirmary. The entire 13th floor is medical, but 13 Baker
17  would be considered the infirmary.
18  Q  Okay.
19  A  So lots of times, they want to -- just like an
20  ICU at a hospital, they want to manage or be a part of
21  managing that bed space.
22  Q  So in implementing -- we're talking about the
23  inmate housing plan policy. There is some involvement, as
24  you're saying, by the medical staff for inmate transfers
25  into 13 Baker and out of 13 Baker?

Page 22

1    A   Correct.

2    Q   That would be a situation where medical staff

3 is involved in implementing inmate housing plan policy?

4    A   Correct.

5    Q   But in all other instances, the County expects

6 detention staff, solely, to carry out the inmate housing

7 plan policy.  Correct?

8    A   That's correct.

9    Q   I am looking here on page 4 of Exhibit 2C on

10 the inmate housing plan policy.  We have got this

11 bullet-pointed list at the end entitled, "Exceptions to

12 Random Housing."

13        Do you see that, sir?

14    A   I do.

15    Q   Tell me -- well, I will start here.  So the

16 introductory bullet point says:

17        The following categories of inmates are exempt

18        from random housing procedures due to potential

19        for behavioral problems.

20        Tell me, what are "random housing procedures"?

21    A   So the random housing is going to be the

22 implementation of just the point system and the inmate

23 classification system.  Those that would exclude or could

24 be overridden are the ones that are listed on the bullet

25 point of being sentenced to death, special care, if they

Page 23

1 have to go into protective custody, administrative

2 segregation.

3        So that's a -- that's a decision from

4 administration because of behavioral problems or an at-risk

5 inmate.  And that could be either at risk for sexual

6 standards that violates the PREA standards or at risk of

7 being a victim of sexual assault.  And those would all be

8 overrides from the traditional housing matrix.

9    Q   And these are overrides that jail staff,

10 themselves, can carry out.  Correct?

11    A   Correct.

12    Q   On that list, what is "special care" intended

13 to cover?  Could you give more specificity to that?

14    A   "Special care" could be high risk, high

15 profile.  For instance, if you remember with the bombing

16 here in Oklahoma City and we had that individual, he was

17 special care.  So he was overridden and had a specific

18 place for him to be on 13.  It could be even medical staff

19 in regards to severe psychiatric things, severe medical

20 issues, those kind of things.  And then that referral or

21 that override would go to medical to see if they concur

22 with that.

23    Q   And I am now on Exhibit 2C, our inmate housing

24 plan still, page 2 at the top.  It notes that: "Housing

25 assignments are based on classification criteria that will

Page 24

1 include, but will not be limited to," and one of the items

2 listed here would be medical and/or mental health needs.

3        Do you see that?

4    A   I do.

5    Q   And so tell me why that is a topic that jail

6 staff are expected to evaluate?

7    A   Again, the -- the goal of inmate classification

8 is to place the individual in the safest environment

9 possible.  So based on all the information they have, which

10 could include medical issues, amputees, wheelchairs, all of

11 those that we had talked about before, or severe mental

12 health needs, that's going to play a role that they can't

13 be placed in general population.  They're going to have to

14 be placed in special -- special area.

15    Q   Okay.  I am next going to introduce Exhibit 2D

16 to your deposition.  This is the sight check policy that

17 was produced in this case.

18        Similar to before, could you walk me through

19 the sight check policy in terms of its purpose?

20    A   Sure.  The sight check is basically a procedure

21 to the detention staff on how to conduct an appropriate

22 sight check of visual observation of the inmates and their

23 housing area and how frequently -- based on their

24 classification, how frequently that sight check needs to be

25 completed.

Page 25

1    Q   And the purpose and scope of the sight check

2 policy, among other things, states that "Sight checks are

3 established to ensure the safety and security of our inmate

4 population."

5        Do you see that?

6    A   Yes.

7    Q   Now, given that evaluating safety and security

8 is one of the purposes and scopes of the sight check

9 policy, would you agree that, when someone's carrying out

10 sight checks, that jail staff must pay attention to what

11 they're observing regarding the inmate population?

12    A   Yes.

13    Q   Now, as part of a reasonable sight check that

14 would comply with the sight check policy, would you expect

15 a reasonable detention officer to pay attention to the

16 appearance and behavior of an inmate?

17    A   The policy outlines that -- and it's based off

18 of the jail standards, is what they are looking for is

19 flesh and movement.  So as long as they're looking in that

20 cell and they see the individual, they recognize that is

21 the individual that belongs to that cell, and there's

22 movement, that's a completed sight check.

23    Q   So they do need to, I guess, first see the

24 inmate.  Correct?

25    A   Right.

Page 26

1     Q     And physically evaluate -- could you be a
2 little more specific? I am not trying to be thick. When
3 you say "flesh," what do you mean there?
4     A     Lots of times inmates will cover themselves
5 completely with a blanket, those kind of things. You can't
6 trust, because you see a large mound laying on a bed, that
7 that is an inmate and that they're moving and they're okay.
8 So you have to see flesh, either face, arms. Lots of
9 times, inmates will reach out and wave to you just because
10 they're sleeping and they're like, "yeah, you did your
11 sight check, move on" kind of thing.
12           And so that's flesh and movement, obviously, is
13 knowing that they are alive.
14     Q     Okay. Is a part of the sight check policy, in
15 terms of looking for, one, flesh and, two, movement aimed
16 at constantly reevaluating the health and safety of the
17 inmate each time a sight check is performed?
18     A     Health, safety, and security.
19     Q     Okay. Now I am going to go to page 3 of the
20 sight check policy. We're going to go to Roman numeral 4
21 about at-risk inmates.
22           Tell me who qualifies as an at-risk inmate
23 under this section of the policy at IV.
24     A     If I remember right, that actually refers to
25 another policy called "At-risk Inmates." And so that is

Page 27

1 your high-profile individuals, high-security risks.
2 Usually, it's more they're not safe again from other
3 inmates, they're not safe even possibly from staff. So
4 that would be like the bombing. That was a perfect at-risk
5 inmate. And that's why the shift commander's got to be
6 involved in sight checks and anytime that door is open,
7 those kind of things.
8     Q     In terms of the at-risk classification, does an
9 inmate's health care condition make them at risk?
10     A     I don't think in regards to this policy that's
11 what we were looking at.
12     Q     It's more of the things you were talking about?
13     A     Uh-huh.
14     Q     In terms of other people harming inmates or
15 something like that?
16     A     Yes. Yes.
17     Q     So kind of tell me, in terms of conducting
18 sight checks, in terms of roving through the jail, does a
19 particular detention officer have to do a certain number of
20 sight checks in a row? Can it be anybody to go out each
21 15, 30, 60 minutes, whatever the applicable time frame is?
22 Is there any continuity expected or does just someone have
23 to do the sight check? Tell me about that.
24     A     Well, it's really somebody -- anybody can do a
25 sight check. You are -- the way the staffing is, is you've

Page 28

1 got what's called a floor rover. And that floor rover, one
2 of their main jobs is sight checks. But in lots of cases,
3 because things are happening -- attorney visitations,
4 chaplain visitations, pulling for court, all sorts of
5 different things -- of course, they've got other tasks. So
6 if DST, which is the change-out team for laundry, if
7 they're in the pod, they can do a sight check. If
8 commissary is in there, they can do a sight check.
9           So they all kind of help each other stay
10 within, depending on what the housing is, within the hour,
11 the 30 minutes, or the 15 minutes.
12     Q     In carrying out a satisfactory execution of the
13 sight check policy, does the County expect the last person
14 to have done a sight check to communicate to the next
15 person doing a sight check if a particular inmate is
16 having, perhaps, some serious medical issues? Is there any
17 type of information relay there?
18     A     Usually, at the end of the shifts, there's kind
19 of a briefing from one rover to the oncoming rover of
20 concerns, red flags, that kind of stuff. There's nothing
21 official, but they usually do a lot of pass-on to each
22 other. Usually, if there's a concern, that rover that's
23 identifying the concern deals with that concern right then
24 and there.
25           Sorry. I am cramping. (Indicating.)

Page 29

1     Q     Well, and I forgot to give you the other
2 standard rule at the start. If you need a break, you tell
3 me. You're not hostage here all day. So I may call a
4 break, but just let me know.
5     A     Okay. Thank you.
6     Q     As long as you fully answer any question
7 pending.
8     A     Okay. Very good.
9     Q     And so there -- when there is a change in the
10 shift of the floor rover, there is some expectation of an
11 information relay if there's a serious issue?
12     A     Yeah. And there's what's called a rover's log.
13 And, usually, they will document things in that rover's log
14 too, in case they can't, you know, verbally get to that
15 oncoming shift. And so that's usually what you do at the
16 beginning of your shift is refer to that rover's log to see
17 what's happened on the shift prior.
18     Q     And in complying with the sight check policy in
19 filling out a responsible rover's log, is it the County's
20 expectation that potentially serious medical episodes would
21 be a topic of discussion or logging in that log? Would
22 that be important enough to include in that process?
23     A     It could be. I would be -- I would think more
24 that, if it's a serious medical issue, that's going to be
25 notified to medical.

Page 30

1    Q    But would it also be a part of that --

2    A    It could be.

3    Q    -- rollover process --

4    A    It could be.

5    Q    -- between the floor rovers?

6         For what length of time did the sheriff's

7   office operate the jail?  I know the handover was July 1 of

8   2020.

9    A    Right.

10   Q    How long did they handle it before that?

11   A    Oh, goodness.  Forever.

12   Q    Since it was built?

13   A    Yeah.  I believe so.

14   Q    It was built in '91.  Is that right?

15   A    Yeah.  There.  But they were -- they had it --

16   Q    Before?

17   A    -- of course at the courthouse even.  Yeah.

18   Q    Yeah.

19        Now, as of August 2019, the events that give

20  rise to our case here today, Turnkey Medical was the

21  medical provider at the jail.  Correct?

22   A    Correct.

23   Q    Okay.  Now, I don't -- we don't need to go way

24  back in history, so I don't mean -- intend to do that.

25        But do you recall when Turnkey began their

Page 31

1   medical operations at the jail?

2    A    They followed Armor Correctional, out of

3   Florida.  I don't remember the date.

4    Q    Okay.  And that's okay.  I probably should have

5   introduced this first.  Exhibit 3 to your deposition is

6   going to be the contract with Turnkey.  And this particular

7   contract produced in this case is July 1 of 2018 to June

8   30th of 2019.

9         Do you see that?

10   A    I do.

11   Q    I understand -- would that have been, to the

12  County's recollection, when Turnkey first started?  July of

13  2018?  Or perhaps was there another term before that?

14   A    I think there was a term before that.

15   Q    Okay.  Now, you mentioned Armor.

16   A    Yes.

17   Q    They previously handled medical services at the

18  jail.  Is that true?

19   A    That is.

20   Q    Do you know the general time frame of when they

21  were in that role?

22   A    No.  I know they were before Turnkey and after

23  Correctional Health Care, and that was early to mid 2000s.

24   Q    Yeah.  And the next one I saw was, yeah,

25  Correctional Health Care Management?

Page 32

1    A    Uh-huh.

2    Q    Something like that?

3    A    Uh-huh.

4    Q    And they predated Armor?

5    A    Correct.

6    Q    Okay.  And so why did the County move from

7   Armor to Turnkey?

8    A    That, I don't know.

9    Q    Okay.  Do you know why the County moved from

10  Correctional to Armor?

11   A    No.

12   Q    And so we've got Exhibit 3.  We've got the

13  Turnkey contract.  We discussed that time frame.

14        Exhibit 4 to your deposition appears to be an

15  amendment to that agreement, among other things, extending

16  the date through June 30th, 2020.  Correct?

17   A    Yes.

18   Q    So Turnkey served in their medical role up

19  until the end of the handover to the Trust.  Correct?

20   A    Correct.

21   Q    Okay.  So I am going to go back on the screen

22  to Exhibit 3, to the base contract.  And I am going to go

23  to page 2.  I am looking at Roman numeral 1, and under that

24  1.1 "Scope of Contract."

25        Do you see that?

Page 33

1    A    Yes, I do.

2    Q    And it notes that contractor, who is Turnkey:

3         shall be the sole supplier and or coordinator of

4         the health care delivery system at the facility.

5         Contractor's responsibility for the medical care

6         of an inmate commences with the commitment of the

7         inmate to the custody of the facility and ends

8         with the release of the inmate.

9         Do you see that?

10   A    Yes.

11   Q    So in other words, under this provision and

12  other parts of the contract, is it the County's

13  understanding that the medical duties in operating the jail

14  were solely on Turnkey and no one else.  Is that accurate?

