```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF OKLAHOMA

 3   EQULLA M. BROTHERS, as the Personal  )
     Representative and Administratix of  )
 4   The Estate of Daryl Clinton, Deceased)
                                          )
 5        Plaintiff,                      )
                                          )
 6   -vs-                                 ) No.  5:2021-cv-418
                                          )
 7   (1) TOMMIE JOHNSON III, in his       )
     official capacity as Oklahoma County )
 8   Sheriff,                             )
                                          )
 9        Defendant.                      )
     _____)

10

11
                          **CERTIFIED COPY**
12

13                   DEPOSITION OF MARY MULANAX

14
                  TAKEN ON BEHALF OF THE PLAINTIFF
15

16                       IN NORMAN, OKLAHOMA

17
                          ON MARCH 15, 2023
18

19                     COMMENCING AT 2:52 P.M.

20

21

22                         INSTASCRIPT, LLC
                          125 PARK AVENUE, LL
23                   OKLAHOMA CITY, OKLAHOMA  73102
                            (405) 605-6880
24                        www.instascript.net

25        REPORTED BY:  LORI JOHNSTON HARSTAD, CSR
```

## Page 2

APPEARANCES

FOR THE PLAINTIFF:

    Geoffrey Tabor
    Attorney at Law
    Madison Smith
    Legal Intern
    Ward & Glass, LLP
    1601 36th Avenue NW
    Suite 100
    Norman, OK 73072
    geoffrey@wardglasslaw.com

FOR THE DEFENDANT:

    Rodney J. Heggy
    Assistant District Attorney
    Office of the District Attorney-Oklahoma County
    320 Robert S. Kerr
    Suite 505
    Oklahoma City, OK 73102
    Rod.heggy@oklahomacounty.org

## Page 3

INDEX

WITNESS     PAGE:

For Defendant:

Mary Mulanax:
    Direct Examination by MR. TABOR     5:5

EXHIBITS

NO.:     DESCRIPTION:     PAGE:

For Deposition:

1     Special Investigations Unit investigative report of Sergeant Jennifer Peek, OCSO-000117 to '139:
    For Identification     12:18

2     Oklahoma County Sheriff's Office Jail Facility Report Form 8/12/2019, OCSO-000085 to '86:
    For Identification     14:13

## Page 4

STIPULATIONS

    It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of Mary Mulanax may be taken on behalf of the Plaintiff on March 15, 2023, in Norman, Oklahoma, by Lori Johnston Harstad, Certified Shorthand Reporter within and for the State of Oklahoma, pursuant to subpoena.

    It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question or the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

\*\*\*\*\*\*\*\*\*\*

## Page 5

    MARY MULANAX,

Of lawful age, having been first duly sworn, deposes and says in reply to the questions propounded as follows:

    DIRECT EXAMINATION

BY MR. TABOR:

Q    Would you state your full name for the record, please.

A    Mary Elizabeth Mulanax.

Q    Okay. And have you ever given a deposition before?

A    No.

Q    Okay. I will go over a few quick ground rules. Nothing too crazy. As you know, you're under oath. We have a court reporter here recording everything. Just be sure to let me finish my question before you start your answer, and I will do the same when I am asking you the next question so we've got a clean back and forth. We have a cleaner transcript rather than overlapping each other.

    If you need a break, let me know. You're free to take one. I just ask that you complete your answer to any pending question that's out there; however, I don't expect us to take long here today.

A    Okay.

Q    If you don't understand a question, let me know. I am happy to rephrase it, help you get where you

Page 6

1 need to be. So don't be afraid to ask me with help on
2 that.
3     Are you suffering from any type of medical
4 condition or under the influence of any substance that
5 would prevent you from giving clear testimony today?
6   A  No.
7   Q  Okay. Could you tell me generally what you
8 did, if anything, to prepare for your deposition today.
9   A  Well, I spoke with Rod, and he kind of
10 explained how things worked. I also received my report
11 from the time, and I read that, went over that to kind of
12 remind myself.
13   Q  You have slept a few times since our case here.
14 Right?
15   A  Yes.
16   Q  And your report, I think -- I've got a copy of
17 it here. We were going to go over it. That's the
18 "Oklahoma County Sheriff's Office Jail Facility Report
19 Form"? Is that what you've got over there?
20   A  Yes.
21   Q  Okay. Did you review anything else?
22   A  The book-in sheet.
23   Q  The book-in sheet for Daryl Clinton?
24   A  Yes.
25   Q  When you first got notice that you were getting

Page 7

1 subpoenaed in this case, did you recall the death of
2 Mr. Clinton or the events of our case?
3   A  Yes. Once I read my report and everything, I
4 had -- it came back to me.
5   Q  It came back to you? Okay.
6     Could you tell me, just really generally -- I
7 don't need way in the weeds, but just give me a general
8 overview of your educational history.
9   A  I graduated high school in 2007, and I went to
10 two semesters of college at UCO.
11   Q  And where did you go to high school?
12   A  Bridge Creek.
13   Q  Okay. Now, since the time you have been out of
14 high school, could you give me just a really general
15 overview of your work history through today?
16   A  I mean, I have worked many different jobs in
17 the past, including private security. And in September of
18 2016, I started at the sheriff's office. And I have been
19 at the jail ever since. Well, I left for about five
20 months. I went to Midwest City Animal Control. And it
21 just didn't work out, so I came back.
22   Q  And you're -- so you're back -- after your
23 stint at Midwest City, you were back at the Oklahoma County
24 Jail. Correct?
25   A  Yes.

