```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF OKLAHOMA

 3   EQULLA M. BROTHERS, as the Personal   )
     Representative and Administratix of   )
 4   The Estate of Daryl Clinton, Deceased )
                                           )
 5        Plaintiff,                       )
                                           )
 6   -vs-                                  ) No.  5:2021-cv-418
                                           )
 7   (1) TOMMIE JOHNSON III, in his        )
     official capacity as Oklahoma County  )
 8   Sheriff,                              )
                                           )
 9        Defendant.                       )
     _____)

10

11
                    [ CERTIFIED COPY ]
12

13           DEPOSITION OF CHRISTOPHER HENDERSHOTT

14
             TAKEN ON BEHALF OF THE PLAINTIFF
15

16                   IN NORMAN, OKLAHOMA

17
                      ON MARCH 15, 2023
18

19                  COMMENCING AT 2:02 P.M.

20

21

22                     INSTASCRIPT, LLC
                      125 PARK AVENUE, LL
23             OKLAHOMA CITY, OKLAHOMA  73102
                        (405) 605-6880
24                    www.instascript.net

25         REPORTED BY:  LORI JOHNSTON HARSTAD, CSR
```

Page 2

1  APPEARANCES

2 FOR THE PLAINTIFF:

3     Geoffrey Tabor
      Attorney at Law
4     Madison Smith
      Legal Intern
5     Ward & Glass, LLP
      1601 36th Avenue NW
6     Suite 100
      Norman, OK 73072
7     geoffrey@wardglasslaw.com

8 FOR THE DEFENDANT:

9     Rodney J. Heggy
      Assistant District Attorney
10    Office of the District Attorney-Oklahoma County
      320 Robert S. Kerr
11    Suite 505
      Oklahoma City, OK 73102
12    Rod.heggy@oklahomacounty.org

Page 3

1  INDEX

2  WITNESS                                    PAGE:

3  Christopher Hendershott:

4  Direct Examination by MR. TABOR            5:5

5  EXHIBITS

6  NO.:   DESCRIPTION:                         PAGE:

7  For Deposition:

8  1   Special Investigations Unit
       investigative report of Sergeant
9      Jennifer Peek, OCSO-000117 to '139:
10     For Identification                     15:13

Page 4

1  STIPULATIONS

2

3     It is hereby stipulated and agreed by and between

4  the parties hereto, through their respective attorneys,

5  that the deposition of Christopher Hendershott may be taken

6  on behalf of the Plaintiff on March 15, 2023, in Norman,

7  Oklahoma, by Lori Johnston Harstad, Certified Shorthand

8  Reporter within and for the State of Oklahoma, pursuant to

9  subpoena.

10    It is further stipulated and agreed by and between

11 the parties hereto, through their respective attorneys,

12 that all objections, except as to the form of the question

13 or the responsiveness of the answer, are reserved until the

14 time of trial, at which time they may be made with the same

15 force and effect as if made at the time of the taking of

16 this deposition.

19              **********

Page 5

1           CHRISTOPHER HENDERSHOTT,

2  Of lawful age, having been first duly sworn, deposes and

3  says in reply to the questions propounded as follows:

4           DIRECT EXAMINATION

5  BY MR. TABOR:

6     Q    Good afternoon, Mr. Hendershott. My name is

7  Geoffrey Tabor. We have met. I will be primarily taking

8  your deposition today.

9          Could you state your full, legal name for the

10 record, please.

11    A    Christopher Raymond Hendershott.

12    Q    Okay. And have you ever given a deposition

13 like this before?

14    A    No. I don't believe I have.

15    Q    Okay. I am going to go over a few quick ground

16 rules and get you out of here sooner, hopefully. As you

17 see, you're under oath. There's a court reporter here

18 typing out everything we say. So to make sure we have a

19 clean record, if you will let me finish what I am saying

20 and then you can start. I will do the same for you. It

21 will be a little mechanical back and forth so we have a

22 clean record, rather than us interrupting each other.