15   A    Yes.

16   Q    Okay.  And under the contract, detention staff

17  at the Oklahoma County Jail were not expected to render

18  medical care or make medical-related decisions.  Correct?

19   A    Correct.

20   Q    And that duty that is on Turnkey, that we're

21  discussing here right now, would that include identifying

22  and properly supervising detainees with serious medical

23  needs?

24   A    Sure.

25   Q    Okay.  And that's their sole medical duty under

Page 34

1 the contract. Correct?

2    A    Correct.

3    Q    And that's the County's understanding of that's

4 Turnkey's sole duty and not the County's. Correct?

5    A    Correct.

6    Q    And that sole duty that we have placed on

7 Turnkey, it would also include recognizing and responding

8 to medical health emergencies. Is that true?

9    A    That's correct.

10    Q    And that sole duty that's on Turnkey and not on

11 detention staff would also include making sure detainees

12 with emergency medical needs receive timely and appropriate

13 care?

14    A    Correct.

15    Q    And that duty you have described, that sole

16 duty from the contract on Turnkey, would also include

17 making decisions regarding referrals or transports for

18 outside care. Correct?

19    A    Correct.

20    Q    And now I am on Exhibit 3, page 4, paragraph

21 1.6. And that pertains to off-site care and

22 hospitalization. Correct?

23    A    Correct.

24    Q    And it notes that:

25        Contractor will arrange for off-site care and

Page 35

1        hospitalization for inmates who, in the opinion of

2        treating provider and of the medical director,

3        require hospitalization or care beyond the

4        capabilities of the facility.

5        Do you see that?

6    A    Yes.

7    Q    Okay. And it's the County's understanding on

8 what we have already talked about -- I think you already

9 answered this. So my apologies if I am being redundant

10 here.

11        In 1.6 here, on off-site care, that duty rested

12 solely on Turnkey. Correct?

13    A    Correct.

14    Q    Pursuant to the written contract signed by the

15 County?

16    A    Correct.

17    Q    And again, just to be sure, that duty, that

18 sole duty under the contract that is off of the County and

19 onto Turnkey, would also include making a determination if

20 the care level at the jail -- or sorry. -- the care level

21 needed for the inmate exceeded what could be offered to him

22 or her at the jail?

23    A    Correct.

24        MR. TABOR: Okay. Let's go off the record real

25 quick.

Page 36

1    (Short Recess from 9:57 a.m. to 10:11 a.m.)

2    Q    (By Mr. Tabor) Now, in August of 2019 --

3 actually, scratch that. I got ahead of myself. I want to

4 go back to the Turnkey contract at Exhibit 3, that we've

5 been looking at. I would like to go to page 20 of that.

6        And do you see that it appears that contract

7 was executed by Turnkey. Correct?

8    A    Correct.

9    Q    And by Sheriff Taylor. Correct?

10    A    Correct.

11    Q    And by the County. Correct?

12    A    Correct.

13    Q    And so would it be accurate to say that the

14 County and the Sheriff's Office would expect its personnel

15 to follow the written contents of this contract?

16    A    Correct.

17    Q    Now, in August of 2019 regarding physician care

18 at the jail, was it the practice at the jail to have a

19 physician always evaluate a detainee when that detainee

20 presented to the jail or returned from a hospital visit, or

21 did this depend on the circumstances?

22    A    I think it depended on the circumstances.

23    Q    And what circumstances were those?

24    A    In cases where they were sent from the facility

25 to, usually Saint Anthony's, upon return, then usually the

Page 37

1 physician would do a follow-up. On new intakes, unless

2 there was something identified by his or her medical staff

3 that was severe, he may not see them until whatever the

4 time frame was that was outlined in their policy.

5    Q    As of August 2019, tell me what training, if

6 any, the jail staff, the detention staff, had regarding

7 detainee and inmate medical care, generally.

8    A    So they have a training block on CPR and First

9 Aid, and then that gets -- depending on who the

10 organization is, that gets updated every two years or every

11 year. And there's a command class that I actually used to

12 teach. I don't recall if it was being taught that late

13 into 2019 or not, but it -- it talked about just command

14 and control. And in that -- in that class, we talked about

15 medical being the sole decisive factors in medical care,

16 that kind of thing. As an officer, you make a

17 recommendation to medical, but medical has that final say

18 of patient care.

19    Q    And similarly speaking, tell me what training,

20 if any, the jail detention staff had regarding recognizing

21 emergency medical situations for detainees.

22    A    I want to say pretty much anything in regards

23 to that topic was around suicidality, mental health kind of

24 stuff. I don't recall -- I mean, again, our contract was

25 with a medical provider. So I don't -- I don't think they

Page 38

1  got any training specific to medical signs or anything like

2  that. If they had a concern, they went to medical.

3     Q   As of August '19, tell me what training, if

4  any, the jail detention staff had regarding what to do if

5  medical staff were potentially not properly admitting or

6  paying attention to a detainee or inmate.

7     A   They were instructed -- I don't know that there

8  was a training curriculum, but they were always instructed

9  to notify medical, and if they felt there wasn't medical

10  care being provided, then to involve their shift commander.

11  And that shift commander would then work with the charge

12  nurse on what needs to happen.

13     Q   So there was some expectation or follow-up

14  expected of the detention staff to potentially do something

15  if it was deemed the medical staff was not doing their job.

16  Correct?

17     A   Correct.

18     Q   Okay. Tell me what training, if any, as of

19  August 2019, the jail detention staff had regarding

20  conducting proper sight checks.

21     A   That is a basic class that they have in the

22  academy, as well as in-service based off of the jail

23  standards.

24     Q   And tell me what you mean in this context by

25  "in-service."

Page 39

1     A   They go through an annual in-service after

2  their initial academy. And the State Health Department

3  Jail Inspection has outlined, as well as ACA, has outlined

4  specific topics that they have to be trained on initially,

5  as well as annually. And so they would have been referred

6  to the policy, how to conduct a sight check, flesh and

7  movement, you know, all the things that the state jail

8  standards says.

9     MS. WILLIAMS: Excuse me. What were the words?

10     THE WITNESS: Flesh and movement.

11     MS. WILLIAMS: "Flesh"?

12     THE WITNESS: Uh-huh.

13     MS. WILLIAMS: "And movement." Okay.

14     Q   (By Mr. Tabor) What does the County do, if

15  anything, to ensure that the employees of medical entities,

16  such as Turnkey in this case, are properly trained?

17     A   I believe it's in the contract where it

18  outlines that the health service administrator will be

19  responsible for all of their staff, their training, their

20  licensures, all of that kind of stuff, and that has to stay

21  current. And they're supposed to report that to the jail

22  administrator.

23     Q   Are you generally familiar with the 2008 DOJ

24  inspection of the jail or the report from 2008?

25     A   Yes.

Page 40

1     Q   Okay. Tell me what you generally recall about

2  that inspection.

3     A   Well, I believe there were 64 areas that DOJ

4  wanted us to either implement, improve. And they ranged

5  from sanitation issues to health care to mental health to

6  facility structure. I mean, there was a lot of different

7  areas that they wanted us to look at.

8     Q   I have introduced Exhibit 5 to your deposition.

9  Is this the DOJ report? I know I've only got the first

10  page pulled up.

11     A   Yeah.

12     Q   But does this look like it to you?

13     A   Yes, it does.

14     Q   Okay. Within Exhibit 5, I am going to go to

15  page 13. And here, on a subsection B, entitled,

16  "Inadequate Health Care Services," there's another

17  subsection B(1). This says "Inadequate Access to Medical

18  Care."

19        Do you see that?

20     A   I do.

21     Q   Okay.

22        MR. HEGGY: And if you need to step closer to

23  the screen to read it, you just feel free to do that.

24        THE WITNESS: Okay.

25        MR. HEGGY: Because he's standing over right

Page 41

1  next to it.

2        MR. TABOR: I can blow it up for you.

3     Q   (By Mr. Tabor) In part, this section B(1)

4  states that:

5        During our tour of the jail, we uncovered

6        instances were detainees were not provided

7        adequate access to medical care, specifically

8        acute services, with dire results.

9        Do you see that?

10     A   I do.

11     Q   What's your understanding of what "acute

12  services" is referencing here in the DOJ report?

13     A   I think they were focusing on, like, chronic

14  care topics: cardiac issues, some of those kind of things,

15  chest pains and how those are being evaluated by medical

16  and who evaluates them.

17     Q   I am going on next to page 14. Let me see if I

18  can blow this up a little bit. And I will give you time to

19  read this top paragraph.

20     A   Okay.

21     Q   But this is a particular example that DOJ

22  observed regarding a pregnant woman. You may be familiar

23  with this and it may be old news, but I want to give you a

24  moment to read that paragraph. And just let me know when

25  you're done.

Page 42

1    A   Okay.  Okay.

2    Q   Now, at least according to the information

3  provided by the DOJ in this paragraph we just read, would

4  you agree with the DOJ that the level of care given to this

5  woman was not acceptable?

6    A   Yes.

7    Q   And would it be accurate to say that, based on

8  the information that we have in this example on page 14 in

9  the DOJ report, that this woman was left for a prolonged

10  period of time outside of the jail medical area?

11    A   Yes.

12    Q   Okay.  And is it also your understanding, based

13  on this paragraph, that this woman made several repeated

14  requests to be moved or to receive further care?

15    A   Yes.

16    Q   Now, tell me, generally, sir, about the

17  Oklahoma State Department of Health's involvement in

18  inspecting the jail.

19    A   So they are the state agency that outlines

20  basic standards for how a jail should run.  So there's a

21  list of standards.  They conduct an annual audit of each

22  jail in the state based on those standards.  And then if

23  there's any complaints that are sent to the Health

24  Department, they will then sporadically kind of investigate

25  those complaints.

Page 43

1    Q   I am going to hop around a little bit, but we

2  will get all the exhibits in.  I am going to go to Exhibit

3  7 to your deposition.  This appears to be a Health

4  Department inspection report.  Correct?

5    A   That's correct.

6    Q   Are you generally familiar with this type of

7  form?

8    A   Yes.

9    Q   Within Exhibit 7, I want to go to page 3.  And

10  within the actual typewritten part of the report itself,

11  under "Supervision of Inmates," it notes that, in February

12  of 2020, which I understand is after our events here, the

13  intercoms in cells 12 through 28 of 12 Baker were tested,

14  producing negative results, and the intercoms in cells 14

15  through 25 of 13 David were tested, producing negative

16  results.

17    Tell me about the intercoms.  Why are those

18  important?

19    A   Can I step up and read my or read those plan of

20  action notes?

21    Q   Oh, yeah.  It's quite a bit smaller, isn't it?

22    A   Yeah.

23    Q   Here.  Let me...

24    MR. HEGGY:  He won't bite.  You can go over

25  there and look at it.

Page 44

1    THE WITNESS:  Well, I can see it now.

2    Q   (By Mr. Tabor) Can you see it?

3    A   Yeah.

4    Q   Just holler at me if you need me to blow it up.

5    MS. WILLIAMS:  Excuse me, Geoff.  What is the

6  date of this Health Department report?

7    MR. HEGGY:  2020 inspection.

8    MR. TABOR:  February of 2020.

9    MS. WILLIAMS:  Thank you.

10    THE WITNESS:  Yeah.  That's why I wanted to

11  read the plan of action is because it's referring to

12  intercoms at -- I want to say, by 2017-2018, we weren't

13  using intercoms anymore.  So the cells are equipped with an

14  intercom in the wall.  And you push the button and it goes

15  down to central control or camera operations.

16    When we entered into a contract with Telmate,

17  our at the time telephone service, they actually moved

18  everything to the telephone itself.

19    Q   (By Mr. Tabor) Okay.

20    A   And so when you got on the telephone, it gave

21  you instructions on how to access medical, how to access

22  central control, or how to report something to the PREA

23  line.  And according to the notes, it looks like, at that

24  point, a circuit had been blown for those cells.  And

25  Telmate fixed it that day.

Page 45

1    Q   And we will go over it some more, but you

2  mentioned -- let's go to 13B, 13 Baker.  That's the

3  infirmary unit.  Correct?

4    A   Correct.

5    Q   But you said the entire 13th floor is the

6  medical floor.  Is that right?

7    A   Correct.

8    Q   So what would be the difference between

9  somebody being in 13B versus 13D?

10    A   It would be the same as in a hospital, if

11  you're on the normal floor or if you're in, say, ICU or an

12  acute care facility.

13    Q   Okay.

14    A   13 Baker would be more that acute care that

15  somebody -- that's somebody that medical feels they need

16  immediate access to or the ability to monitor almost

17  continuously.