Page 8

1   Q  Okay. And so you started your career at the
2 Oklahoma County Jail in 2016? Is that what you said?
3   A  Yes.
4   Q  Okay. Was that your first job in law
5 enforcement?
6   A  Yes.
7   Q  Okay. And did you go through CLEET?
8   A  No.
9   Q  Okay. So let's talk about, let's kind of
10 narrow the frame of your time working at the Oklahoma
11 County Jail.
12     Tell me the different positions or titles you
13 have held during that time.
14   A  When I started, I started as a Detention
15 Officer or a rover on the floors.
16   Q  Uh-huh.
17   A  I have -- I have roved every floor in the jail.
18 I have -- after I left and came back, I was promoted to
19 Corporal in March of 2019. And then I was promoted to
20 Staff Sergeant or Unit Manager in March of 2021.
21   Q  Okay.
22   A  And then Lieutenant in November of 2021.
23   Q  Okay. And so you're currently serving as a
24 lieutenant. Correct?
25   A  Yes.

Page 9

1   Q  Okay. And you were a corporal at the time of
2 the events of our case, August of 2019?
3   A  Yes.
4   Q  Okay. When you started working, let's say,
5 your first time roving at the jail in 2016, tell me what
6 training you had, if any, regarding monitoring potential
7 medical conditions of inmates.
8   A  Well, I actually started on the 13th floor,
9 which is our medical floor. As far as, you know, we looked
10 for loss of life, limb, or eyesight. That's our big ones.
11 Monitored, made sure everybody is breathing, talking,
12 healthy. And that's pretty much it. Anything outside of
13 that, we have nurses on staff.
14   Q  Okay. So anything in terms of training and
15 responsibilities outside of what you just described doesn't
16 really fall on the detention staff, that kind of shifts
17 over to the medical staff. Am I understanding that right?
18   A  Yes.
19   Q  Okay. So in terms of inmate supervision and
20 medical care and recognizing medical issues, what you have
21 just described to me would be the extent of your training
22 and experience on those items. Right?
23   A  Yes.
24   Q  Okay. And I believe you kind of described it
25 in substance a minute ago. That really ties into the sight

Page 10

1 check policies of the jail. Right?
2    A   Yes.
3    Q   I have heard other people say, I think,
4 "movement and flesh," is the phrase I have heard from
5 somebody else. Is that an accurate understanding on sight
6 checks on your part?
7    A   Yes.
8    Q   Okay. And so kind of on that same line, your
9 understanding would be the detention staff at the jail,
10 they're not expected to render medical care or make any
11 medical-related decisions. Correct?
12    A   Correct.
13    Q   And they're not expected to be trained in those
14 items. Right?
15    A   Correct.
16    Q   Okay. And kind of similarly, I want to parse
17 it out a little bit. You also would agree that the
18 detention staff is not expected to identify or properly
19 supervise inmates with serious medical needs. Correct?
20    A   Could you rephrase that?
21    Q   Yeah. Let me break that down a little bit.
22       Would you agree that the detention staff is not
23 trained to identify serious medical problems?
24    A   As far as like labeling them as serious medical
25 problems, yes.

Page 11

1    Q   Okay.
2    A   Or diagnosing, I guess.
3    Q   Did you ever receive any training from the
4 County on identifying serious medical needs?
5    A   Like I said, if somebody -- it's flesh,
6 movement, loss of life, limb or eyesight. But we have
7 medical staff on hand, which is actually on the floor that
8 Mr. Clinton was in.
9    Q   On the 13th floor. Correct?
10    A   Yeah.
11    Q   So anything -- any -- no training on
12 recognizing serious medical needs outside of what you have
13 just described to me today. Correct?
14    A   Correct.
15    Q   What about any training the detention staff
16 has, in your experience, on recognizing and responding to
17 medical health emergencies? Anything there?
18    A   Well, anything that warrants immediate medical
19 attention, we notify the nurses, the charge nurse. And
20 they -- that's their area.
21    Q   Uh-huh. During your time at the Oklahoma
22 County Jail when the sheriff's office managed it, did you
23 get any training about making sure detainees with emergency
24 medical needs were receiving timely and appropriate care by
25 the medical staff?