23    A    Okay.

24    Q    That's kind of the easiest way to do it.

25         If you could say "yes" or "no" or a clear

Page 6

1 verbal response, that's better than "uh-huh" or, like, a
2 shake of the head. If you do say something like that,
3 that's okay. I will just ask you to clarify. I am not
4 picking on you.
5     If you need a break, let me know. I just ask
6 that you fully answer the pending question before we go off
7 the record, but I don't expect you to be here very long.
8     Are you suffering from any type of medical
9 condition or under the influence of any substance that
10 would affect you giving clear testimony today?
11   A   No.
12   Q   Okay. You're of sound mind today. Right?
13   A   Yes.
14   Q   Could you just give me a really general
15 overview, 30,000-foot overview, of your educational
16 history?
17   A   High school education plus CLEET.
18   Q   And where did you graduate from high school?
19   A   Ada High School.
20   Q   Okay. Well, I didn't know that. You better
21 look out. I am from Ardmore.
22   A   Uh-oh.
23   Q   We've got a little rivalry brewing here.
24     What year or years did you go to CLEET?
25   A   Went to CLEET in 2012.

Page 7

1   Q   2012. Okay.
2     Now, tell me -- let's kind of go from 2012 to
3 present. Tell me about your work history.
4   A   2012, I was a sergeant with the Oklahoma County
5 Sheriff's Office in the detention center, assigned to the
6 Disciplinary Grievance Unit. When I went to CLEET, did
7 that for about another year before I made lieutenant/shift
8 commander inside the Oklahoma County Detention Center.
9     I worked there until I retired December 31st,
10 2019, but I was also on the Dignitary Protection Unit.
11     THE REPORTER: I'm sorry. Did you say
12 "dignitary protection"?
13     THE WITNESS: Dignitary Protection Unit, the
14 Oklahoma County Gang Intelligence Unit, and I was Crisis
15 Intervention Team.
16   Q   (By Mr. Tabor) And so what time frame were you
17 at the Oklahoma County Jail? You were there until December
18 31st, 2019.
19     When did you first start there?
20   A   Very first started there in November of 1995.
21   Q   Okay.
22   A   And then I left County in 2003 or '4. 2004,
23 April of 2004. Then I came back in August of 2007.
24   Q   Okay. And tell me what have you done in terms
25 of work since December 31st of 2019?

Page 8

1   A   Armed security and a reserve police officer.
2   Q   Okay. And who are you -- what department are
3 you reserve for?
4   A   I was with Custer City.
5   Q   Okay.
6   A   I am no longer there.
7   Q   Okay. Did you do anything -- I know we sent
8 you the subpoena for today. Have you done anything else to
9 prepare for today's deposition, or just show up?
10   A   I looked on the Google and Googled the person's
11 name and read the News 9 article on them.
12   Q   Daryl Clinton?
13   A   Yes.
14   Q   Have you talked to any of the other detention
15 officers? County personnel?
16   A   No.
17   Q   Let's talk about -- let's say as of 2019, when
18 you were last at the jail, if you could give me a basic
19 hierarchy from the detention officers up to the sheriff on
20 the jail operation side. Tell me how that worked.
21   A   Oh, man. Well, detention officers were the
22 backbone of it. They sat there, they did all the work.
23 You had corporals and sergeants also doing all the work.
24 Corporals would be assigned to a floor, whatever floor the
25 shift commander wanted them to. Sergeant would be assigned

Page 9

1 to a floor by administration, and they would be in charge
2 of that floor. Lieutenants would be in charge of a shift.
3     After that, you had captains above us, who were
4 in charge of the operations of the whole jail, and a major
5 above them. And then, after that, it would be the
6 undersheriff and sheriff that did whatever they did.
7   Q   Okay. Could you tell me kind of generally the
8 nature and purpose of sight checks at the jail? Tell me
9 about that.
10   A   To make sure the inmates are physically okay
11 and to make sure the security of the facility is intact.
12   Q   Okay. During your time with the jail, tell me
13 the training, if any, that you got regarding sight checks.
14   A   Basically, in the classroom, they talk about
15 them. They tell you what to look for. You look for
16 movement, look for breathing, look for the color of the
17 skin. You look at the jail surroundings, the cell
18 surroundings, make sure nothing is out of the ordinary.
19 Then when you got to the jail, when you're on your training
20 phase, you go -- you go around with someone. They just
21 tell you kind of what to look for and show you, and that's
22 it.
23   Q   And when you talk about the training you're
24 describing just now in the classroom, is that CLEET?
25   A   No.