18    Q   Okay.  And you testified about this earlier

19  when we talked about, I think, inmate classification and

20  housing.  The County's expectation was that the medical

21  provider would govern the transfers of inmates in and out

22  of 13 Baker.  Correct?

23    A   Correct.

24    Q   Okay.  I am going to hop around here, but I

25  will get back to all of our exhibits.  I am going to go to

Page 46

1 what I marked as Exhibit 24 to your deposition. And this
2 is another Health Department inspection report. Correct?
3    A    Yes.
4    Q    And you see this, the inspection date is June
5 25th of 2019. Correct?
6    A    Correct.
7    Q    Within this report, I am going to go to page 4.
8 I will let you read that. I've just got a few questions,
9 but I will let you read that for a minute.
10    A    Okay.
11    Q    And so the Department of Health in this case
12 found that the sight check policy was not followed.
13 Correct?
14    A    Correct.
15    Q    Because this individual had -- had only done
16 three sight checks during a 12-hour period and had
17 falsified the sight check log. Correct?
18    A    Correct.
19    Q    Do you know what inmate this is in regards to?
20    A    I don't.
21    Q    Okay. And -- and why is this of concern if
22 sight checks are not being performed with enough frequency,
23 as required by the policy?
24    A    Well, lots of reasons. The inmate may not be
25 in the cell for a period of time and we would not know

Page 47

1 that. They could be having a medical issue and we would
2 not know that. For purposes of internal investigations, if
3 they are deceased, we don't even know when that time of
4 death has taken place because of sight checks.
5    Q    And a part of that, too, would be that the
6 sight check needs to be performed so that the analysis of
7 -- what did you say -- flesh and movement can be done so
8 that the inmate can be individually viewed. Correct?
9    A    Correct.
10    Q    Okay. I am next going to go back to Exhibit 8
11 to your deposition. This is going to be a November 7th,
12 2014 inspection, but our letter is dated November 30th,
13 2017.
14        Do you see that?
15    A    I do.
16    Q    Here, on the -- here. Let me blow up the
17 response, in case you need to review it. The Health
18 Department noted here, in this November 30th, 2017 letter,
19 that three inmates were handcuffed to a rail standing
20 unattended, waiting to be escorted to their cell, and that
21 inmates left unattended and confined to their cell
22 hollering and yelling through the bean hole.
23        Do you see that?
24    A    I do.
25    Q    Why would those be issues of concern, if they

Page 48

1 are, to the County?
2    A    Number 2, I am not sure what -- what the State
3 was seeing was the issue there.
4    Q    Okay.
5    A    Unless those individuals were in the wrong
6 cell. Because, to me, it sounds like, right there, they
7 were confined to their cell. I don't know what they were
8 hollering.
9        I know DOJ and the State has always had issues
10 with the facility and handcuffing individuals to bars in
11 the -- as a waiting area. So that would be -- that would
12 be their issue there for Adam pod. And our response,
13 usually when -- when we were found in deficiency for that
14 specific thing, usually we would remove those bars and go
15 to a different procedure. And it looks like that's what we
16 had written there, that the bars were removed from that
17 area.
18    Q    Now, in the recommended plan of correction from
19 the Health Department, one of the recommendations was to
20 conduct meetings with the sheriff, county commissioners, et
21 cetera, to find a solution to hire more detention facility
22 staff.
23        Do you see that?
24    A    I do.
25    Q    And why would that help alleviate some of these

Page 49

1 concerns from the Health Department?
2    A    The way the building was designed, it was very
3 cumbersome for staff the way they designed it. So our
4 authorized number probably at that point in time was 420
5 security staff and civilian staff. And DOJ always felt
6 like we needed more staff than that to be able to have --
7 they wanted direct supervision. So to make it direct supervision, it
8 indirect supervision. So to make it direct supervision, it
9 would almost double the amount of staff required to meet
10 that.
11    Q    And I know what you're saying, but just to
12 clear it for the record, what do you mean by "direct
13 supervision" in the jail context?
14    A    "Direct supervision" would be, in the living
15 area with the inmates, a staff member is located 24/7.
16 This jail was built with separate pod offices that you --
17 you don't have that one-to-one contact. And there's four
18 of them per floor, which would require a rover to be able
19 to respond to situations and then a pod officer in each
20 one. So that would be five officers per floor. So it
21 would at least double the amount of staff that was
22 allocated.
23    Q    And a direct supervision system, as I
24 understand, would be more desirable. Correct?
25    A    Absolutely.

Page 50

1  Q   And why -- ultimately, why is that?

2  A   One, you're -- you're visible, you're building

3  a rapport with those inmates.  So it curbs behavioral

4  problems.  And your response, obviously, is quicker to

5  anything because you're right there in the pod.  There are

6  pods that are direct supervision, and that -- that's up on

7  13, based on the acuity.  And then there's one assigned to

8  segregation because of the acuity, but the rest would be

9  considered indirect.

10  Q   I am next going to go to Exhibit 9 to your

11  deposition.  This is also a November 30th, 2017 inspection

12  document from the State.

13      Do you see that?

14  A   I do.

15  Q   Okay.  Within this exhibit, I am going to page

16  2.  Well, this is the same page we looked at.  And you see

17  -- I'm sorry to be redundant.  Okay.  Scratch that.  We've

18  got a duplicate here.

19      I am next going to go to Exhibit 11 to your

20  deposition.  This is a -- I will submit to you it's a 2007

21  inspection report of the jail.  And we're certainly not

22  going to read everything on here.  I don't know about you,

23  but I cannot read a lot of this.

24      Within this exhibit, I am going to go to page

25  3.  Now, at the bottom of page 3, do you see this note in

Page 51

1  handwritten form that there appears to be staffing issues?

2  And can you make this out right here?  (Indicating.)  "As

3  the..."

4  A   As the -- "there appears to be staffing issues,

5  as the common" --

6  Q   "Excuses"?

7  A   "Excuses for something on sight checks is

8  because of lack of sufficient staffing."

9  Q   So it's -- so, perhaps, does it appear there

10  were issues with sight checks at this time and one of the

11  explanations or blames was insufficient staffing.  Correct?

12  A   Correct.

13  Q   Why -- and, again, not to have you repeat your

14  prior answers, but why would insufficient staffing at the

15  jail impact reasonable sight checks getting carried out?

16  A   Because of the multitude of tasks that are

17  required.  It would be -- it would be difficult -- if

18  you're short-staffed, it would be difficult to get the

19  tasks and the sight checks done consistently.  I think

20  that's why -- it was about this time, because that's --

21  Major Bobby Carson was the jail administrator.

22      I believe it was about this time where we

23  implemented what we had talked about earlier, where other

24  people that go into the pod can also do a sight check, to

25  supplement that.

Page 52

1  Q   But as we noted here, even in 2017, ten years

2  after this report, the State Department of Health was still

3  showing concerns of insufficient staffing.  Correct?

4  A   Correct.

5  Q   I am next going to go to Exhibit 12 of your

6  deposition.  And I will represent to you this is a

7  compilation of several inspections at the jail from the

8  State Department of Health, 2008 to 2010.  Now, within this

9  exhibit, I am going to go to page 26.  And we will look

10  at...

11      Now, one of the standards that the Health

12  Department cited -- and we're on Exhibit 12, page 26 -- was

13  adequate medical care being provided at the facility.  Do

14  you see that?

15  A   I do.

16  Q   And the State Department of Health noted that

17  this standard was not met because the facility failed to

18  render aid.  Do you see that?

19  A   I do.

20  Q   Now, in the plan of action, the State

21  Department of Health is discussing the County sight check

22  policy.  Do you see that?

23  A   I do.

24  Q   So from the County's perspective, what is the

25  relevance, if any, of the sight check policy and carrying

Page 53

1  that out to medical care detainees or inmates?

2  A   Well, again, to -- to reassure flesh and

3  movement, to evaluate if that individual is okay in the

4  cell, is safe, secure, those kind of things, for escape

5  reasons as well as medical reasons.

6  Q   Now, within this same Exhibit 12, I am going to

7  go to page 33.  And these are all scanned in different, so

8  I need to rotate some of these.

9      State Department of Health is still discussing

10  adequate medical care here, but one violation they mention

11  is "a prisoner was not seen by a physician until after this

12  inspection date.  He was put on antibiotics before he was

13  seen by a doctor."

14      Do you see that?

15  A   I do.

16  Q   Now, as you testified earlier, and you can

17  correct me if I am wrong, the decision on whether a

18  particular detainee or inmate needs to see a physician, the

19  County expects the medical provider, in this case Turnkey,

20  to solely handle that decision making.  Correct?

21  A   Correct.

22  Q   Okay.  Within Exhibit 12, I am now going to go

23  to page 71.  And we're now on to an inspection from 2009,

24  January of 2009.  Again the State Department of Health is

25  discussing adequate medical care in the -- in the

Page 54

1 regulations. And the State Department of Health noted
2 that:

3      This standard was not met because -- redacted --
4      returned to the 10th floor after each medical
5      visit instead of being on the 13th floor, where he
6      could be closely observed.
7      And so is this saying that -- is it my
8 understanding that this particular inmate needed to remain
9 on the 13th floor because of his or her medical condition?
10     A  That's the assumption they're making. I don't
11 know what the medical issue was, but yeah. That's what
12 they're saying is they feel -- the Health Department --
13 that he should have been observed closely on the 13th
14 floor.
15     Q  Okay. He should have been kept to be more
16 closely observed by medical staff. Correct?
17     A  Correct.
18     Q  Okay. Within Exhibit 12, I am going to go
19 forward to page 139. And again, as you can see, the State
20 Department of Health is still discussing the adequate
21 medical care standards.
22     Do you see that?
23     A  Uh-huh. Yes.
24     Q  Okay. And I know we don't have a lot of
25 information here, but the State Department of Health is

Page 55

1 noting that this standard was not met because -- redacted
2 -- was not kept in a location where he could be observed.
3     Do you see that?
4     A  I do.
5     Q  And why is observation generally, whether it's
6 medical staff or detention staff, important in terms of
7 making sure adequate medical care is given?
8     A  I would assume based on the medical acuity. I
9 mean, I don't know what was going on with this individual,
10 but that would be the reason you would want them in close
11 observation is because of the acuity of their medical
12 status.
13     Q  And then, lastly in Exhibit 12, I am going to
14 go to page 150. And the standards we're still talking
15 about here are rendering adequate medical care, and the
16 alleged violation here is that an inmate was without a
17 wheelchair for a period of time.
18     Do you see that?
19     A  I do.
20     Q  Why would that be something of concern?
21     A  Just, I mean, mobility reasons for the
22 individual. I mean, instead of -- for whatever reason,
23 they needed a wheelchair to move. So mobility would be an
24 issue for that individual without the wheelchair. So...
25     Q  Could -- you talk about "mobility." Is another

Page 56

1 important part of mobility and having a wheelchair being
2 able to communicate or interact with other people if
3 there's something going on?
4     A  No. I would see it more as just, you know,
5 just basic movement, for that individual to be able to move
6 and stretch and get blood flow and -- I am not a medical
7 professional, but those are some basic things that I would
8 think would need to be important for an individual in a
9 cell.
10     Q  And so, under the standards and practices of
11 the County, tell me how it works for detainees or inmates
12 in their cells who would otherwise need a wheelchair to get
13 around. Is the practice to always have a wheelchair? Tell
14 me what happens there.
15     A  Well, that would be another one of those that
16 falls into the classification policy. And if they need a
17 wheelchair to be mobile, then they would have to be on the
18 13th floor and they would be given a wheelchair. Unless
19 it's just they can move, they can move about the cell, they
20 just can't move long distances, then that wheelchair would
21 be located somewhere close, so when they had to go see
22 medical or go to an appointment, they had a wheelchair. So
23 it just really depends on that individual and the need.
24     Q  So -- and so I am just -- I am not trying to
25 twist your words. I just want to make sure I understand it

Page 57

1 right. So you're free to correct me.
2     If the detainee -- we're talking about giving
3 him or her a wheelchair in the cell. If that person cannot
4 move at all, cannot move at all without a wheelchair, the
5 expectation is to have a wheelchair with them in the cell?
6     A  And that -- that would be a doctor's order.
7 That would be the physician's decision. And for whatever
8 reason he or she could say, "No, I want them in an upward
9 position, so they need to have a wheelchair." It could be
10 likely that they say, "No. He's fine. He can be in a
11 prone position. Just anytime he leaves, he needs to be in
12 a wheelchair." But that would be a physician's order.
13     Q  That's going to be a medical determination the
14 County would delegate to Turnkey. Correct?
15     A  Correct.
16     Q  Okay. Tell me, generally speaking, about the
17 -- about command meetings or command meeting reports. Is
18 that something you're familiar with?
19     A  Well, we had -- monthly, we did a command staff
20 meeting. And that was jail administration and the
21 supervisors. So sergeant and lieutenant level. And we did
22 that just to talk about -- we talked about all sorts of
23 things, maybe issues of things that were coming up, tours
24 that were coming up. We did positive feedback in those
25 meetings. Those kind of things.