Page 12

1    A   I mean, like I said, we would notify medical
2 staff. And they would come over, check them out, and
3 things like that.
4    Q   Okay. So in terms of training, once medical
5 was notified and got involved in the situation, the County
6 didn't give you any additional training on making sure the
7 inmate actually got appropriate care. Correct?
8    A   Correct.
9    Q   Okay. Did the County give you or anyone, in
10 your experience from the time the sheriff's office ran the
11 jail, any training about making decisions regarding
12 referrals or transports to outside medical care?
13    A   Not at the time. I mean, that was -- I was
14 only a corporal.
15       (Exhibit 1 marked for identification)
16    Q   (By Mr. Tabor) Let's look at -- I am going to
17 introduce -- there's a copy there for you that I am going
18 to mark as Exhibit 1. This is the investigative report
19 that was completed regarding the death of Daryl Clinton.
20 You know, before we go into anything specific, kind of tell
21 me -- you have looked back at some of your reporting on
22 this matter.
23       Tell me what you remember about this whole
24 thing, about Daryl Clinton.
25    A   I remember, you know, while doing sight checks,

Page 13

1 Mr. Clinton told me, "Well, I can't move my arms and legs."
2       And I went and -- I said, "Okay. Let me go
3 talk to the charge nurse." I went and talked to the charge
4 nurse, and she more or less brushed me off because he had
5 been cleared medically before coming to the jail by Saint
6 Anthony's.
7       And she said, "Oh, he's faking. He was already
8 cleared by Saint Anthony's."
9       I said, "Okay." But conducting more and more
10 sight checks, you know, he was in the same position. So I
11 went and told my lieutenant and sergeant at the time, you
12 know, "This is what's going on. This is what the charge
13 nurse said. What should I do?" I was told to submit
14 movement paperwork for him to go to 13 Baker, which is our
15 infirmary. And -- sorry. So I -- because medical has to
16 sign off on that movement to go into that particular area,
17 it wasn't completed.
18       So that night, I had let the officer know,
19 coming on duty, I let him know what was going on, what the
20 charge nurse had told me and, you know, just keep an eye on
21 him. Things like that. And when I came back the next day,
22 it was a different charge nurse. The officer that I
23 relieved told me that he had actually given him water.
24       And the charge nurse, since it was a different
25 charge nurse, I talked to her about, you know, trying to

Page 14

1 move him over to 13 Baker with 21, which has a camera in
2 it. And I told her, "Well, you know, if he is indeed,
3 quote-unquote, faking it, then, you know, we would be able
4 to see that on a camera, but at least he would, you know,
5 be in the infirmary." And she agreed to that.
6     So I submitted a movement, but I couldn't move
7 him until paperwork... Unfortunately, Classifications,
8 which does the paperwork and movements, they had closed.
9 By the time they had opened, it was the next shift. And I
10 was informed that, you know, they would take care of it,
11 not to worry about it and, you know, they would handle it.
12 And that was pretty much it.
13     (Exhibit 2 marked for identification)
14   Q  (By Mr. Tabor) Okay. So with that in mind, I
15 will give you a single copy. I am introducing Exhibit 2,
16 which is your statement we were just talking about. You
17 reviewed that before coming in. Is that what we were
18 talking about a minute ago?
19   A  Yes.
20   Q  "Oklahoma County Sheriff's Office Jail Facility
21 Form." Correct?
22   A  Yes.
23   Q  And is that your signature at the bottom of
24 page 1?
25   A  Yes.

Page 15

1   Q  I printed these backsided. I didn't mean to do
2 that, but could you turn around -- on the page 2 of 2, is
3 that your signature at the bottom of page 2?
4   A  Yes.
5   Q  Okay. So I want to kind of walk through this a
6 little bit. You noted that on -- I am looking here at the
7 bottom of page 1 of Exhibit 2. -- on August 8th, 2019, you
8 were told by Inmate Daryl Clinton that he could not move
9 his arms, help himself to the bathroom, or eat without
10 assistance.
11     Do you see that?
12   A  Yes.
13   Q  And did -- on August 8th, when Mr. Clinton told
14 you that, was his appearance consistent with how he was
15 describing himself?
16   A  It -- I mean, he was lying on the bunk.
17   Q  Yeah. Okay.
18     And at that time, when you were observing him,
19 had he been able to get up and walk around or move around
20 or anything like that?
21   A  I had not seen him do that. No.
22   Q  And do you recall, at this particular point in
23 time on August 9th, 2019, when Mr. Clinton told you this,
24 how long you had been observing him that day on your -- on
25 your roving?

Page 16

1   A  I don't recall. I mean, I believe it was most
2 of the day.
3   Q  And so, assuming August 9th, 2019 was a regular
4 roving day for you, how many -- how long is that shift?
5 How long do you rove on a shift like that?
6   A  12 hours.
7   Q  12 hours. Okay.
8   A  Yeah.
9   Q  And for someone in 13D, how often are you going
10 -- if you're doing everything right in terms of the number
11 of sight checks, how often is an inmate in 13D going to get
12 a sight check?
13   A  Every 30 minutes.
14   Q  Okay. So if you roved on 13D for a 12-hour
15 shift, you would have seen -- if Mr. Clinton was there the
16 whole time, you would have seen him 24 times. Correct?
17   A  Correct.
18   Q  Okay. Now, what's the roving like in 13 Baker?
19 Is it different?
20   A  Yes.
21   Q  Tell me how it's different.
22   A  Sight checks are every 15 minutes.
23   Q  Okay. Given that you'd been roving 13D that
24 day on August 9th, 2019, based on the times you had seen
25 Mr. Clinton, what he was telling you, and how he appeared,