Page 10

1  Q  Okay.
2  A  That's from the Oklahoma County Sheriff's
3  Office, their training division.
4  Q  Okay. And how often did you receive that type
5  of training on sight checks?
6  A  Initial academy, and that's it.
7  Q  Okay. And would you agree with me that a
8  proper sight check is intended, in part, to ensure the
9  safety and security of the inmates?
10  A  Absolutely.
11  Q  And you would agree with me that it's accurate
12  to say that performing a reasonable sight check, the
13  detention staff has got to pay attention to the condition
14  of the inmate?
15  A  Yes.
16  Q  Now, as a part of a reasonable sight check,
17  would you expect the detention staff to pay attention to
18  the appearance and the behavior of the inmate?
19  A  Yes.
20  Q  And as part of a reasonable sight check, would
21  you expect detention staff to pay attention to what could
22  be a potential medical emergency?
23  A  Yes.
24  Q  Okay. And you would agree with me paying
25  attention to those sorts of things are important for the

Page 11

1  detention officer. Correct?
2  A  Yes.
3  Q  If a particular detention officer, let's say,
4  is doing their sight checks, sees an inmate with a
5  potentially serious medical problem, and there's a shift
6  change on whoever the rover is, is it your understanding,
7  does the sheriff's office expect there to be some type of
8  exchange of information there or --
9  A  Yes.
10  Q  Okay. And why is that?
11  A  Well, you always do pass-on to alert the next
12  shift on possible situations that might come up.
13  Q  Now, as of 2019, your time there at the jail,
14  did the detention staff have any training on detainee or
15  inmate medical care?
16  A  Just your basic CPR and First Aid.
17  Q  Okay. Anything else other than basic CPR and
18  First Aid?
19  A  How to use an AED. That was about it.
20  Q  Did the detention staff ever get any training
21  from the County about when to call 911, if ever, regarding
22  an emergency medical situation?
23  A  Detention staff doesn't do that. The shift
24  commander would do that.
25  Q  During your experience at the Oklahoma County

Page 12

1  Jail, is it your understanding that the detention staff,
2  they were not expected to render medical care or make
3  medical-related decisions for inmates? Right?
4  A  Well, I wouldn't say that. I mean, if someone
5  is in need of immediate medical assistance, I expect that
6  the officer would intervene right then.
7  Q  So you would say that --
8  A  Whether it be, you know, performing CPR or at
9  least calling for medical over the radio to get a nurse and
10  gurney in there.
11  Q  So you would agree that there is some
12  involvement by the detention staff on medical issues,
13  depending on the situation?
14  A  Yes.
15  Q  And that may, depending on the situation,
16  exceed just calling the medical staff. Right?
17  A  Yes.
18  Q  Okay. And that -- that is your understanding
19  of the duties that are on the detention staff as a
20  lieutenant, former lieutenant working at the jail.
21  Correct?
22  A  Yes.
23  Q  And I already asked you this a little bit, so I
24  apologize if I am repeating myself, but tell me the
25  training, if any, the detention staff at the jail had

Page 13

1  regarding recognizing and responding to medical health
2  emergencies.
3  A  Well, you know, you're taught, you know, to
4  observe someone. If they look to be in medical distress,
5  you notify medical. You know, that could be the color of
6  the skin. That could be their behavior. It could be a
7  number of things.
8  Q  In your experience at the jail, did any of the
9  detention staff anywhere along the chain, did they have any
10  decision-making process regarding referrals or transports
11  to outside medical facilities for inmates?
12  A  No.
13  Q  So in your understanding of how the jail
14  operated, the County expected all of that decision making
15  to be on the medical provider. Correct?
16  A  Unless it was a life-threatening medical
17  emergency. Then the shift commander would usually go ahead
18  and make that call.
19  Q  So you would agree with me there's some
20  situations where the detention staff can play a role on the
21  transfer process. Correct?
22  A  The shift commander. Yes.
23  Q  And in order for that to happen, it's my
24  understanding there needs to be some type of reporting up
25  the chain of command. Right?

Page 14

1 A Yes.
2 Q And you said "the shift commander." Is that
3 right?
4 A Yes. What would happen in a medical emergency
5 -- say someone is not breathing. The shift commander would
6 go ahead and call EMSA. But then after making that call
7 and getting it rolling, you would immediately call the duty
8 officer and let them know what's going on.
9     If it wasn't a life-threatening emergency and
10 the shift commander felt that this inmate needed to go out
11 but medical didn't, you would relay it up to your captain.
12 And wherever it goes from there, it goes.
13 Q So if there is either a disagreement with
14 medical or medical is maybe not doing their job, there is
15 still a process, as you understand, for it to go up the
16 chain of command on the detention staff side. Right?
17 A Yes.
18 Q Okay. And so it wouldn't be accurate to say,
19 you know, the detention staff, as long as they just make
20 the medical staff known of an emergency, the detention
21 staff isn't necessarily done there. They just can't wash
22 their hands in that scenario. Right?
23 A No.
24 Q And just to be clear -- I know what you're
25 saying. Just to make sure -- we've got a written