Page 58

1     The sheriff would do a command staff meeting
2 with his command, and that was all majors and sometimes
3 captains. And that could involve whatever topics the
4 sheriff wanted. It could involve a death in custody. It
5 could involve just a global picture for the sheriff's
6 office. And those were not scheduled. Those were random.
7     Q   And so would it be accurate to say things
8 getting brought up or discussed at command meetings were
9 things that the County deems important to get on the table
10 and address?
11     A   Yes.
12     Q   I am going to introduce Exhibit 13 to the
13 deposition. This is a June 27th, 2016 "Minutes of Command
14 Staff Concerns."
15         Do you see that?
16     A   I do.
17     Q   So would this be minutes of the types of
18 meetings you're talking about here?
19     A   This would be one of the sheriff's ones.
20     Q   Okay.
21     A   That are random.
22     Q   Okay. And when you say "random," is that when
23 somebody makes a request for the meeting or is there some
24 type of --
25     A   Usually the sheriff.

Page 59

1     Q   Okay. So when the sheriff would demand it?
2     A   When the sheriff decides. Yeah.
3     Q   I believe you were present at this one.
4 Correct?
5     A   Yeah.
6     Q   Now, at the bottom of this -- of these minutes,
7 Exhibit 13, when referencing new cadet officer training,
8 the minutes note that "reiterate to existing staff the
9 importance of proper sight checks and the importance of
10 communicating with supervisors about inmates at risk."
11         Do you see that?
12     A   I do.
13     Q   So for this to be included in the sheriff's
14 meeting here, were there concerns at this time in June of
15 2016 about properly executing sight checks?
16     A   There could have been. That was a topic that
17 we never stopped talking about. I mean, that was pretty
18 much every meeting was the importance of sight checks, but
19 also that -- and we talked about this earlier -- the
20 communicating with supervisors. And that kind of plays
21 that role, where if you're power struggling with medical
22 about an at-risk inmate, then you involve your supervisor.
23     Q   And so during your time here working for the
24 sheriff's department at the jail, properly conducting sight
25 checks has always been a topic of concern like this for the

Page 60

1 sheriff?
2     A   Well, and I don't even know "a topic of
3 concern." It's always been a topic.
4     Q   Okay.
5     A   It's just one of those things that's very
6 important, that we constantly reiterate to staff.
7     Q   But you would agree with me that if this is --
8 in the context this is getting brought up in, in the
9 minutes for the sheriff's meeting here in Exhibit 13, this
10 is being flagged as something to improve. Correct?
11     A   It could be. It could be, again, just that
12 basic topic that we always talked about.
13     Q   And then the latter part of that sentence
14 references the importance of communicating with supervisors
15 about inmates at risk.
16         And why is that important again?
17     A   Again, that would be one of those that we don't
18 make medical decisions. We emphasize that to the staff.
19 There's NCCHC standards that kind of outline security
20 doesn't make medical decisions. But if you felt there was
21 something going on and proper care wasn't taking place, you
22 need to get your supervisor involved. And that's where I
23 was speaking earlier, where that was usually the shift
24 commander, and then the shift commander would get with the
25 charge nurse. And between those two, they would discuss

Page 61

1 that topic.
2     Q   Okay. And so, again, something had to have
3 been happening or some concerns had to have been present
4 for this to be discussed in the fashion of Exhibit 13.
5 Correct? Were there complaints? Were there issues?
6     A   It could have been complaints. And, again, it
7 could have been -- that's how often we talked about those,
8 because they were so important. It could have been just
9 standing agenda.
10     Q   I am going to move next to Exhibit 14. This is
11 going to be the "Serious Incident Review Policy." Do you
12 see that?
13     A   I do.
14     Q   And you testified about some of this earlier,
15 so I will try not to be too redundant. And so if I
16 remember your earlier testimony right, the "Serious
17 Incident Review" portion of reviewing an incident or a
18 death or an event is the -- is the review undertaken by the
19 County, by the sheriff. Correct?
20     A   By the sheriff.
21     Q   Because we talked about the Morbidity and
22 Mortality Review would be by the medical provider.
23 Correct?
24     A   Correct.
25     Q   Okay. And then what was the third potential

Page 62

1 review you mentioned?

2     A   We were talking -- well, we were talking about

3 quality assurance.

4     Q   Quality assurance?

5     A   And that didn't necessarily involve these

6 topics.

7     Q   Okay. So tell me the purpose and the general

8 ambit of the Serious Incident Review policy and process.

9     A   So there -- it kind of goes hand in hand with

10 duty officer as well. So we broke down topics that could

11 take place into a Priority A or a Category A and a Priority

12 B. That let the supervisors know, if a Priority A took

13 place, that was an immediate notification to

14 administration. So if it was after hours, that would be

15 the duty officer.

16     If it was a Priority B, that could be the

17 next-day notification. Those topics then -- usually

18 Priority A's were the ones that then were referred to

19 investigations. And then investigations at that point,

20 usually admin would completely step out of it, to not skew

21 the investigation or play a role in it. And the

22 investigators would investigate that and then come back

23 with a Serious Incident Review and brief all of

24 administration on their findings.

25     Q   Okay.

Page 63

1     MS. WILLIAMS: Is this Exhibit 14?

2     MR. TABOR: Yes.

3     MS. WILLIAMS: Thank you.

4     Q   (By Mr. Tabor) And so an inmate death -- I know

5 you testified about this a moment ago.

6     Are there inmate deaths that don't trigger

7 Serious Incident Review?

8     A   No.

9     Q   So all inmate deaths are going to trigger some

10 form of Serious Incident Review. Correct?

11     A   Correct.

12     Q   Okay. I am next going to go to page 5 of

13 Exhibit 14, Roman numeral 5, entitled "Serious Incident

14 Review."

15     And it talks about some of the processes the

16 jail administrator can undertake. Correct?

17     A   Correct.

18     Q   And so who was the jail administrator as of

19 August of 2019?

20     A   Will Blaik.

21     Q   Will Blaik?

22     A   Uh-huh.

23     Q   Is that a "yes"?

24     A   Yes.

25     Q   Okay.

Page 64

1     A   Sorry.

2     Q   That's okay.

3     I am next going to go through some of the

4 Serious Incident Review minutes or documents that we have,

5 themselves. And do you see the subject is -- and this is

6 January 3rd, 2018 "Requested list of Oklahoma County Jail"

7 -- is that "Internal Affairs"?

8     A   It is.

9     Q   "Cases in which staff was found to have acted

10 in violation of facility policy in the last 12 months."

11     Do you see that?

12     A   I do.

13     Q   So would it be routine for the sheriff's office

14 to be requesting a list like this or is this something that

15 came up sporadically? Tell me, was this just something

16 routine, saying, "hey, every year we ask for a list or a

17 meeting of where our staff has violated policy," or is this

18 just something that happens?

19     A   I have never seen that document. So I don't --

20 I don't know why that would have been created.

21     Q   But, to your knowledge, this is not some type

22 of routine, standard request that always happens?

23     A   No. Usually, it's part of the Serious Incident

24 Review for that, say, that quarter. And you would maybe

25 have that information about those cases that were presented

Page 65

1 that quarter, not a blanket list of cases for the year.

2     Q   Okay. And is it concerning that, here in this

3 list, there's a total of 16 responsive cases where there's

4 been violations?

5     A   Yeah.

6     Q   Now, here at the top, there's an incident from

7 2017 with a corporal -- or the death of an inmate. It was

8 a Nguyen, "Corporal Brown terminated for sight checks not

9 being conducted."

10     Do you see that?

11     A   I do.

12     Q   And then in a 2017 death of an inmate,

13 Mr. Willis, an employee -- is that Detention Officer

14 Newkirk?

15     A   It is.

16     Q   DO. Terminated for improper sight checks.

17     Do you see that?

18     A   Yes.

19     Q   Okay. And again, I -- I -- not to go over this

20 again, but here, the County, in Serious Incident Review, is

21 specifically flagging improper sight checks in the context

22 of inmate deaths.

23     Why do those two things go together? Why are

24 those important?

25     A   Again, because, for investigative purposes, we

Page 66

1  don't have information on what happened, necessarily, with
2  that death, how long it had taken place, because of the
3  sight checks not being done correctly. And I mean, it's a
4  state standard and a policy.
5       Q   And there's a third 2017 incident involving
6  inmate death for a Davey Jimmerson. It notes that "Central
7  control failed to log all medical calls. Changed
8  procedure, added a second medical line, inconsistent sight
9  checks, referred to jail admin."
10      Do you know what that's talking about when it
11  says "changed procedure, added a second medical line"?
12      A   Well, I know -- I don't know what "added a
13  second medical line" is. They -- central control -- so
14  back to when I was talking about Telmate and the phone
15  system, so they have the ability to call camera operations.
16  Camera operations would simply say, "What's your medical
17  emergency," and then they would log that.
18      And so in that, it looks like they failed to
19  log those medical calls. So once again, for investigative
20  purposes, we don't know how many times that individual
21  actually called medical to try and...
22      Q   Hmm. So as we were discussing earlier with the
23  other two, in January of 2018, the Serious Incident Review
24  had flagged three different sight check violations
25  specifically regarding inmate deaths. Correct?

Page 67

1      A   According to that document. Yes.
2      Q   Okay. And that's of concern to the County.
3  Correct? That there's three violations?
4      A   Correct.
5      Q   I am going to next go to Exhibit 16, which is
6  another Serious Incident Review Minute from January 10th of
7  2018. Do you see that?
8      A   I do.
9      Q   The very last entry here mentions the 2017
10  death of an inmate, Larry Prather. Do you see that?
11      A   I do.
12      Q   And it notes that "sight checks not complete."
13  Do you see that?
14      A   I do.
15      Q   Okay. And is that of concern to the County
16  that there's an inmate death and the sight checks
17  revolving around that death were not complete?
18      A   It is.
19      Q   And again the Serious Incident Review process
20  would be flagging proper sight checks with inmate deaths
21  because the expectation is that the detention staff
22  conducting the sight check has to view and evaluate the
23  inmate. Correct?
24      A   Correct.
25      Q   But even if the sight check is getting done

Page 68

1  timely and it's routinely getting done, a proper sight
2  check still requires a proper analysis of the inmate in
3  terms of movement and flesh. Correct?
4      A   Flesh and movement.
5      Q   Okay. I am going to next go to Exhibit 17.
6  This is going to be the Serious Incident Review Minutes
7  from May 10th, 2018. Do you see that?
8      A   I do.
9      Q   There's another inmate death here for 2018, an
10  Inmate Nicholas Green. Oh, no. Never mind.
11      On the "Discussion" section, staff shortage is
12  one of the topics of discussion in May of 2018.
13      Do you see that?
14      A   I do.
15      Q   And, you know, I don't want you to have to
16  repeat everything from earlier, but when it says "Staff
17  shortage is being discussed by the Serious Incident Review
18  process," is that similar to the staff shortage you were
19  talking about earlier? Those same concerns with -- what
20  did you call it? Direct?
21      A   Direct supervision.
22      Q   Direct supervision?
23      A   Probably not. That's probably more in regards
24  to, you know, now having to be very creative with other
25  teams helping and doing that or dismantling specialty

Page 69

1  teams, those kind of things, to help with the staff
2  shortage.
3      Q   It also mentions cell doors. Do you know what
4  would be a problem or issue for the Serious Incident Review
5  process to be flagging cell doors in 2018?
6      A   Yeah. So a lot of cells, especially on the
7  eighth floor, a lot of inmates were destroying their cell
8  locks so they could get out and go visit other inmates,
9  those kind of things. So we were constantly battling
10  having to make sure those doors were not circumvented.
11      Now, that was -- that was probably the time, I
12  think we, in 2018, had already gone and installed a whole
13  new locking system on 8 and 4. So we were -- we were
14  constantly talking about cell doors and trying to find the
15  funds to do that throughout the entire jail.
16      Q   I am going to next go to Exhibit 18, which is
17  an October 18th, 2018 Serious Incident Review Form. Do you
18  see that?
19      A   I do.
20      Q   On page 2 of Exhibit 18, there's an inmate
21  death for a Clark Streetman. And there's a mention of lack
22  of consistency with sight checks. Do you see that?
23      A   Yes.
24      Q   Okay. And so, similar to before, the Serious
25  Incident Review process would be flagging the sight check

Page 70

1  process with inmate deaths because of general inmate
2  safety. Correct?
3      A   Correct.
4      Q   That that process is, first, being done? That
5  people are actually doing the sight check. Right?
6      A   Correct.
7      Q   And, two, once they're doing the sight check,
8  they're carrying it out properly with flesh and movement.
9  Correct?
10     A   Correct.
11     Q   Okay. I am next going to go to Exhibit 19.
12  And this is a May 24th, 2017 Serious Incident Review
13  Minute. Do you see that?
14     A   I do.
15     Q   And on page 2 of this minute -- hold on. Yeah.
16  The last entry, for an Inmate Ricky Windle, do you see this
17  one?
18     A   I do.
19     Q   And it mentions "sight checks not complete,
20  found unresponsive." Do you see that?
21     A   I do.
22     Q   And again, that would be the same type of
23  concern why this Serious Incident Review process is
24  flagging proper sight checks with inmate death. Correct?
25  As you have testified before?