Page 17

1 were you concerned about his situation at that time on
2 August 8th?
3   A  Yes.
4   Q  Okay. And given that you were concerned, you
5 reported this to the charge nurse, Kristin. Correct?
6   A  Yes.
7   Q  And so kind of from your standpoint, from your
8 subjective point of view, you were concerned about
9 Mr. Clinton's potential health situation. Correct?
10   A  Yes.
11   Q  Okay. And it appeared to you that you believed
12 he may need some further medical attention. Correct?
13   A  Yes.
14   Q  Now, that nurse told you she thought, quote,
15 he's just faking it. He was cleared by Saint Anthony's
16 Hospital before coming here. Just ignore him, end quote.
17     Do you see that?
18   A  Yes.
19   Q  Tell me, what did you think about that when
20 that nurse, Kristin, told you that?
21   A  It -- I didn't necessarily -- it was a little
22 unsettling.
23   Q  And tell me why it was -- it was a little
24 unsettling to you.
25   A  It's -- I mean, it's our job to take care of

Page 18

1 these detainees and inmates. So...
2 Q And at that time, August 8th, when you had
3 those concerns about Mr. Clinton, you, it appears, promptly
4 reached out to the nurse, and she told you to ignore him.
5    Were you still concerned about Mr. Clinton's
6 condition?
7 A Yes.
8 Q Okay. Do you believe at that point in time --
9 I kind of want to stop the clock there. So August 8th, you
10 reported Mr. Clinton's issue to the nurse. She told you,
11 you know, what you found unsettling.
12    At that point in time, do you believe
13 Mr. Clinton had received adequate medical care for his
14 situation?
15 A I am not -- I can't say.
16 Q Do you think Nurse Kristin did a -- from your
17 perspective. I know you're not a nurse and you're not a
18 doctor. But from your perspective, do you think she had
19 adequately assessed the situation that you promptly
20 complained to her about?
21 A I would have liked her to at least come over
22 and look at him.
23 Q So at that point in time, on August 9th, when
24 you reported Mr. Clinton's condition to Nurse Kristin, she
25 didn't even come evaluate him. Correct?

Page 19

1 A Correct.
2 Q And why was that something of concern to you?
3 A Just to clear any complaints of medical needs,
4 and if we needed something further.
5 Q So you would agree with me, at that point in
6 time, that Mr. Clinton may need some additional access to
7 medical care. Correct?
8 A I can agree with that.
9 Q Okay. You go on to mention in your statement
10 that:
11    Later that day, I was involved in an altercation
12    with his cellmate, Inmate Reginald McCowin, due to
13    Inmate McCowin having to help Inmate Clinton and
14    Inmate McCowin having a temporary breakdown.
15    Tell me what you remember about that situation
16 with McCowin.
17 A During one of my sight checks, he -- Inmate
18 McCowin started banging on the door. I opened the door.
19 He pushed out of the cell, said he wasn't going back in
20 there because, you know, he had been helping him. And this
21 caused me to go back to medical again and was again told
22 "he's just faking it" or "he's faking it."
23 Q And that's stated here in your report on the
24 next part. Right? "After this, I went to the medical
25 staff again and was again told he's faking it." Correct?

Page 20

1 A Yes, sir.
2 Q Do you remember -- boy, I know it's been a long
3 time. This second time you went on August 8th, do you
4 remember who you spoke to in medical? Was it the same
5 charge nurse or somebody different?
6 A I believe it was the same charge nurse.
7 Q Now, the second time that you went to medical,
8 did you still have some of the same concerns about
9 Mr. Clinton's condition that you did earlier, when you
10 reported him the first time?
11 A Yes.
12 Q And then the second time you went to medical on
13 August the 8th, did anyone from medical come evaluate
14 Mr. Clinton in person?
15 A Not that I recall.
16 Q Okay. And then the second time that you went
17 to medical on August the 8th, similar to before when I
18 asked you, did you still have some concerns about
19 Mr. Clinton getting adequate access to medical care?
20 A Like I said, I would have preferred if they
21 came and looked at him, checked him out.
22 Q So next in your statement, you said:
23    At this time, I went and talked to Lieutenant
24    Carter and Sergeant April, Unit Manager over the
25    13th floor. Sergeant April told me she submitted

Page 21

1    a movement sheet to move Inmate Clinton to 13B for
2    further observation, but it was denied because
3    there was no medical movement form signed by the
4    medical staff.
5    Do you see that?
6 A Yes.
7 Q So at this time, Lieutenant Carter would have
8 been -- is that Tiffany Carter?
9 A (Witness moves head up and down).
10 Q Is that a "yes"?
11 A Yes.
12 Q Would have been your direct supervisor. Is
13 that right?
14 A No. Sergeant April was my direct supervisor.
15 Q Sergeant April and then Lieutenant Carter?
16 A Yes.
17 Q Okay. And Sergeant April tried submitting a
18 movement form to get Mr. Clinton into 13 Baker. Right?
19 A Yes.
20 Q And so I -- you testified about it earlier, but
21 I just want to make sure we have a real clear record.
22    A movement form is the form to get an inmate
23 into 13 Baker, the infirmary wing. Is that right?
24 A Correct.
25 Q And medical has to also sign off on that. Is