Page 15

1 transcript and there's a -- make sure we don't have a
2 double negative there.
3     You would agree with me that the detention
4 staff just can't call medical and wash their hands of the
5 situation. Correct?
6 A That's correct.
7 Q Okay. Thank you.
8     Because if, in some situations, it's apparent
9 that medical is not doing their job or neglecting an
10 inmate, there is still a duty to make sure that inmate gets
11 taken care of. Right?
12 A Yes.
13     (Exhibit 1 marked for identification)
14 Q (By Mr. Tabor) I am introducing Exhibit 1 to
15 your deposition. I think you've already got a copy here.
16 This is the investigative report of the death of
17 Mr. Clinton.
18     Now, I know you have slept quite a bit since
19 this, since October of 2019, but have you given a general
20 look-over of this investigation?
21 A Of my portion. Yes.
22 Q Okay. And what page are you on there?
23 A Page 11, very top.
24 Q And I believe you mentioned you Googled
25 Mr. Clinton's death before coming in here, to try to

Page 16

1 refresh your memory. Right?
2 A Correct.
3 Q Okay. You were interviewed by Sergeant
4 Jennifer Peek as a part of this investigation. Correct?
5 A I guess so. I don't remember.
6 Q Okay. But after reviewing page 11 -- OSCO 127
7 is the Bates -- of this investigation, you don't have any
8 reason to doubt the context of your interview portion?
9 A No.
10 Q Okay. Did reviewing any of this, of your
11 interview here with Sergeant Peek, did this refresh your
12 recollection at all about this night? Do you remember
13 this?
14 A No, I do not.
15 Q Okay. Before August 2019 at the jail, do you
16 recall -- and I am not just talking about you. I am not
17 picking on you or anything.
18     But do you recall any patterns or instances
19 where detention officers weren't doing their sight checks
20 properly?
21 A Absolutely.
22 Q Okay. Tell me a little more about that.
23 A The jail was extremely shorthanded. And there
24 were probably a lot of sight checks missed, whether it be
25 due to shorthandedness, some -- sometimes there were

Page 17

1 officers assigned one officer per two floors. It just
2 wasn't possible to get them done in a timely fashion and
3 feed and pass meds and do everything else. And then there
4 were occasions where officers just neglected their duties.
5 Q And was that a concern that you had about how
6 things were being run at the jail?
7 A Absolutely.
8 Q And from your experience at the jail going all
9 the way back to the nineties, could that shorthandedness
10 and pattern of not doing sight checks properly, could that
11 impact the safety of certain inmates?
12 A Absolutely.
13 Q And did you still even have those concerns
14 about those things when you left the sheriff's department
15 in December of 2019?
16 A Even more so, because we were extremely
17 shorthanded then.
18 Q Okay. And so would you say, over your time
19 there at the jail, you had become increasingly concerned
20 about the -- those matters?
21 A Not only sight checks but the safety of the
22 staff and everyone there.
23 Q During your career there at the jail, did
24 anyone raise concerns about improper sight checks or
25 understaffing?

**Page 18**

1  A  Yes.
2  Q  Okay. Tell me what you remember about that.
3  A  Well, I mean, I did, as lieutenant, to my
4  captains almost weekly. Other lieutenants would complain
5  about it. The captains knew that we were shorthanded.
6  They knew the sight checks weren't getting done properly.
7  And it just was going on repeat after repeat.
8  Q  And then, from your perspective, that never
9  really got better? In fact, it sounds like, from your
10 perspective, it got worse. Right?
11 A  Yep. Yes. Sorry.
12 Q  Kind of on this topic of things in your career
13 that troubled you about the jail and how it was being run,
14 tell me anything else that you voiced your concerns about
15 or you thought were not being done right.
16 A  Okay. There was a particular instance where my
17 partner at the time, Lieutenant Chairs, had written up a
18 female officer for abandoning her post, which was medical
19 13 Adam, which had suicidal females, pregnant females, and
20 mental health females in there, because she had class to go
21 to. And she had an evening class twice a week for 16
22 weeks, I believe it was.
23     And Lieutenant Chairs had let her off every
24 single time except for one time she couldn't because we
25 were too shorthanded. And the officer basically said, "I