Page 71

1      A   Correct.
2      Q   Okay. I am next moving on to Exhibit 20. And
3  this is going to be the Serious Incident Review Minutes
4  August 17th, 2016. Do you see those?
5      A   I do.
6      Q   Okay. Now, here on page 2, we're going to look
7  at the death of an Inmate Robert Hollis here in the middle
8  of the page. Do you see that?
9      A   I do.
10     Q   And it was a suicide by hanging. The Serious
11  Incident Review process noted: "Staff failures, lack of
12  communication from security staff to medical staff.
13  Disciplinary action taken, medical mortality/morbidity
14  complete. OSBI pending."
15         Do you see that?
16     A   I do.
17     Q   So in the terms of an inmate death, whether
18  that's a suicide case or just a medical death, a natural
19  death let's say, why is it important that the Serious
20  Incident Review process is flagging communication from
21  security staff to medical staff? How does that link up?
22     A   I mean, I don't know this case specifically,
23  but all I could assume is that this individual did not
24  notify medical of a medical concern and they're saying that
25  correlated with the death.

Page 72

1      Q   And is the expectation that -- is the goal
2  that, hopefully, there can be better communication from
3  detention staff to medical staff if intervention could be
4  had to maybe prevent the death? Is that one of the goals?
5      A   Well, again, it's a best practice and it's
6  National Commission standards that we don't make medical
7  decisions. So we have to provide that information to
8  medical.
9      Q   And then you see, further down the page here,
10  an Inmate Debbie McAbee, inmate death. "Disciplinary
11  action taken/improper sight checks for a natural death."
12         Do you see that?
13     A   I do.
14     Q   And the concerns would be the same there.
15  Correct? On linking up proper sight checks with an inmate
16  death. Correct?
17     A   Correct.
18     Q   I am going to go next to Exhibit 21, which is
19  going to be the Serious Incident Review Minutes from April
20  20th, 2012. Do you see those?
21     A   I do.
22     Q   Just real quick on this one I had a question.
23  There's a suicide here of a Jeff Darling. It said:
24  "Inmate was found hanging in cell. Inmate had covered his
25  window to block any view."

Page 73

1         Tell me why having a view on the inmate is a --
2  well, tell me why that's an issue.
3      A   Well, again, it's the basic premise of doing a
4  sight check. You have to be able to view inside the cell
5  and see flesh and movement. So with a window being
6  blocked, the state jail standard says that individual --
7  that door cannot be breached. You have to get backup to
8  breach it because you don't know what the inmate is doing
9  on the inside, but it needs to be breached to find out
10  what's going on.
11     Q   Okay. And the Serious Incident Review process
12  noted that corrective actions were taken, policy and
13  procedure not followed. During the sight check, the
14  officer should have removed the paper which inmate placed
15  in the window to block the view.
16         That would have been the best practice.
17  Correct?
18     A   Correct.
19     Q   I am going to go next to Exhibit 22, Serious
20  Incident Review Minutes from August 17th, 2011. Do you see
21  that?
22     A   I do.
23     Q   I am going to go to page 2 there. There's an
24  inmate death for a William Horton. Do you see that?
25     A   I do.

Page 74

1 Q And it said the ME ruled his death was natural
2 due to kidney disease. Do you see that?
3 A I do.
4 Q It discusses the incident, which you're welcome
5 to read, but it notes video and sight checks were reviewed
6 and looked good; however, one officer performed an extra
7 sight check and did not conduct it as trained.
8 Do you see that?
9 A I do.
10 Q And so this goes back to officers can do an
11 adequate number, and in this case even an extra number of
12 sight checks, but if the actual substantive sight check is
13 not carried out, that's an area of concern. Correct?
14 A Correct.
15 Q If it's not done correctly?
16 A Correct.
17 Q Okay. And that was exactly the case here in
18 the death of Mr. Horton. Correct?
19 A Yeah. That's why the officer was terminated --
20 Q Yes.
21 A -- was solely because of inadequate.
22 Q And then just below that, a case -- a death
23 involving a David McClain was a suicide case. The officer
24 saw the inmate hanging and failed to render aid
25 immediately. And the corrective action was that that

Page 75

1 officer was terminated. And the OSBI, at least at that
2 time, was considering filing criminal charges; and if they
3 didn't, the sheriff's office would seek criminal charges.
4 Do you see that?
5 A I do.
6 Q Do you recall this incident?
7 A I do not.
8 Q Okay. But either way, this was another
9 concerning situation in 2011 of an officer failing to carry
10 out the observation of an inmate. Correct? Or to
11 intervene to prevent --
12 A To intervene. Yes.
13 Q -- harm to the inmate?
14 Because there's some level of involvement
15 that's inspected -- expected of the officers. Correct?
16 When they're conducting sight checks?
17 A Correct.
18 Q And so in the case -- I know Mr. McClain's case
19 sounds like an extreme case of a suicide that had taken
20 place or was taking place, but backing up from that, if the
21 officer suspects an emergency, there's some expectation
22 that they intervene. Correct?
23 A Correct.
24 Q Okay. And the failure to do so in the case of
25 David McClain potentially led to criminal charges being

Page 76

1 filed. Correct?
2 A Correct.
3 Q I am next moving on to Exhibit 23. This is --
4 do you see the minutes, the Serious Incident Review
5 Minutes, from October 12th, 2011?
6 A I do.
7 Q Okay. We're going to go to page 2 of Exhibit
8 23. The bottom paragraph after the inmate death section
9 notes that Lt. Chuck Brewer, Special Investigation
10 Division, advised corrective actions needed, slash, sight
11 check issue was addressed and solved.
12 Do you see that?
13 A I do.
14 Q Okay. And so, again, here in this particular
15 review, signed in October of 2011, carrying out proper
16 sight checks in the context of inmate deaths was again
17 flagged as an item of concern. Correct?
18 A Yes.
19 MR. TABOR: Okay. I think right now is a good
20 point for a break. We can go off the record.
21 (Short Recess from 11:22 a.m. to 11:27 a.m.)
22 Q (By Mr. Tabor) We're back on the record. We
23 have already gone through Exhibit 24. I am going to go
24 through Exhibit 25 to your deposition. And this is the May
25 2021.

Page 77

1 I know this is after our events of this case,
2 but this is the NIC Operational Assessment. Do you see
3 that?
4 A I do.
5 Q And are you generally familiar with this
6 assessment?
7 A Well, NIC would be the National Institute of
8 Corrections. That would be a technical assistance that was
9 requested by the agency. And this would be under the
10 Trust, so I am not familiar with this at all.
11 Q Okay.
12 (Discussion held off the record)
13 Q (By Mr. Tabor) I am going to ask you just a few
14 brief questions about this NIC report, even though I know
15 that, with the timing of it and the handover --
16 A Okay.
17 Q Within this report, Exhibit 25, I am going to
18 go to page 12. The very bottom paragraph notes that it's
19 talking about the period of 2009 to the handover of July
20 2020.
21 Do you see that?
22 A I do.
23 Q And it says:
24 At the same time inmate health care has been
25 extremely troublesome with it identified that 45

Page 78

1  inmates have died in custody between 2014 and
2  2019. Since January 2021, six inmates have died.
3  Of course, some of these were natural, but one was
4  due to a hostage situation. However, these
5  numbers are disturbing.
6      Do you see that?
7  A  Yes.
8  Q  And do you agree with that assessment that it
9  is disturbing the number of deaths between 2014 and 2019 at
10  the jail?
11  A  The number, obviously, is -- is disturbing.
12  Unfortunately, natural causes, I don't know how that breaks
13  down to suicides and natural causes and all of those kind
14  of things. Unfortunately, with, you know, 50,000 people
15  going into that jail every year, naturally, you're going to
16  have natural-cause deaths. So yeah. I don't like the
17  Number "45."
18  Q  But natural cause deaths, there -- there could
19  still be things that either the medical staff or the
20  detention staff could do to treat or prevent a
21  natural-cause death. Correct?
22      MR. HEGGY:  Object to the form.
23  Q  (By Mr. Tabor)  Again, talking about -- I think
24  this sentence is talking about the period of 2009 to July
25  of 2020. This NIC report states that, during that time

Page 79

1  period, "inmate health care has been extremely
2  troublesome."
3      Do you see that?
4  A  I do.
5  Q  And do you agree with that characterization?
6  A  I do not.
7  Q  You do not?
8  A  No.
9  Q  Okay. And why do you disagree with that
10  characterization?
11  A  Maybe -- maybe at the start of 2009, but
12  towards 2018, 2019, I think Turnkey was doing a good job.
13  I think some of the things that DOJ was still watching us
14  for was mental health and medical. And when they did their
15  follow-up audit in 2019, they felt like we were pretty much
16  in substantial compliance with things. So I think towards
17  the end of that time frame, I think things were looking
18  much better.
19  Q  Now, we're talking about this timeline of 2009
20  to 2020. And your testimony is that you think things were
21  better when Turnkey -- Turnkey was doing a better job? Is
22  that...
23  A  I think towards the end of our stint with
24  Turnkey, they were doing a better job.
25  Q  And I know you were mentioning some -- some

Page 80

1  time frames a minute ago. Could you hammer that down?
2      When you say "towards the end of our stint,
3  when they were doing a better job," what time frame would
4  that be?
5  A  Because I was more involved with them, I can
6  speak to those dates. But I think probably 20- --
7  certainly 2018 and 2019.
8  Q  Okay.
9  A  And then, of course, the end of 2019 is when
10  DOJ came in. And they felt pretty much the same thing that
11  I was observing, was that they were starting to meet all of
12  those standards.
13  Q  And so I will ask you kind of this -- and I
14  understand. I -- your answer makes sense to me on how you
15  would disagree with this -- this sentiment at the bottom of
16  page 12 of Exhibit 25 for 2009 to 2020. But what about
17  2009 to 2018? Would you agree with the NIC report for that
18  time frame before this Turnkey time frame you're
19  describing?
20  A  I was going to say that -- that would probably
21  involve Armor and Turnkey, both. And I think -- I mean, I
22  think that's why we had some of the standards that were
23  created by DOJ in 2008 was because they had some concerns
24  of medical care and some of that kind of stuff. So I -- I
25  would agree with that.

Page 81

1  Q  Okay. I am next going to go to Exhibit 26 of
2  the deposition. And this is going to be a Special
3  Investigations Review of an inmate death of Jordan England.
4  Do you see that?
5  A  I do.
6  Q  And this is a suicide case. Any individual
7  recollections of this incident?
8  A  No.
9  Q  Okay. I know it's been a while. This is a
10  2013 case.
11  A  Uh-huh.
12  Q  Within Exhibit 26, I am going to go to page 6.
13  On the "Conclusion of Facts" section, the investigator
14  notes that Detention Officers Cody Duncan and Ronald -- I
15  might butcher this name -- Adegoke violated OCDC policy
16  relating to sight checks, the assurance of observing moving
17  flesh.
18      Do you see that?
19  A  I do.
20  Q  And that all goes back to the Serious Incident
21  Reviews. We have been through a lot of them today. Why a
22  proper sight check and evaluating an inmate is proper
23  especially in the context of an inmate death. Correct?
24  A  Correct.
25  Q  And in this case, these two detention officers

Page 82

1  violated the sight check policy in this particular death.