Page 22

1 that true?
2   A   For the infirmary. Yes.
3   Q   For the infirmary. Okay.
4       And Sergeant April told you that the movement
5 form was denied by medical. Correct?
6   A   Correct.
7   Q   Now, did she tell you at that time how or why
8 it was denied or whether there -- what the efforts were to
9 get medical to sign the movement form?
10  A   No.
11  Q   Just that they hadn't signed it and that was
12 that. Right?
13  A   Correct.
14  Q   And so that last part about the movement form
15 not being signed by medical, that's kind of the last part
16 of the entry you have for your shift on August 9th.
17 Correct? Or August 8th, 2019. Correct?
18  A   Correct.
19  Q   Okay. So at that point in time, when your
20 shift ends on August 8th, 2019, Mr. Clinton was still there
21 in 13D. Correct?
22  A   Correct.
23  Q   And he was still, at least based on his
24 appearance, not able to get up and move. Correct?
25  A   From what I observed.

Page 23

1   Q   And his condition at the time you left on
2 August the 8th, 2019, was that consistent with what you had
3 seen on your whole 12-hour shift that day?
4   A   Yes.
5   Q   Okay. And kind of similar to before, I know
6 this is the third time I have asked you this, but at that
7 point in time when you leave your shift August the 8th,
8 2019, did you still have those same type of concerns about
9 Mr. Clinton's condition?
10  A   I -- I mean, I did. And that's why I let the
11 officer relieving me know what was going on.
12  Q   And similar to before, did you still have some
13 concerns about Mr. Clinton potentially needing some further
14 access to medical care?
15  A   I -- yes. I thought that they should still go
16 over and check him out.
17  Q   And similar to before, when you left your shift
18 August 8th, 2019, did you still have some concerns about
19 medical needing to come be more involved with Mr. Clinton's
20 care?
21  A   In my opinion, yeah.
22  Q   In your opinion. Yes.
23      And your opinion was based on your roving and
24 your 24 sight checks performed in 13D that day, August the
25 8th, 2019. Correct?

Page 24

1   A   Correct.
2   Q   But you reported this up your chain of command.
3 Correct?
4   A   Correct.
5   Q   That same day. Correct?
6   A   (No verbal response).
7   Q   Is that right?
8   A   Yeah. Yes. Sorry.
9   Q   Sorry. I kind of asked quick questions back to
10 back on you there. I apologize.
11  A   That's okay.
12  Q   So it appears you came in to work again the
13 next day. We're on Friday, August 9th, 2019. Is that
14 right?
15  A   Correct.
16  Q   And you were told by SDO Flores, who worked
17 13th floor from 1800 to 600 that night, he had given Inmate
18 Clinton water because he could not drink it on his own.
19      Do you see that?
20  A   Yes.
21  Q   So SDO Flores would have been the night, the
22 graveyard shift rover for 13?
23  A   Correct.
24  Q   And so tell me what you thought about that when
25 you started your shift August the 9th and you're still

Page 25

1 hearing about Mr. Clinton and hearing that the rover had to
2 help Mr. Clinton drink.
3   A   Well, as I stated on page 2 of my report, I
4 told Officer Flores what the charge nurse had told me the
5 day before, but I would see if I could look into it
6 further. And there was a different charge nurse, Charge
7 Nurse Sherri. And so I told her -- I basically kind of
8 informed her on what was going on. And, you know, like I
9 stated earlier, "Okay, you know, if he is, quote-unquote,
10 faking it, if we could move some people around where I
11 could put him in 13 Baker 21 in a camera cell, then we
12 could see whether he was. But either way, he would be in
13 13 Baker."
14      And she also put in a task for mental health,
15 just in case it was a mental health issue. And so at that
16 point, I submitted movement paperwork but had to wait on
17 Classifications.
18  Q   I am going to back up a little bit to there
19 kind of towards the end of your shift on August 8th, when
20 you reported things up the chain of command through April
21 and Carter.
22  A   Uh-huh.
23  Q   Do you recall what specific concerns you
24 relayed to them about Mr. Clinton?
25  A   I mean, I just told them of the condition that

Page 26

1  I observed, what he had said to me, and of course, you
2  know, even his cellmate, what his cellmate had told me.
3     Q   And what had his cellmate told you? I know we
4  talked about it a minute ago, but just to make sure I've
5  got it clear. What did McCowin tell you on August 8th?
6     A   He was upset and he was having to help him
7  drink water and things like that.
8     Q   Okay. Tell me what type of response -- I know
9  we talked about the movement form. So I don't need you to
10 repeat that.
11         Anything else you remember about how April or
12 Carter responded to you? What did they think about the
13 situation about Mr. Clinton and...
14    A   They didn't really tell me.
15    Q   Okay.
16    A   That I recall, at least.
17    Q   So we're back there to the start of your shift
18 the morning of August 9th. You mentioned there's a new
19 charge nurse for Turnkey, Sherri. Right?
20    A   Yes.
21    Q   And you went and told Sherri the same thing you
22 had told Nurse Kristin the day before. Right?
23    A   Correct.
24    Q   So at that point on August 9th, when you went
25 and talked to Nurse Sherri, did you still have some of