**Page 19**

1  am leaving anyways," and left and sent her a text message
2  saying something to the effect of "fuck Oklahoma County.
3  It's not worth me staying. I am going to my class." And
4  she left those inmates without anyone in there, and they
5  were 15-minute sight checks.
6      And Lieutenant Chairs wrote her up and took it
7  to Captain Sedbrook. And nothing was being done about it.
8  About two weeks later, I talked to Captain Sedbrook about
9  it, confronted him about it, you know, because he -- and
10 asked him what was being done. And he said, "Oh, that's on
11 the sheriff's desk right now. She's going to be
12 terminated."
13     I said, "So that report is on the sheriff's
14 desk right now?"
15     He said, "Yes."
16     I said, "Then why is it right there on your
17 desk?"
18     He looked me in the eyes and got all flustered
19 and stated, "You know, we can't just write everyone up for
20 making a mistake. We have to retain the officers we have."
21     And I said, "Well, that's the problem. You
22 guys don't have our back." And then the next day I came
23 in, I was transferred back to graveyards.
24 Q  You were what?
25 A  Transferred back to graveyards.

**Page 20**

1     During your time working at the jail, did you
2  ever have any concerns about medical needs of inmates being
3  met?
4  A  Oh, yeah.
5  Q  Tell me about that a little bit.
6  A  Just some of the nurses up there just didn't
7  seem like they cared. They didn't seem like they believed
8  anything the inmates said. And I am -- and I know that
9  there were inmates that played the system. But sometimes,
10 you know, you just -- it just didn't -- it didn't add up.
11 Q  Tell me your thoughts about the time at your
12 career at the jail with Turnkey Health.
13 A  I think County went with the lowest bidder and
14 a lot of the nurses there shouldn't be in the nursing
15 profession.
16 Q  Were there -- during your tenure there, when
17 Turnkey was contracted, were there ever concerns raised
18 about the quality of care being given by Turnkey?
19 A  Yes.
20 Q  Okay. Tell me what you remember about that.
21 A  The inmates complained about it constantly.
22 And, you know, even -- even me as lieutenant, if you put in
23 a word at the clinic, "Hey, can you guys see this person?"
24     "Oh, they were seen earlier in the day. We
25 don't need to see them."

**Page 21**

1  Q  So it sounds like, to me, over the years on
2  some of the concerns you voiced, that you spoke up about
3  these things. Right?
4  A  Yes.
5  Q  Do you feel that the County took your concerns
6  seriously and addressed them?
7  A  My captains, not so much.
8     MR. TABOR: Okay. I will pass the witness at
9  this time.
10    MR. HEGGY: I have no questions.
11    MR. TABOR: Mr. Hendershott, you have a right
12 to get your deposition transcript, the written transcript,
13 that can be sent to you and you can review it and correct
14 it if there's any transcription errors, or you have the
15 right to waive that process and just stand on what's been
16 transcribed today. It's your decision.
17    THE WITNESS: I will stand.
18    MR. TABOR: Okay. So you will waive reading
19 and signing?
20    THE WITNESS: Yes.
21    MR. TABOR: Okay. Thank you, sir.
22 (Deposition concluded at 2:26 p.m. and witness excused
23      after 24 minutes on the record)

```
 1                    C E R T I F I C A T E

 2    STATE OF OKLAHOMA  )
                         ) SS:
 3    COUNTY OF OKLAHOMA )

 4

 5         I, Lori Johnston Harstad, a Certified Shorthand

 6    Reporter for the State of Oklahoma, certify that

 7    Christopher Hendershott was by me sworn to testify the

 8    truth; that the deposition was taken by me in stenotype and

 9    thereafter transcribed by computer and is a true and

10    correct transcript of the testimony of the witness; that

11    the deposition was taken by me on March 15, 2023, at

12    2:02 p.m., at 1601 36th Avenue NW, Norman, Oklahoma; that I

13    am not a relative, employee, attorney or counsel to any

14    party in this case or a relative or employee to any counsel

15    in this case or otherwise financially interested in this

16    action; and that the witness waived his right to review the

17    deposition transcript prior to its filing.

18         Witness my hand and seal of office on this 17th day

19    of March, 2023.

20

21
                         [signature: Lori Harstad]
22                       _____
                         Lori Johnston Harstad, CSR
23                       Oklahoma Certified Shorthand Reporter
                         Certificate Number 1726
24                       Expiration Date:  December 31, 2023

25    Oklahoma CSR #01726
      My Commission Expires 12/31/2022
```