2  Correct?

3  A   Correct.

4  Q   And this notes that:

5      Inmate Jordan England was positioned in his bunk

6      and would appear as if sleeping when viewed

7      through the cell window.  Understandably, inmates

8      do not like their sleep being disturbed during the

9      night as officers conduct sight checks.  However,

10     at some point, there should be a reasonable sight

11     check that ensures the inmate is alive and

12     breathing.

13     Do you see that?

14  A   I do.

15  Q   So in this context, what would that actually

16  mean?  If the inmate is, let's say, laying down on his back

17  or his side on the bed, just laying on the bed, what does a

18  proper sight check look like in that instance, to make sure

19  the inmate is alive and doing okay?

20  A   It's movement and flesh.  So if I see flesh,

21  then that's one part of it.  I need movement.  And so

22  that's knocking on the cell door, something to get that

23  individual's attention to wave at me, raise their head,

24  something like that.

25  Q   Okay.

Page 83

1  A   And I mean, like in this case, I am not sure.

2  I don't recall this case.  But it may not have contributed

3  to the death, but once again, it affects the investigation

4  and how long that individual had been expired.

5  Q   But would you agree that, in some instances, if

6  someone -- if an inmate is undergoing a medical emergency,

7  is still alive, the failure to intervene and do a proper

8  sight check could contribute to the death?

9  A   Could.

10  Q   So I have seen some inspection reports from the

11  Oklahoma Department of Corrections.

12  A   Okay.

13  Q   Could you tell me your familiarity with that in

14  regards to the Oklahoma County Jail?

15  A   Yeah.  So when the jail had contract Department

16  of Correction inmates, they were housed on 10 Adam.  There

17  was 98 of them.  And based on the contract with DOC, DOC

18  was obligated to do an annual audit of the jail.  They used

19  the ACA Small Jail Standards as their audit tool.  And so,

20  annually, they would come in based on those standards and

21  -- and do an audit.

22  Q   And would you recall, let's say, since 2010,

23  how many DOC audits there have been of the Oklahoma County

24  Jail?

25  A   I don't even remember when we got rid of the

Page 84

1  contract.  So no.  I don't.

2  Q   But if I am understanding you right, that whole

3  process and those inspections were premised on that

4  contract regarding DOC inmates at the -- at the jail?

5  A   Correct.

6  Q   Okay.  So that's why DOC inspections were even

7  happening to begin with?

8  A   Correct.

9  Q   Okay.  Tell me generally, what's the National

10  Commission on Correctional Health Care?

11  A   So that is the accrediting body for health care

12  for prisons and jails.  Well, they do more than prisons and

13  jails, but mainly prisons and jails.

14     So for best practice, a jail would want to be

15  accredited through NCCHC and ACA.  And they go through a

16  pretty rigid audit process where they go through medical

17  files, patient care, access to care, all of those kind of

18  things.  And you have to meet -- testing my memory now.  I

19  think you have to be compliant, for NCCHC, with 100% of the

20  standards to be accredited.

21     ACA separates them into mandatory and

22  nonmandatory.  And in that audit, you have to be compliant

23  with 90% of nonmandatory and 100% of mandatory.  So it's a

24  little different.

25  Q   And for the record, what's the ACA?

Page 85

1  A   ACA is American Correctional Association.

2  Q   And as of August 2019, was the Oklahoma County

3  Jail accredited by the NCCHC?

4  A   Both of those accreditations expired in 2019.

5  I don't know the month.

6  Q   And why did they expire in 2019?

7  A   They're certifications for three years.  We

8  initially did 2012 ACA again in 2015.  NCCHC we waited,

9  because of the ACA, until 2016, did that reaccreditation.

10  So they both expired, I think one at the beginning and one

11  towards the end of 2019.  And the reason we didn't go for

12  reaccreditation is money.  It just -- we were -- all of our

13  policies were written based off of those standards and best

14  practices.  It didn't make sense for the County to put up,

15  you know, $20,000 for each audit to hang a certificate on

16  the wall.  We were doing all the standards anyway.  So the

17  sheriff decided not to go for reaccreditation.

18  Q   Okay.  I am going to go back to this NIC report

19  really briefly on Exhibit 25.

20     Now, I think you covered it right at the very

21  start of your deposition on the timing and reasons on the

22  handover in July of 2020.  Correct?

23  A   Uh-huh.

24  Q   NIC report notes that, at the top here:

25     Due to the above, the County of Oklahoma chose to

1   remove the jail from the sheriff on June 10th,

2   2019, with the creation of the Trust Indenture,

3   Oklahoma County Criminal Justice Authority,

4   commonly called "the Jail Trust." It became

5   effective July 1, 2020.

6       Do you see that?

7   A   I do.

8       Q   And so would you -- and I know I asked this

9   earlier somewhat to you, but do you know, sitting here

10  today, any or all of the reasons why the County chose to

11  remove the jail from the sheriff's control in June of 2019?

12  A   I don't know all the reasons. No.

13      Q   Tell me all of the reasons you do know, sitting

14  here today.

15  A   I mean, these are, of course, my opinions. I

16  think, with the involvement of DOJ, even though we were

17  found in compliance with all of their things in 2019, at

18  that point some of the county commissioners had already

19  made a move politically to do something. And so it was

20  already set in motion. And we had asked -- as an agency,

21  we had asked to have them do a financial trust instead of

22  an operational trust. And the decision was to just go

23  ahead and do a complete operational and financial trust.

24      Q   Isn't it true that the 2019 decision to move

25  the operation of the jail from the sheriff to a trust was a

1   pattern of deficient jail practices?

2   A   I think it was based on that early on. I don't

3   think anybody could articulate that towards the end of,

4   when it took place, that it was still in regards to

5   deficiencies.

6       Q   And so for -- when you say "early on," when you

7   say a period that does fall under that, what are we talking

8   about here? What time frame?

9   A   Well, I think the involvement of DOJ, so early

10  2000s. I think that set things in motion.

11      Q   So you would agree that, at least at the time

12  that DOJ report was rendered in July -- I believe July 31

13  of 2008 -- there was a pattern of civil rights abuses at

14  the jail?

15      MR. HEGGY:  Objection to the form. Calls for a

16  legal conclusion.

17      Q   (By Mr. Tabor) You can answer.

18  A   I don't know about civil right violations. I

19  know there were outlying deficiencies for best practice

20  that certainly were taking place.

21      Q   Okay. So you would agree -- I will rephrase

22  the question.

23      In July of 2008, when the DOJ rendered its

24  report, you would agree there was a pattern of deficient

25  jail practices at the Oklahoma County Jail?

1   A   There were inadequate practices to meet best

2   practice standards.

3       Q   And would you agree with me that some of these

4   involved inmate supervision?

5   A   In regards to DOJ's --

6   Q   Yes.

7   A   -- expectations? Yes.

8       Q   Okay. And would you agree with me -- would you

9   agree with the DOJ characterization that there was a

10  pattern of failing to render adequate medical care?

11  A   At times.

12      Q   Okay. For how long after, in your opinion,

13  from that DOJ report, did a pattern of deficient medical

14  care continue at the Oklahoma County Jail?

15  A   I mean, that -- that's a hard one to answer. I

16  think the facility initially, right at 2003, started making

17  changes to address those deficiencies. I know, when they

18  came back 2008 and then again maybe 2012 -- I am not sure

19  completely on those dates. Each time, we were improving

20  with those deficiencies, but there were deficiencies all

21  the way until the last report, until 2019, when they came

22  back for that last and said we were substantially

23  compliant. So...

24      Q   So what follow-up reports or inspections

25  occurred from the DOJ following the July 2008 report?

1   A   To my knowledge, not much. They would do their

2   audit. We would, obviously, know what they were thinking

3   and saying. And then we didn't necessarily see a report as

4   frequently as we would have liked.

5       Q   But I am going to go back to this July 2008

6   report. After that, would you agree with me that deficient

7   practices in medical care continued -- a pattern of those

8   practices continued for some amount of time after 2008?

9   A   There were still some deficiencies from that

10  2008 audit.

11      Q   Okay. And you noted that, even though the jail

12  showed improvement in that regard, there were still

13  deficiencies flagged in the 2019 report from the DOJ.

14  Correct?

15  A   To my knowledge, the 2019 was complete

16  substantial compliance.

17      Q   And so for how long following 2008 did the

18  pattern of deficient medical care continue to exist at the

19  jail?

20  A   That, I don't know.

21      Q   But I know, based on your earlier testimony,

22  it would at least cover the time that Correctional Health

23  Care was contracted, and Armor?

24  A   It would have. I think once NCCHC was involved

25  with the accreditation, I think at that point, a lot of

Page 90

1 those deficiencies had to have been compliant to receive
2 that accreditation.
3     Q   Now, this decision to hand over the jail,
4 transfer the jail from the sheriff's office to the Jail
5 Trust, as we have seen in the NIC report, the actual
6 decision was made in June 2019. Correct?
7     A   I know it was the beginning of '19.
8     Q   Okay.
9     A   I don't know specifically June, but yeah.
10     Q   Okay. And that would have been before the
11 August 2019 incident that brings us here today in this
12 case. Correct?
13     A   Correct.
14     Q   Let's just go from -- oh, we'll go from the
15 time of the DOJ report, since we've been talking about it,
16 the 2008 report, until the time of the handover on July 1,
17 2020. Tell me about the general capacity issues that the
18 jail has had in terms of inmate population.
19     A   It's been a steady downslide. The focus has
20 obviously been, with the implementation of CJAC here in the
21 community, which is the Criminal Justice Advisory Council,
22 their big focus has been lowering the population. So from
23 2008 -- I mean, I don't know the exact dates. You know,
24 mid to late 2000s. Well, mid 2000s, our numbers were still
25 up towards capacity.

Page 91

1     But towards 20- -- probably 2014 to 2019, each
2 year, it dropped significantly with changes with some of
3 the bond stuff. And they incorporated a program with some
4 organization out of California for low risk, low bond
5 releases. Some of it -- we got rid of the Department of
6 Corrections contract. That took out 90.
7     There was a lawsuit with the public defenders
8 office for those that had been adjudicated for judgment and
9 sentenced for DOC that they are gone in 45 days. And used
10 to, that would go for a lot -- you know, a long time. So a
11 lot of those kind of changes helped with the lowering of
12 the population.
13     Q   Now, I know -- it's my understanding you can
14 rate capacity of a jail in different ways. Is that true?
15     A   That's true.
16     Q   Tell me how that works.
17     A   Well, so the capacity that we used was from the
18 fire marshal. And that's just like any other business, how
19 many people you can have based on exits and suppression
20 systems and alarms and all of that kind of stuff. So we
21 used that number. So did -- the state jail inspector used
22 that same number.
23     Q   Is there another metric to use when rating the
24 capacity of a jail, specifically?
25     A   There's -- ACA does a square footage,

Page 92

1 unencumbered space, day room space, those kind of things
2 that kind of change things. I am wanting to say there's
3 one other -- one other number, but I don't recall what that
4 one is. But, again, we use the State Fire Marshal.
5     Q   And so the State Fire Marshal standards, those
6 would be the ones the jail was using in August of 2019?
7     A   Correct.
8     Q   So by those standards in August of 2019, would
9 it be a fair characterization to say that the jail was
10 overcrowded at that time?
11     A   No.
12     Q   And why so?
13     A   We were substantially under the number
14 allocated by the fire marshal.
15     Q   Now, by the ACA standards or any other similar
16 standards, would that be a different answer to that
17 question?
18     A   The only thing in regards to the ACA would be
19 the unencumbered versus encumbered. Fire marshal doesn't
20 use encumbered space. So it's -- it's square footage and
21 all of those kind of things and all the other things that I
22 said. I think we would have probably been at the maximum
23 number for ACA's numbers in regards to square footage and
24 unencumbered space.
25     Q   Generally speaking, what difficulties are

Page 93

1 placed on the detention staff if a jail is operating at or
2 over its capacity in terms of the inmate population?
3     A   Inmate behavior. Time frames. Of course,
4 being at your maximum capacity increases visitation times,
5 increases attorney visits, chaplain visits, all of those
6 kinds of things. So workload.
7     Q   And in the sheriff's office experiences in
8 operating in the jail, can an overcrowded inmate population
9 cause some staff members to cut corners, perhaps, or
10 expedite those duties so they don't fall behind?
11     A   We always directed the staff not to cut
12 corners. I mean, I can't speak to each individual --
13     Q   Yeah.
14     A   -- and what they're thinking, but we always
15 talked about, you know, regardless of what's happening, do
16 not cut corners, especially policy.
17     Q   And I understand that. But in the sheriff's
18 office experience, could that -- did that ever cause
19 individual detention officers to cut corners or feel
20 stressed or feel that they could not cover their duties?
21     A   Again, I don't know that I ever heard a staff
22 member say, "Hey, the reason I did this was because I am
23 overworked and understaffed." So I can't speak to why they
24 chose to do certain things. Regardless, the consequence
25 was the same. They were terminated for cutting those

Page 94

1 corners.