Page 27

1  those same types of concerns you had about Mr. Clinton the
2  day before?
3     A   Yes.
4     Q   Which is why you went back to the medical
5  staff. Right?
6     A   Correct.
7     Q   Okay. And it was then that it was agreed to
8  that Clinton would get moved into 13 Baker. Right?
9     A   Correct.
10    Q   Okay. And so you continued to perform sight
11 checks on your shift on August 9th. Correct?
12    A   Correct.
13    Q   Now, tell me -- you may have to educate me a
14 little bit on doing sight checks on the 13th floor.
15        Is the same rover usually doing B and D?
16    A   No.
17    Q   Okay. So it's usually a different -- different
18 rover at all times?
19    A   I mean, usually, because back then you had an
20 officer for B by itself because it's so -- you know,
21 15-minute sight checks, you have the infirmary. You need
22 an officer there.
23    Q   And D is 30 minutes. Correct?
24    A   And D is 30 minutes.
25    Q   But you were roving on August 9th in 13B.

Page 28

1  Right?
2     A   13 David.
3     Q   13 David?
4     A   Yeah.
5     Q   Okay. And so when you're mentioning here --
6  and I know we've got the logs. I could pull them up.
7         You say, "Each sight check, I would notice
8  Inmate Clinton had not changed positions and I would still
9  talk to him to make sure he was okay. And he would tell
10 me, 'I can't move my arms.'"
11        So that was in 13D that day on August 9th?
12    A   Yes.
13    Q   Okay. Because you went on to tell him you were
14 trying to get him into 13 Baker. Right?
15    A   Correct.
16    Q   Okay. And at that point in time on August 9th,
17 when you were doing your roving in 13D, was Mr. Clinton
18 still not showing any signs that he could move?
19    A   Correct.
20    Q   Okay. You go on to state: "After waiting for
21 hours, around 1500, medical movement forms were finally
22 turned in to Classifications."
23        Tell me what that means with a capital C,
24 Classifications.
25    A   So that's the department that handles any

Page 29

1  movements in the system. So in the computer, to show a
2  person had moved from one location to the next.
3     Q   And you state: "However, the paperwork showing
4  where all the other movements that had to be done before
5  moving Inmate Clinton could not be brought up because
6  Classifications had closed."
7         What do you mean there?
8     A   At the time, Classifications would close at
9  1600 -- or 1800. No. 1600. Sorry. And reopen at 1800
10 hours.
11    Q   Okay.
12    A   So they -- because they had closed, there was
13 -- the paperwork was locked in their office.
14    Q   And that's where the medical clearance has to
15 happen for that movement form to go through. Right?
16    A   Correct.
17    Q   So they're -- so they're closed. At least at
18 this time, they were closed from 4 to 6 p.m. Is that
19 right?
20    A   Yes.
21    Q   Okay. And so around 1800, when Classifications
22 opens back up, you check about these other inmates that are
23 supposed to get moved out of 13 Baker. Am I understanding
24 that right?
25    A   Yes.

Page 30

1     Q    Okay. Because that's going to free up the
2 space for Clinton to go into 13 Baker?
3     A    Correct.
4     Q    Okay. And so you pass this on to SDO Miles.
5 Is that right?
6     A    Yes.
7     Q    And he --
8     (Cell phone alarm interruption)
9     THE WITNESS: I'm sorry.
10     Q    (By Mr. Tabor) Oh, you're okay.
11     A    I am normally waking up at this time.
12     Q    And if someone's calling you, you've got a work
13 thing, you need to take a break, let me know. We can go
14 off the record.
15     A    Oh, no. I work nights. I am normally waking
16 up right now.
17     Q    So we brought you in early, I guess, is what...
18     A    Yeah. A little bit. It's okay. Sorry.
19     Q    So you pass this news on to Miles, who
20 reassured you that if Medical Security could not complete
21 the movements, he would take care of it.
22 Tell me what you mean there, what he was
23 telling you.
24     A    We have a division called "Medical Security."
25 And they typically handle any sort of medical movements and

Page 31

1 especially, you know -- mainly over the 13th floor, either
2 moving individuals into 13 Baker, out of 13 Baker, or
3 anywhere on the 13th floor. And so, basically, he was
4 telling me -- or he told me that if for some reason they
5 could not complete those movements, he would make sure that
6 Mr. Clinton got moved over to 13 Baker.
7     Q    Okay. So based on your discussions with SDO
8 Miles, he agreed with your assessment that Mr. Clinton
9 needed to be moved over to 13 Baker. Correct?
10     A    I mean, I can't really say, but I was the
11 outranking officer. So...
12     Q    So kind of stepping back. From your job
13 experience and your time that you've worked at the Oklahoma
14 County Jail, tell me what you believe the duty is of a
15 detention officer on how to act if the detention officer
16 sees an inmate with a potentially serious medical problem.
17 Walk me through with what you think is required of the
18 detention officer.
19     A    I mean, we observe, you know, look for any --
20 if somebody needs immediate medical care or anything like
21 that, you know, we notify -- notify medical. If -- you
22 know, in this case, I went to the charge nurse, told her
23 what was going on. And medical then takes over as far as
24 their medical care.
25     Q    What if medical is not doing their job or