2 **Q** We have talked a bit about 13 Baker and 13

3 David and that the transfer in/transfer out process for 13

4 Baker is a Turnkey question. Right?

5 **A** Collaborative.

6 **Q** Collaborative?

7 **A** Yeah.

8 **Q** So when you say "collaborative," what do you

9 mean?

10 **A** Well, it still involves classification.

11 Classification has to do the reassignment in the computer

12 so everything is current and we know where that individual

13 is. But classification can place somebody anywhere in the

14 jail solely off of what they're doing. They cannot do that

15 in 13 Baker. That involves -- medical has to be involved

16 in that decision on whether or not they go in the

17 infirmary.

18 **Q** So we talked a little bit about the State

19 Department of Health a while ago. We went through some of

20 those reports.

21 Did the State Department of Health investigate

22 the death of Daryl Clinton?

23 **A** I don't know for a fact. I would assume they

24 did.

25 **Q** And the County submits incident reports to the

Page 95

1 State Department of Health for inmate deaths. Is that

2 right?

3 **A** That is correct.

4 **Q** Exhibit Number 6. And this would be the form

5 for such a report. Is that correct?

6 **A** That's correct. Should be two pages. Yeah.

7 MS. WILLIAMS: What exhibit is this?

8 MR. TABOR: 6.

9 MS. WILLIAMS: Thank you.

10 **Q** (By Mr. Tabor) It's got a brief description.

11 Correct?

12 **A** Correct.

13 **Q** Now, page 3 of the incident report, Exhibit 6,

14 has what looks like the opening page of the investigation

15 report. Correct?

16 **A** Correct.

17 **Q** You know, it may just be the copy I have here,

18 but it's only the first page. Would it be typical for the

19 County to share the entire investigative report with the

20 State Department of Health?

21 **A** Only during the State's investigation. And

22 they would actually have to go to Investigations to get

23 that information.

24 **Q** Okay. So that report is not initially shared

25 with the Health Department? Right? Only if then the

Page 96

1 Health Department follows up to investigate a complaint.

2 Correct?

3 **A** Well, or they investigate all deaths.

4 **Q** Yeah.

5 **A** Yes.

6 **Q** Okay. Tell me -- now, we have kind of talked

7 about this somewhat already. We're talking about Serious

8 Incident Review, but tell me, what is the Special

9 Investigations Unit?

10 **A** So that is a unit of certified officers,

11 CLEET-certified officers, that take care of Internal

12 Affairs issues. So any issues regarding staff and any --

13 mainly Priority A on that one policy, Priority A incidents.

14 They can -- they file charges on people that

15 are inside the jail, that commit a crime inside the jail,

16 with the DA's Office. They take care of all of that stuff.

17 **Q** And I know we talked about this when looking at

18 the Serious Incident Review policy earlier, but does the

19 Special Investigations Unit investigate every inmate death?

20 **A** Yes.

21 **Q** Okay.

22 **A** Unless -- I think there had been some times --

23 because they always notify OSBI, which is the state

24 investigative agency. And most -- I would say probably 90%

25 of the time, they tell Special Investigations go ahead and

Page 97

1 do the investigations. There has been some times that I

2 think either OSBI has done a co-investigation or a

3 separate. What separates those, I don't know what makes

4 those decisions.

5 **Q** Who is Jennifer Peek?

6 **A** She was an investigator for Special

7 Investigations.

8 **Q** And she rendered the investigation into the

9 death of Daryl Clinton. Correct?

10 **A** Correct.

11 **Q** Were any employees of the county, any of the

12 detention staff demoted, disciplined, subject to corrective

13 action, or terminated as a result of Daryl Clinton's death?

14 **A** I don't believe so.

15 **Q** Okay. Were any employees of Turnkey Health

16 demoted or disciplined or terminated, to your knowledge?

17 **A** Just from reading Peek's, but I never was privy

18 to that information. So I don't know what that involved.

19 **Q** Because she made a very brief mention in her

20 report. Right?

21 **A** Yes. Correct.

22 **Q** I am going to go to our investigation here at

23 Exhibit 27. Do you see that?

24 **A** I do.

25 **Q** I am not going to go through the whole thing,

Page 98

1 but I have a few questions.

2 And you have reviewed this and you're generally

3 familiar with this report?

4 A I have.

5 Q We're looking at page 3 right now. Take a

6 minute. So here on page 3, we're looking at Peek's

7 interview with a Detention Officer Christian Miles.

8 Do you see this back and forth?

9 A I do.

10 Q Okay. And Peek is asking Miles about some of

11 the interactions Miles had with Mr. Clinton on August 10th

12 of 2019. Correct?

13 A Correct.

14 Q And, as you have read before here today,

15 Mr. Clinton tells Mr. Miles that he cannot move and he

16 needs water.

17 Do you see that?

18 A I do.

19 Q And then Miles mentions a Charge Nurse Phyllis

20 Miller, or "Phyllis," but her name is Phyllis Miller. And

21 she tells Miles that Mr. Clinton is faking it.

22 Do you see that?

23 A I do.

24 Q Okay. "He's just been discharged from the

25 hospital, and everything is fine."

Page 99

1 In a situation like this that we're looking at,

2 with Miles and the Nurse Miller, with an inmate complaining

3 and the nurse says that the inmate is lying or is -- is

4 exaggerating, what does the County expect the officer to do

5 if the officer has a suspicion that the nurse may be wrong?

6 A To continue to investigate it. And if he's not

7 -- he or she is not satisfied and continues to have

8 concerns, to then involve his supervisor or her supervisor.

9 Q And so for someone in Miles's position, what

10 supervisor would that be?

11 A Probably the very next one would be the

12 corporal. And if things still aren't working, then at some

13 point in time, the shift commander needs to get involved so

14 they can have a direct dialogue with the charge nurse.

15 Q So it would go from the detention officer to

16 the corporal to the shift commander?

17 A It could. It could go from the corporal to the

18 sergeant to the staff sergeant to the lieutenant, but

19 regardless, if nothing's getting done, that lieutenant has

20 to get involved.

21 Q So if nothing is getting done, ultimately, that

22 issue, if there's a problem, has to be worked up to the

23 lieutenant. Correct?

24 A Correct.

25 Q And could you just, in terms of an

Page 100

1 organizational chart or -- could you kind of build

2 everybody up?

3 A Sure. So you've got a detention officer.

4 That's an individual that's been employed for under six

5 months.

6 Q Okay.

7 A You've got a senior detention officer, which is

8 a detention officer with no rank but has been there longer

9 than six months. Then your first level of rank is

10 corporal, then sergeant, staff sergeant, lieutenant, and

11 then captains or administration.

12 Q Yeah.

13 So as long as you're going up the chain and the

14 highest person, if they still have a belief that something

15 is not right, that reporting needs to continue up the

16 chain. Correct?

17 A Correct.

18 Q Okay. So in this instance, if Miles told

19 Corporal Mulanax and Corporal Mulanax still had concerns

20 that something was amiss or something wasn't right, Mulanax

21 has a duty to report it further up the chain. Correct?

22 A Correct.

23 Q Okay.

24 A And, usually, corporal would then go to that

25 unit manager, which is a sergeant or a staff sergeant.

Page 101

1 MS. WILLIAMS: I'm sorry? Staff sergeant or...

2 THE WITNESS: A sergeant or a staff sergeant.

3 MS. WILLIAMS: Thank you, sir.

4 Q (By Mr. Tabor) And here, Miles indicated that

5 he did talk to Corporal Mulanax. Correct?

6 A I want to go to the top of page 5 here. We're

7 still in the Peek report, Exhibit 27. Peek is asking Miles

8 about the sight checks were every 30 minutes, Mr. Clinton

9 was vocal.

10 Miles then says:

11 Yes. Like I said, with everything that popped

12 off, I had multiple reports that the lieutenants

13 were breathing down my neck trying to get, helping

14 out 4 and 8, doing other things. But I was

15 calling other rovers to come and be like, "Hey, I

16 am not going to be able to hit the sight check,

17 can you come hit it for me?" Chapel was full.

18 There was a bunch of people, so not all the sight

19 checks were done by me, and the logbooks reflect

20 that.

21 Do you see that?

22 A I do.

23 Q And so that gets to the practices of the County

24 you discussed earlier that different people can conduct the

Page 102

1  sight checks. Correct?

2      A    Correct.

3      Q    Okay. Now, you talked about -- and I forget

4  exactly what you called it. The -- the -- the officer who

5  is overseeing the whole floor, was that the "rover" --

6      A    "Rover."

7      Q    Just "rover"?

8      A    Uh-huh.

9      Q    There needs to be some type of exchange of

10  information from the rover to the person coming on the next

11  shift. Correct? If there's something to be talked about?

12     A    Sure.

13     Q    Is that -- is what Miles talking about here,

14  is that a -- was he the rover for that floor at that time?

15     A    It sounds like he was. I don't think there's

16  anything in there that said that he was. But based on what

17  he's doing and having to bounce around and help other

18  things, it sounds like he's the rover.

19     Q    And so if he's the rover and if at that time he

20  did have concerns about the health of Mr. Clinton, the

21  County would expect some exchange of information from Miles

22  to whoever is taking over, as you have described

23  previously?

24     A    Correct.

25     Q    Is that true?

Page 103

1      A    Correct.

2      Q    Okay. I do want to go -- with the reporting

3  issue in mind, I want to go to Peek asked Miles: "Did you

4  ever go to your shift commander and say, 'Listen, this guy

5  really needs help but medical is not -- they're not helping

6  him?'

7      "Miles: No, I did not."

8      As you have described earlier on this upward

9  reporting process, Miles would not be following that

10  process. Correct? If he did not report that up the chain?

11     A    Not necessarily, because he did report it to

12  his corporal. So he could assume the corporal then

13  reported it to the sergeant, and so on and so on.

14     Q    Okay.

15     A    I would -- me, I would encourage him at some

16  point, if nothing is still getting done, then "overstep

17  your corporal and go to your sergeant yourself" kind of

18  thing.

19     Q    And so, more specifically, who is Peek

20  mentioning here when she says "shift commander"?

21     A    That would be the lieutenant.

22     Q    That would be the lieutenant?

23     A    Correct.

24     Q    Peek asked about Mr. Clinton asking for help in

25  his cell and says:

Page 104

1      "Yes, like please help me. Was he doing that

2  and no one would help him?

3      "Miles: He didn't say, 'Please help me,' but

4  it was more like -- like a 'please, man, help me.'

5      "Peek: And then you just shut the door and

6  went on?

7      "Miles: Pretty much. Yeah. Yes."

8      Do you believe that was an appropriate response

9  at that point in time by Miles to the complaints being

10  submitted by Mr. Clinton?

11     A    I don't know what all Miles knew at the time.

12  I think, prior to that, Miles is being told by the

13  responsible medical authority that this individual is

14  faking it. So I don't know Miles's mindset that, "okay,

15  yeah, he's faking it, medical told me that," or is he at

16  the stage of "I don't agree with this, I need to get more

17  help." I -- I don't know.

18     Q    Okay. But, again, you would agree with me that

19  if Miles, if the officer in his position has doubts about

20  what medical staff is saying, Miles does have a duty on his

21  end to do something. Right?

22     A    Pass that information on.

23     Q    Okay.

24         MS. WILLIAMS: Geoff, may I have just one

25  moment?

Page 105

1  (Sotto voce colloquy between Mr. Tabor and Ms. Williams)

2      Q    (By Mr. Tabor) If in this case Miles had a

3  suspicion something was really wrong with Mr. Clinton but

4  the medical staff is saying, "Hey, he's faking it," would

5  part of Miles's duties include going into the cell to

6  interact with Mr. Clinton or investigate further?

7      A    It could. That's a touchy, touchy subject

8  there because you've got the "last locked door" standard.

9  And lots of times, inmates have chose to fake something,

10  even a suicide attempt, to get that officer to break that

11  "last locked door," and then they have been attacked. So,

12  again, I don't know what those circumstances were for

13  Miles.

14     Q    In this situation we're going over here, this

15  back and forth between Jennifer Peek and Miles about

16  observing Mr. Clinton, what medical staff was saying about

17  Mr. Clinton, at what point in time, if ever, does the

18  County expect its detention staff to call 911 for a medical

19  emergency?