Page 32

1 neglecting the inmate? What do you think the duty, if any,
2 is on the detention staff?
3     A    I mean, at that time, like I stated in my
4 report, I took it up my chain of command. And at the time,
5 as a corporal, like, that's all I could do.
6     Q    Okay. And you did that. Correct?
7     A    Yes.
8     Q    Because you were concerned about Mr. Clinton's
9 situation. Correct?
10     A    Correct.
11     Q    Now, you're now a lieutenant at the jail.
12 Correct?
13     A    Correct.
14     Q    So tell me, from the lieutenant's perspective,
15 on a situation like this, if you have a subordinate
16 reporting to you something like this with Mr. Clinton,
17 "Hey, there's an inmate. He may have a serious medical
18 problem. I don't know. And medical may not be doing their
19 job." If that opinion comes up the chain of command to you
20 as a lieutenant, what is your duty, if any, to address the
21 situation?
22     A    I mean, how I personally would handle it,
23 because every lieutenant is different.
24     Q    Okay.
25     A    I would, at the very least, go talk to

Page 33

1 Mr. Clinton. I would go talk to that inmate, see what's
2 going on. If medical needed to be over there, I would have
3 said, "No, come -- you're coming. Let's go." If they
4 refused, then I would -- because of my position, I would be
5 able to call or go through their chain of command.
6     (Cell phone alarm interruption)
7     THE WITNESS: Sorry. I thought I turned that
8 off.
9     MR. TABOR: You're okay. You're okay.
10     Q    (By Mr. Tabor) Would you agree with me that, if
11 a lieutenant at the Oklahoma County Jail has a suspicion
12 that an inmate's serious medical problem might not -- or is
13 not being treated properly by the medical staff, that
14 lieutenant has a duty to do something further?
15     A    We do have a duty of care.
16     Q    Okay. And would you agree with me that the
17 detention staff generally, they just can't simply report
18 the inmate's condition to medical and be done with the
19 situation. Correct?
20     A    Like speaking as a lieutenant or a corporal?
21     Q    As a lieutenant.
22     A    As a lieutenant, like I stated, I --
23 personally, I would have at least checked it out myself.
24     Q    Okay. So you would have undertaken some
25 further action to fulfill your duty as the lieutenant.

Page 34

1 Correct?
2  A   That's just me as a person.
3  Q   Okay. But what's your understanding of what is
4 required of you as a lieutenant?
5  A   Generally speaking, as far as getting further
6 medical care and anything, we leave that up to the charge
7 nurse.
8  Q   And is that still your understanding of your
9 duty as a lieutenant, even if you have the personal opinion
10 that there might be a serious medical problem and the
11 medical staff are ignoring the inmate?
12  A   Oh, I wouldn't ignore the inmate. There's -- I
13 would also be able, as the lieutenant -- at least now. I
14 can't speak for then, because I wasn't a lieutenant then.
15 But as of now, I would have been able to go ahead and move
16 Mr. Clinton to 13 Baker when I was first told about it.
17  Q   Okay. So you would have undertaken some
18 further action as a lieutenant. Correct?
19  A   Yes.
20  Q   You just, as a lieutenant, don't pass it off on
21 medical and wash your hands of the situation. Correct?
22  A   I mean, it's -- every lieutenant is different.
23  Q   Okay. Tell me, what about -- I know I am kind
24 of changing it up on you a little bit here.
25      What about, as a lieutenant, if you've got an

Page 35

1 inmate who is in 13 Baker and you have the opinion that
2 he's still getting ignored by the medical staff? What
3 duty, if any, do you have, as the lieutenant, to act on
4 that situation?
5  A   I mean, every situation is different.
6  Q   Uh-huh.
7  A   I have been known to call and get them sent and
8 checked out at the hospital, if needed, if it's something
9 that is out of the hands of our medical staff. But I
10 usually am working pretty closely with medical staff.
11  Q   So you -- there are some instances -- and I
12 know every case is different. Right?
13  A   Yes.
14  Q   But there are some cases out there, if it's
15 serious enough, you, as a lieutenant, would recognize that
16 you may need to call an outside medical provider if -- if
17 required. Correct?
18  A   At times. Every case is different, though.
19  Q   But there could be some cases, in order for you
20 to fulfill your professional duty, you would have to make
21 that call. Correct?
22  A   Yes.
23  Q   Okay. Are you generally familiar -- I know I
24 am plowing a lot of ground here -- with any of the prior
25 inspections or investigations of the Oklahoma County Jail

Page 36

1 from the State Department of Health? Have you ever been
2 involved in any of that?
3  A   I have taken them around on tours.
4  Q   Do you recall when the -- well, I know what it
5 is.
6      The management of the jail was handed over from
7 the Sheriff to the Trust in July of 2020. Is that correct?
8  A   That's correct.
9  Q   Tell me, from your perspective, as somebody
10 that's worked during the Sheriff's operation of the jail
11 and during the Trust's operation of the jail, are there
12 differences in how things are run? Are they largely the
13 same? Kind of tell me your perspective on that.
14  A   There are differences. Like some things are
15 the same. Some. But, to me, from what I have seen,
16 working with both the Sheriff's Office and the Trust, it
17 seems like it's improved as far as getting inmates
18 treatment and having -- having medical more involved and --
19 I mean, it -- that's my opinion.
20  Q   And so those areas where, from your
21 perspective, the Jail Trust has improved the operation of
22 the jail, at the time you were at the jail when the Sheriff
23 was running it, I mean, did you have some concerns about
24 those -- those areas that are now improved by the Trust?
25  A   I mean, I can't -- can't recall.