20     A    Detention staff calls 911 at the direction of

21  the contracted medical provider.

22     Q    So there's no situation, ever, where the

23  detention staff would call 911 on an inmate medical issue?

24     A    Without medical being involved, I can't think

25  of one. No.

Page 106

1  Q  Would --
2  A  Medical is always the go-to person.
3  Q  Well, did the jail staff call 911 in
4  Mr. Clinton's case, eventually?
5  A  Eventually, I think, from the direction of
6  Turnkey.
7  Q  So to clarify here, there's just no situation
8  that the detention staff on their own, without medical's
9  involvement, calls 911.  Correct?
10  A  I mean, unless medical just is not available,
11  which I can't imagine that's the case.  I don't know of a
12  situation, though.
13  Q  And that would be the sheriff's office practice
14  and expectation of its -- of its employees.  Correct?
15  A  It's back to that contract that that's your
16  immediate medical response is that contracted medical
17  provider.
18  Q  We're still in Exhibit 27.  I am going to go to
19  page 17.  Peek built a pretty detailed timeline of things,
20  and I am not going to walk through everything with you.  I
21  am taking her deposition.
22  I had a quick question.  I am finding it.
23  What's the morpho window?
24  A  That's where -- that's part of the book-in
25  process.  It's down in receiving on the first floor.  It's

Page 107

1  where they actually take your electronic fingerprint, and
2  it pulls up if you've ever been there, that kind of thing.
3  Basically enters you into the system.
4  Q  And then what is the medical waiting area?
5  A  So at -- looking at dates.
6  At the time, the way it was designed in
7  receiving was, after you went from morpho, you went to
8  medical, because you had to be in the system for medical to
9  be able to access you.  You went back there.  And we had
10  designed two private areas where medical could meet with
11  the intake, and adjacent to that was a little waiting area
12  right in front of the nurses.  So you're being observed
13  while you're waiting.
14  Q  So if someone's in the medical waiting area,
15  the medical staff can see that inmate.  Correct?
16  A  Correct.
17  Q  How long, typically, are people in the medical
18  waiting area?  Inmates?  Detainees?
19  A  I don't know.  I would just be giving you a
20  guess.  I don't know.
21  Q  What's -- do you have a number on kind of the
22  usual custom?
23  A  I think most nurses do an intake in about 15
24  minutes.  So you're probably seeing somebody every 15
25  minutes.

Page 108

1  Q  Do you know how long Mr. Clinton was in the
2  medical waiting area?
3  A  I do not.
4  Q  Okay.  Have you watched any of the security
5  footage of when Mr. Clinton was brought into the waiting
6  area?
7  A  When he was admitted, no.
8  Q  Are you aware he was left in his wheelchair
9  with his pants down for over an hour?
10  A  No.
11  Q  Now that you know that, is that something that
12  would be acceptable to the County if -- if a paralyzed
13  detainee was left with his pants down for over an hour in
14  that waiting area?
15  A  No.
16  Q  In terms of bringing an inmate into the medical
17  waiting area and bringing him out, who typically does that?
18  A  It's one of the intake officers.
19  Q  One of the detention staff?
20  A  It would be detention staff.  Yeah.
21  Q  Okay.  The investigation report, at the bottom
22  of page 17, Exhibit 27, mentions an orderly approaching
23  Clinton in the medical waiting area.
24  What's your understanding of who that would be,
25  how that term is used?

Page 109

1  A  It's a trustee.  And we don't use the word
2  "trustee," but that's the most familiar term.  It's an
3  inmate from the second floor that's probably serving county
4  jail time and is working as a trustee either to clean up or
5  whatever.  They've got a couple assigned to receiving, and
6  they pretty much walk around and make sure, anybody that
7  wants water, they've got water or those kind of things
8  while they're cleaning up.
9  Q  You have reviewed the investigation report from
10  Peek and some of the other documents in this case.  I know
11  you haven't reviewed the security footage we were talking
12  about a minute ago.
13  Do you know Mr. Clinton, in the cells that he
14  was in, do you know how long he laid on his back without
15  moving?
16  A  No.
17  Q  From the time that Mr. Clinton was brought into
18  the jail to the time he was found on August the 10th, do
19  you know how many individual detention staff interacted
20  with him?
21  A  Just the ones that were identified, that were
22  interviewed by Deputy Peek.
23  Q  Okay.  Do you know how many people that is?
24  A  I don't.  I would have to go back there and
25  count.  Half a dozen, I think.

Page 110

1    Q   Okay.  In your review of the records in this
2  case, the investigation report, is the County aware of any
3  single detention staff observing Mr. Clinton being able to
4  move his arms or legs during his time at the jail?
5    A   I do believe that I had read somewhere where an
6  officer said they saw him move his hands.
7    Q   Hands?
8    A   And then one described his arms being up by his
9  head, like his arms had moved.  I think that was it.
10   Q   Would you agree with me that the County's not
11 aware of any evidence indicating, while Mr. Clinton was at
12 the jail, any of the detention staff calling 911.  Correct?
13   A   Correct.
14   Q   That never happened.  Is that true?
15   A   Well, I believe Lieutenant Hendershott called
16 911 at the nursing gurney call.
17   Q   At the end.  Right?
18   A   Yes.  Yes.
19   Q   All right.  And did anybody -- other than
20 Officer Miles contacting Mulanax, did any other detention
21 staff contact their supervisors at any point in time?
22   A   I believe -- I believe there was a sergeant
23 that had contacted Lieutenant Carter, and then Lieutenant
24 Carter got involved and did a movement -- I think she might
25 have been the one that did the movement back to 13 Baker

Page 111

1  that didn't take place.
2    Q   Officer Miles describes ultimately going into
3  Mr. Clinton's cell.  Correct?
4    A   Correct.
5    Q   And what's -- what's your understanding of why
6  Officer Miles ultimately went into the cell?  I know we
7  talked about entering cells before and some of the concerns
8  with that.
9    A   Well, I know there was -- I don't know if this
10 involved Miles.  I know there was at one point where they
11 had propped Mr. Clinton up.  And it looked like he had slid
12 down, and so somebody went in there.  And at some point,
13 they had noticed that he had defecated on himself.  And I
14 think that was Miles.  And so that kind of exacerbated the
15 contacting, after that point, of medical.
16   Q   And does the County, sitting here today, know
17 how long Mr. Clinton laid in his own feces in that cell?
18   A   I don't believe so.
19   Q   Mr. Clinton in his cell was showing signs that
20 he was not able to feed himself.  Correct?
21   A   There -- I know there was statements of that.
22 I also know officers said that he had a sack lunch, too.
23 So they assumed he was eating the sack lunch and not the
24 tray to perpetuate this -- what the nurses were saying:
25 that he was faking it.

Page 112

1    Q   But I believe Officer Miles noted that he had
2  some doubts about whether Mr. Clinton was faking because he
3  also was not eating.  Correct?
4    A   Well, I know he did reference, in the
5  interview, that he had not ate his tray.  He made notice of
6  that.  Because I think he even says that it's odd that
7  somebody doesn't eat their tray in jail.
8    Q   Do you think that all of the actions of the
9  detention staff regarding Mr. Clinton were proper under the
10 circumstances?
11   A   I think so.  I think they voiced concern.  They
12 tried to involve the appropriate people.  And when nothing
13 was getting done, they were continuing to voice concern and
14 involve chain of command.
15   Q   Do you think the actions of the Turnkey staff
16 in regards to Mr. Clinton were appropriate?
17   A   I can't speak to why they did what they did or
18 why they thought he was faking.  I am not a medical
19 professional, and I don't know what reports they had got
20 from Saint Anthony's and some of that kind of stuff.
21 There's a question.
22   Q   Now, I don't have the medical examiner's
23 records here for your deposition, but it has the same cause
24 of death.  Deputy Peek's investigation notes the cause of
25 death being blunt force trauma of cervical spine.

Page 113

1        Do you see that?
2    A   I do.
3    Q   Do you have any basis to doubt that
4  determination?
5    A   No.
6    Q   And I will represent to you the Medical
7  Examiner's Office made a similar finding on the cause of
8  death.  Would you have any basis to doubt the findings of
9  the medical examiner?
10   A   No.
11   Q   I want to go back very briefly to the contract
12 with Turnkey, Exhibit 3.
13   A   Okay.
14   Q   And I -- I am not going to go all the way
15 through this again.  I am not going to -- not going to
16 replow that ground, but I just want to make sure we're
17 clear on a few things.
18        This contract, since it was signed by Turnkey,
19 the sheriff, and the County -- correct?
20   A   Yes.
21   Q   The expectation by the County and the sheriff
22 was that detention staff would follow the terms and
23 understandings of this contract with Turnkey.  Right?
24   A   Correct.
25   Q   And under this contract, this written contract,

Page 114

1  the expectations were that detention staff at the jail were

2  not to render medical care or make medical-related

3  decisions.  Correct?

4       A   Opposite of basic First Aid and CPR, that would

5  be correct.

6       MR. TABOR:  Okay.  Let's take a quick break.

7       (Short Recess from 12:33 p.m. to 12:36 p.m.)

8   Q   (By Mr. Tabor) Just a few quick questions.

9       MR. HEGGY:  Never say "quick."  We know better.

10       MR. TABOR:  Just a few questions.

11   Q   (By Mr. Tabor) One of the topics in the notice

12  is from January 1 -- from 2014 until the handover of the

13  jail.

14       Were there -- during that time frame, were

15  there any demands by Turnkey to the County or the sheriff's

16  department for you-all to increase or improve your

17  staffing?

18       A   No.  We -- we would meet sometimes biweekly,

19  myself and the HSA.  And we would always be talking about

20  staffing -- theirs, ours, how we could better utilize.  So

21  lots of times, we were having conversations about, you

22  know, changing staffing schedules because of, you know,

23  doctors and all of them wanting to work business hours.  So

24  overstaffing on days for tasks, those kind of things.  So

25  that was a continuous conversation.

Page 115

1       I don't recall, either way, ever having a

2  conversation that "you need to increase staffing" or

3  "Turnkey needs to increase staffing."

4       MR. TABOR:  Okay.  I have no further questions

5  at this time.  I will pass the witness.

6       MR. HEGGY:  He will read and sign.

7       (Deposition concluded at 12:38 p.m. and witness excused

8          after 3 hours and 4 minutes on the record)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    C E R T I F I C A T E

 2   STATE OF OKLAHOMA   )
                         ) SS:
 3   COUNTY OF OKLAHOMA  )

 4

 5        I, Lori Johnston Harstad, a Certified Shorthand

 6   Reporter for the State of Oklahoma, certify that Ernest

 7   Eugene "Gene" Bradley was by me sworn to testify the truth;

 8   that the deposition was taken by me in stenotype and

 9   thereafter transcribed by computer and is a true and

10   correct transcript of the testimony of the witness; that

11   the deposition was taken by me on February 28, 2023, at

12   9:08 a.m., at 320 Robert S. Kerr, Oklahoma City, Oklahoma;

13   that I am not a relative, employee, attorney or counsel to

14   any party in this case or a relative or employee to any

15   counsel in this case or otherwise financially interested in

16   this action; and that the witness elected to exercise his

17   right to review the deposition transcript prior to its

18   filing.

19        Witness my hand and seal of office on this 6th day

20   of March, 2023.

21

22

23

24                    Lori Johnston Harstad, CSR
                      Oklahoma Certified Shorthand Reporter
                      Certificate Number 1726
25                    Expiration Date:   December 31, 2023

26   Oklahoma CSR #01726
     My Commission Expires 12/31/2022
</pre>

1          JURAT

2          I, Ernest Eugene Bradley, do hereby state under oath

3     that I have read the above and foregoing deposition in its

4     entirety and that the same is a full, true, and correct

5     transcription of my testimony so given at said time and

6     place, except for the corrections noted.

7

8     _____    WITH CORRECTIONS

9     _____    WITHOUT CORRECTIONS

10

11                                  _____

12

13

14          Subscribed and sworn to before me, the undersigned

15    Notary Public in and for the State of Oklahoma, on this,

16    the _____ day of _____, 2023.

17

18

19                                  _____

                                    NOTARY PUBLIC
20

21    My Commission Expires:  _____

22    My Commission Number:  _____

23

24

25    Reported by:  Lori Johnston Harstad, CSR

```
 1                        ERRATA SHEET

 2            WITNESS:  Ernest Eugene Bradley, 30(b)(6)

 3            CASE STYLE:  Brothers v. Johnson, et al.

 4            REPORTER:  Lori Johnston Harstad, CSR

 5    PAGE    LINECORRECTION AND REASON

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25    _____  _____  _____
```