Page 37

1  Q   Okay. Can you -- during your time at the jail,
2 let's say when the sheriff was operating the jail, can you
3 think of any other times you witnessed where you thought
4 medical staff was maybe not doing their job or paying
5 attention to an inmate with a problem?
6  A   I mean, this is one.
7  Q   Okay. Mr. Clinton's case is one of those
8 cases. Correct?
9  A   So am I -- I mean, from what I saw from at
10 least Charge Nurse Kristin, but that's the only one I can
11 recall at this particular moment.
12  Q   From your perspective, your involvement in the
13 events surrounding Mr. Clinton, do you think the Turnkey
14 staff, from your opinion, do you think they did everything
15 they could to help him?
16  A   I think Charge Nurse Sherri tried at least.
17  Q   Okay. Do you think that the sheriff's
18 department, on its involvement in Mr. Clinton's care, do
19 you think it did everything it could to get him medical
20 attention?
21  A   I believe that I, working for the sheriff's
22 department, did everything that I possibly could have. I
23 think that they put trust into the Turnkey medical staff to
24 be able to help Mr. Clinton.
25      MR. TABOR: Pass the witness at this time.

Page 38

1	MR. HEGGY: No questions.
2	MR. TABOR: You have the right to receive a
3 copy of the transcript of today. And you also have the
4 right to read it and make any corrections, if there's like
5 a transcription error to your testimony. And you can
6 return that sheet with your corrections, if any, to the
7 lawyers and the court reporting service, or you can just
8 stand on the transcript that's been created today and waive
9 that process.
10	It's your decision. We just need you to make
11 that decision on the record.
12	THE WITNESS: Yes. I will have a copy of it.
13	MR. TABOR: Okay. So you will want to read and
14 sign your deposition?
15	THE WITNESS: Yes. Thank you.
16	(Deposition concluded at 3:44 p.m. and witness excused
17	after 52 minutes on the record)
18
19
20
21
22
23
24
25

1                C E R T I F I C A T E

2   STATE OF OKLAHOMA   )
                        ) SS:
3   COUNTY OF OKLAHOMA  )

4

5          I, Lori Johnston Harstad, a Certified Shorthand

6   Reporter for the State of Oklahoma, certify that Mary

7   Mulanax was by me sworn to testify the truth; that the

8   deposition was taken by me in stenotype and thereafter

9   transcribed by computer and is a true and correct

10  transcript of the testimony of the witness; that the

11  deposition was taken by me on March 15, 2023, at 2:52 p.m.,

12  at 1601 36th Avenue NW, Norman, Oklahoma; that I am not a

13  relative, employee, attorney or counsel to any party in

14  this case or a relative or employee to any counsel in this

15  case or otherwise financially interested in this action;

16  and that the witness elected to exercise her right to

17  review the deposition transcript prior to its filing.

18          Witness my hand and seal of office on this 20th day

19  of March, 2023.

20

21

22                        *Lori Harstad* (signature)

                          Lori Johnston Harstad, CSR
23                        Oklahoma Certified Shorthand Reporter
                          Certificate Number 1726
24                        Expiration Date:   December 31, 2023

25  Oklahoma CSR #01726
    My Commission Expires 12/31/2022

```
 1                        JURAT

 2        I, Mary Mulanax, do hereby state under oath that I

 3   have read the above and foregoing deposition in its

 4   entirety and that the same is a full, true, and correct

 5   transcription of my testimony so given at said time and

 6   place, except for the corrections noted.

 7

 8   _____  WITH CORRECTIONS

 9   _____  WITHOUT CORRECTIONS

10

11                                        _____

12

13

14        Subscribed and sworn to before me, the undersigned

15   Notary Public in and for the State of Oklahoma, on this,

16   the _____ day of _____, 2023.

17

18

19                                        _____
                                          NOTARY PUBLIC
20

21   My Commission Expires: _____

22   My Commission Number:  _____

23

24

25   Reported by:  Lori Johnston Harstad, CSR
```

```
 1                    ERRATA SHEET

 2           WITNESS:  Mary Mulanax

 3           CASE STYLE:  Brothers v Oklahoma County, et al.

 4           REPORTER:  Lori Johnston Harstad, CSR

 5    PAGE   LINE   CORRECTION AND REASON

 6    ____   ____   _____

 7    ____   ____   _____

 8    ____   ____   _____

 9    ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

25    ____   ____   _____
```