IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

EQULLA M. BROTHERS, as the Personal )
Representative and Administratrix )
of the Estate of Daryl Clinton, )
Deceased, )
                             )
            Plaintiff, )
                             ) Case No.
vs. ) 5:2021-cv-418
                             )
(1) TOMMIE JOHNSON III, in his )
official capacity as Oklahoma )
County Sheriff, )
                             )
1             Defendant. )

1

1

1                *   *   *   *

1        VIDEOCONFERENCE DEPOSITION

1        OF WILLIAM ALLEN COOPER, D.O.

1      TAKEN ON BEHALF OF THE PLAINTIFF

1          ON MARCH 14, 2023

1        IN OKLAHOMA CITY, OKLAHOMA

1       COMMENCING AT 9:32 A.M.

2             *   *   *   *

2

2          INSTASCRIPT, L.L.C.
       125 PARK AVENUE, SUITE LL
2     OKLAHOMA CITY, OKLAHOMA   73102
          405.605.6880
2       schedule@instascript.net

2 REPORTED BY: THERESA L. McDANIEL, C.S.R.

Page 2

1                   A P P E A R A N C E S

2  Appearing via videoconference on behalf of the
   Plaintiff
3
       MR. GEOFFREY A. TABOR
4      Attorney at Law
       WARD & GLASS, LLP
5      1601 36th Avenue NW
       Suite 100
6      Norman, Oklahoma  73072
       E-mail: geoffrey@wardglasslaw.com
7
8  Appearing via videoconference on behalf of the
   Defendant
9
       MR. RODNEY J. HEGGY
10     Assistant District Attorney
       OFFICE OF THE DISTRICT ATTORNEY-OKLAHOMA COUNTY
11     320 Robert S. Kerr
       Suite 505
12     Oklahoma City, Oklahoma  73102
       E-mail: rod.heggy@oklahomacounty.org
13
14 Appearing via videoconference on behalf of the
   Witness
15
       MS. ALEXANDRA "ALLIE" AH LOY
16     Attorney at Law
       SWEET DEWBERRY HUBBARD LAW
17     24 West Park Place
       Oklahoma City, Oklahoma  73103
18     E-mail: allie@sdh.law
19
20
21
22
23
24
25

Page 3

1                 EXAMINATION INDEX

2                                    PAGE

3  Stipulation Page ..............................4

4  Direct Examination by Mr. Tabor  ...............5

5  Cross Examination by Mr. Heggy  ................63

6  Jurat Page ....................................68

7  Errata Sheet ..................................69

8  Certificate Page ..............................70

9

10            PLAINTIFF'S EXHIBIT INDEX

11 NO.      DESCRIPTION                  PAGE

12 1     Notice of Deposition ...................7

13 2     Turn Key medical records ..............59

14 3     Report of Medical Examiner ............58

15 4     St. Anthony's records .................59

16 5     Sentinel Event Review .................41

17 6     County investigative report ...........42

18 7     Cellmate statements ...................46

19 8     Table of Contents .....................61

20 9     Turn Key's policies ...................12

21 10    Nursing protocols .....................27

22 11    Turn Key contract .....................27

23 12    First Amendment to Turn Key contract...61

24 13    Sinead Eastman, RN note ...............44

25

Page 4

1                 S T I P U L A T I O N S

2        It is hereby stipulated and agreed by and

3  between the parties hereto, through their respective

4  attorneys, that the Videoconference Deposition of

5  WILLIAM ALLEN COOPER, D.O., may be taken on behalf of

6  the Plaintiff, on March 14, 2023, in the City of

7  Oklahoma City, Oklahoma, by Theresa L. McDaniel,

8  Certified Shorthand Reporter within and for the State

9  of Oklahoma, taken pursuant to Notice and Agreement

10 and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1            WILLIAM ALLEN COOPER, D.O.,

2  having been duly sworn, testified as follows:

3                DIRECT EXAMINATION

4     Q    (By Mr. Tabor)  Can you state your full name

5  for the record, please?

6     A    William Allen Cooper.

7     Q    Okay.  And, Dr. Cooper, you have given a

8  deposition before?

9     A    Yes.

10    Q    Okay.  I know you're well-prepared, and so I

11 can skip over the lengthy introduction, but just a

12 quick refresher, particularly since we're on Zoom, if

13 we could be really mechanical in our back and forth,

14 that will make our court transcript quite a bit

15 cleaner, rather than interrupting each other.  I'm

16 the worst offender at that probably.

17       If my feed goes out, let me know.

18 Interrupt -- you can interrupt me mid-question if my

19 sounds starts to go out.  That's -- that's not

20 uncommon on these Zoom depositions.

21       If you need a break, let me know.  I would

22 just ask that you completely answer any pending

23 questions that are posed to you.

24       I'm going to be using some exhibits today.

25 I'm going to be putting them on my screen share.  If

Page 6

1  you need me to scroll, blow something up, whatever,
2  let me know and I can -- I can navigate for you.
3  A   Okay.
4  Q   Tell me, how many prior depositions have you
5  given?
6  A   I think it's three.
7  Q   Okay.  Could you kind of give me an overview
8  of the circumstances of each time you have given a
9  prior deposition?
10  A   It was regarding a suit over a death each
11  time.
12  Q   And did you testify as a designee on behalf
13  of Turn Key in each of those depositions?
14  A   Yes.
15  Q   Okay.  And, to your memory, were all of
16  those prior depositions, were those Oklahoma County
17  Jail deaths or other facilities or a mixture of both?
18  A   Those were Tulsa.
19  Q   Tulsa?  Okay.  Tulsa County Jail?
20  A   Yes.
21  Q   Could you give me just a really brief
22  background of your -- just kind of a 30,000-foot
23  overview of your professional career and kind of what
24  title you have currently?
25  A   I was in private practice for eight years in

Page 7

1  a small southern Oklahoma community, Marshall County,
2  which is Madill.  I did that for eight years.
3  The last two years I was there, I also
4  worked at the prison in Stringtown, Oklahoma, which
5  is Mack Alford Correctional -- Correctional Center.
6  So for two years, I did both.
7  Then I went full-time at the prison and
8  donated my practice to Integris, and I was with DOC
9  for 16 years pretty much, almost 16 years.  And the
10  last year or so that I was there, I was the Chief
11  Medical Officer for DOC.
12  And then I went to work for Red Rock
13  Behavioral Health here in the Oklahoma City area and
14  worked for them for -- I believe it was seven months,
15  until Turn Key found me and recruited me, and so I
16  have been with Turn Key for seven years as their
17  Chief Medical Officer.
18  Q   And are you an MD?
19  A   DO.
20  Q   DO.  And where did you receive your DO from?
21  A   Oklahoma State University.
22  Q   Let me get this pulled up.  Dr. Cooper, can
23  you see the document I'm sharing on my screen?
24  A   Yes.
25  Q   Okay.  I'm going to introduce Exhibit 1 to

Page 8

1  your deposition.  I'll represent to you this is the
2  30(b)(6) notice that brings us here today.  Do you
3  recognize this document?
4  A   Yes.
5  Q   Okay.  And -- and -- and you have reviewed
6  this before today's deposition, correct?
7  A   Correct.
8  Q   And it's your understanding that you have
9  been designated by Turn Key to testify on its behalf
10  regarding the topics in this notice, correct?
11  A   That's correct.
12  Q   Okay.  Tell me, generally speaking -- and I
13  know you know this because you have given testimony.
14  Never interpret any of my questions to ask about
15  attorney/client communications, anything you have
16  discussed with Ms. Ah Loy, so just take that off the
17  table.
18  But with that clarified, I'd ask you, tell
19  me everything that you have done to prepare to
20  testify on Turn Key's behalf for this notice.
21  A   I searched my e-mails for relevant topics at
22  hand.  I, of course, visited with Allie and reviewed
23  the court document that you're showing me there.  I
24  looked through some medical records and I looked
25  through the jail's investigation, and I made a phone

Page 9

1  call to Tammy Hill, who used to be the Health Service
2  Administrator, to kind of confirm some of my memory.
3  Q   And tell me, what did -- what did you and
4  Ms. Hill discuss?
5  A   Whether or not we had asked for additional
6  medical staff at the jail and about how -- what time
7  period that was.
8  Q   To your best estimation possible, about how
9  many total hours have you devoted to preparing for
10  your testimony today?
11  A   Oh, probably four.
12  Q   Okay.  And, again, anything attorney/client
13  aside, preparing for today's deposition, did you
14  prepare any physical or digital notes in conjunction
15  with your preparation?
16  A   No.
17  Q   Okay.  And did you speak with or prepare
18  with anyone else at Turn Key, other than Ms. Hill, as
19  you previously mentioned?
20  A   No, just -- I -- Austin Young, our General
21  Counsel at Turn Key, and he and I spoke very briefly
22  about it.
23  Q   Okay.  Based on your preparation that you
24  have described here today, do you believe that you
25  are prepared and possess the requisite knowledge to

Page 10

1 testify on behalf of Turn Key for the topics here in
2 the deposition notice?
3    A   I believe so, yes.
4    Q   Okay.  Now, I -- under the document requests
5 that we submitted in the notice, I was given the
6 documents you reviewed to prepare for today, and I'm
7 going to list them off and make them a part of your
8 deposition as we go through today, but you reviewed
9 the notice, correct?
10   A   Yes.
11   Q   You reviewed Turn Key's medical records
12 regarding Mr. Clinton, correct?
13   A   Yes.
14   Q   You reviewed the Medical Examiner's report,
15 correct?
16   A   Yes.
17   Q   And you reviewed the St. Anthony's records?
18   A   The only record there that I reviewed was
19 the CAT scan report.
20   Q   You reviewed the morbidity and mortality or
21 the Sentinel Event Review for Mr. Clinton's death,
22 correct?
23   A   Correct.
24   Q   You reviewed the investigative report
25 rendered by the County, correct?

Page 11

1    A   Yes.
2    Q   You reviewed Mr. Clinton's cellmates'
3 written statements, correct?
4    A   The best I could.  They were very difficult
5 to read.
6    Q   Yeah, yeah.  One of them, in particular, I
7 think was really tough.
8    A   Yeah.
9    Q   You reviewed the Table of Contents for some
10 of the written policies kept by Turn Key Health,
11 correct?
12   A   Yes.
13   Q   You reviewed Turn Key's policies for the
14 Oklahoma County Jail, correct?
15   A   Yes.
16   Q   And you reviewed the nursing protocols kept
17 by Turn Key, correct?
18   A   Yes.
19   Q   Okay.
20       MS. AH LOY:  Yeah.  And, Geoff, just to
21 interject, I accidentally produced the Table of
22 Contents twice.  That's -- I don't know why I did
23 that.  I'm sorry.
24       MR. TABOR:  That's okay.  We noticed it.
25 Not a problem, but better than -- duplicating it

Page 12

1 than -- than not --
2       MS. AH LOY:  Yeah, yeah.
3       MR. TABOR:  -- so you're doing good.
4    Q   (By Mr. Tabor)  Okay, Dr. Cooper.  I have
5 got some of these exhibits for your deposition
6 marked, so I'm going to go a little bit out of order,
7 but we will get all of them cleanly into the record
8 as we go.
9       I'm introducing -- there is a series of PDFs
10 Turn Key produced containing different sections of
11 Turn Key's policies.  I'm going to introduce all of
12 these as Exhibit 9.  Can you see my screen?
13   A   Yes.
14   Q   Okay.  I have got pulled up Section A of the
15 policies.  Do you see that there in the middle of the
16 page?
17   A   Yes.
18   Q   Okay.  Within Section A -- well, let me ask
19 here, first, these policies Turn Key has, the medical
20 staff employed by Turn Key are expected to be
21 familiar with and follow these policies, correct?
22   A   Correct.
23   Q   Does Turn Key expect the detention staff at
24 the jail, if something is mentioning "detention
25 staff" in here, does Turn Key expect the detention

Page 13

1 staff to follow those portions of the policies?
2    A   They are not expected to follow our
3 policies, but they are expected to follow the jail's
4 policies.
5    Q   Okay.  Within Exhibit 9, Section A, I'm
6 going to go to Page 20.  This sub-policy is entitled
7 Communication on Patients' Health Needs.  Do you see
8 that?
9    A   Yes.
10   Q   Okay.  Tell me the basic aim and purpose of
11 this policy.
12   A   To make sure that people are getting the
13 care they need, which, you know, is reliant upon
14 people communicating well.
15   Q   And would it be accurate to say that part of
16 the aim of this policy is to have open and accurate
17 communication between the medical staff and the
18 detention staff?
19   A   Yes, as -- as much as allowed by law, yes.
20   Q   Okay.  And -- and could you tell me -- maybe
21 flesh that out a little bit so I understand what you
22 mean by "as allowed by law"?
23   A   Well, you know, we try not to violate HIPAA,
24 of course.  But, according to HIPAA, security staff
25 have the right to know the minimum amount necessary

Page 14

1 to do their job, and if -- part of their job is to
2 keep people safe and cared for, too. So, you know,
3 they need to let us know when somebody has a need,
4 that sort of thing.
5    Q   And so that was kind of going into my -- my
6 next question. Does Turn Key generally, Turn Key
7 staff, do they rely, to some degree, on the detention
8 staff keeping them up to date on the conditions of
9 certain inmates or detainees?
10   A   Yes.
11   Q   Okay. Tell me more specifically about that
12 relationship, what it entails.
13   A   Well, it's part of a teamwork approach
14 that's necessary to take care of the amount of people
15 that we have to take care of.
16      So, you know, nurse -- medical staff can't
17 be in every nook and cranny of the building, and the
18 security officers spend much more time with these
19 people, so they often know things about them that we
20 don't.
21   Q   Okay. And so from Turn Key's perspective,
22 does it expect detention staff to relay to them if
23 the detention staff thinks there is a problem with an
24 inmate, such as a potential medical emergency?
25   A   Yes.

Page 15

1    Q   And -- and why is that important to Turn
2 Key?
3    A   Well, for the same reason I just said, we
4 can't be everywhere, and security is generally
5 everywhere. So, you know, they are -- they serve as
6 our eyes and ears a lot of times.
7    Q   Okay. And would you agree with me that part
8 of that reliance Turn Key has on the County, in this
9 case, since it's pre-Jail Trust, the Sheriff's
10 Department, does Turn Key rely in part on the jailers
11 properly doing site checks on inmates?
12   A   Yes.
13   Q   Within Exhibit 9, Section A, I have gone to
14 Page 24 of the document. It's a sub-policy entitled
15 Procedure in the Event of Inmate Death. Do you see
16 that, sir?
17   A   Yes.
18   Q   Okay. This policy provides a process to
19 follow following a death, and it's got here on
20 Paragraph 3 a series of reviews that are undertaken.
21 Do you see that?
22   A   Yes.
23   Q   Section 3A entails an administrative review.
24 Could you tell me what that is?
25   A   It's kind of where we look, you know, was

Page 16

1 our staffing adequate, you know, did -- that sort of
2 thing. At the time of a death, were, you know,
3 people in -- where they should have been in the
4 building and that -- that type of thing.
5    Q   And I believe the definition section under
6 there kind of elaborates on the administrative
7 review, correct?
8    A   Yes.
9    Q   Okay. Now, the administrative review that
10 Turn Key does under this policy, does it also look at
11 acts or omissions of the detention staff?
12   A   Yes, if we're aware of them.
13   Q   Okay, okay. And I'm going to come back to
14 that real quick here in a minute, but let's go on to
15 Paragraph 3B, clinical mortality review. Tell me
16 what that entailed.
17   A   That's where we look at was the care prior
18 to the death appropriate, was the emergency response
19 to the death appropriate. So, basically, you know,
20 were they clinically cared for in a way that they
21 should have been.
22   Q   And here, kind of similar to my question on
23 3A a minute ago, does a clinical mortality review
24 also encompass looking at detention staff's acts, or
25 is this solely focused on Turn Key -- Turn Key staff?

Page 17

1    A   It's mostly on Turn Key. You know, there is
2 always officers involved in an emergency response.
3 So any actions that we take that we are aware of
4 are -- are included and, you know, is there something
5 we need to work on.
6    Q   So going back to 3 -- the 3A administrative
7 review, tell me, was there an administrative review
8 performed regarding the death of Daryl Clinton?
9    A   Yeah, it was kind of simultaneous at the
10 time that we do the Sentinel Event Review. We look
11 at pretty much all three of these.
12   Q   Okay. And tell me, as a part of that
13 administrative review that was done with the Sentinel
14 Event Review, did Turn Key look at or evaluate any of
15 the conduct of the detention staff?
16   A   Yes.
17   Q   And tell me what Turn Key looked at and what
18 its conclusions were.
19   A   We looked at the act, that they, you know,
20 responded to the emergency, they notified medical
21 quickly, they helped with CPR, that sort of thing.
22   Q   Okay. I appreciate your patience here while
23 I pull your exhibits up, so sorry for any delays
24 here.
25   A   You're fine.

1    Q    We're still in Exhibit 9.  I have entered
2  Section B.  Within Section B, I'm going to go to
3  Page 5 on the Patient Safety Policy.  Do you see
4  that?
5    A    Yes.
6    Q    Okay.  This defines an adverse clinical
7  event as an injury or death caused by medical
8  management rather than a patient's disease or
9  condition.  Do you see that?
10    A    Yes.
11    Q    Okay.  Was this definition or process used
12  in any way regarding the death of Mr. Clinton?
13    A    I don't remember that specifically being
14  part of the conversation.
15    Q    Okay.  Now, in terms of the administrative
16  review, did Turn Key make any type of, I want to say,
17  global finding of what it -- who it believed, if
18  anyone, was at fault for Mr. Clinton's death?
19    A    No.  You know, we did recognize some
20  failings and took appropriate actions.
21    Q    Okay.  And could you tell me about those
22  failings and the actions that were taken?
23    A    We had one of our nurses that was found to
24  have claimed that Mr. Clinton was faking his
25  problems, and we terminated her when we found that

1  out.
2    Q    And I believe that would have been Phyllis
3  Miller, an RN; is that correct?
4    A    Yes.
5    Q    Okay.  And did Turn Key, as a part of the
6  administrative review, find any other deficient
7  practices?
8    A    Not that I recall.
9    Q    Okay.  We're still in Exhibit 9.  I have
10  introduced Section C.  Within Section C, I'm going to
11  Page 9.  It's entitled Health Training for
12  Correctional Officers.  Do you see that?
13    A    Yes.
14    Q    Okay.  Tell me about the scope and purpose
15  of this policy.
16    A    Oh, it's just to help the security side be a
17  little better part of the team because they have a
18  little bit of knowledge as far as medical operations
19  and first aid, CPR, that sort of thing.
20    Q    Now, Paragraph 2 of this policy states,
21  "That correctional officers, who work with inmates,
22  receive health-related training at least every two
23  years," and then the policy gives a list under that.
24  Do you see that?
25    A    Yes.

1    Q    So I want to really understand this -- this
2  every-two-years part of the policy.  Is -- is -- at
3  any given time, if I -- at least at the time of
4  our -- of our case here, in 2019, if I were to go
5  into the jail and look at all the correctional
6  officers, would every one of those for sure have been
7  given this training in this policy within two years
8  of that date?
9    A    I -- I'm not able to answer that accurately.
10  I wouldn't know.
11    Q    Okay.  Paragraph 3 of this policy says, "An
12  outline of the training, including course, content
13  and length, is kept on file."  Do you see that?
14    A    Yes.
15    Q    Would you happen to know, when it says "on
16  file", is that kept in Turn Key's records?
17    A    Yes.
18    Q    Okay.  So that would be, like, the -- the
19  training materials, any -- any materials actually
20  presented to the correctional officers on this --
21  this two-year training?
22    A    Yes.
23    Q    Okay.  If I wanted to know whether
24  particular correctional staff were trained under this
25  policy we're looking at, where, if anywhere, would I

1  be able to look to know whether a particular person
2  got that training?
3    A    I think that the jail is the one that keeps
4  the training log or attendance record.  I don't think
5  it's us.  I don't think it's Turn Key.  I could be
6  mistaken about that.
7    Q    Okay.  So if such records showing compliance
8  with this training protocol exist, that would be on
9  the County to have proof of that, correct?
10    A    Well, or Turn Key.  Like I said, I'm not
11  sure who maintains those records, but it should be
12  documented somewhere.  We always keep an attendance
13  log of any training that we do.
14    Q    Okay.
15    A    And I don't know who -- I don't know who
16  files that away, us or the jail.  Probably both, but
17  I honestly don't know.
18    Q    Okay.  And if you know, regarding
19  correctional officers, would such training records,
20  in your experience, typically be found in
21  correctional officers' personnel files?
22    A    I would think so.
23    Q    Okay.
24    A    Typically, employers maintain, you know,
25  training records for their employees.

Page 22

1    Q    We're staying within the Health Training for
2  Correctional Officers policy, the second page of that
3  policy, Exhibit 9, Section C, Page 10.  Paragraph 4
4  says, "A certificate or other evidence of attendance
5  is kept on site for each employee."  Do you see that?
6    A    Yes.
7    Q    And so that -- that's what you -- what we
8  have been talking about, correct?
9    A    Yes.
10    Q    Okay.  And Paragraph 5 gives notes that the
11  goal is to have 100 percent of the staff trained on
12  these items, correct?
13    A    Correct.
14    Q    Okay.  But the policy recognizes that
15  perhaps not every single correctional staff will be
16  covered, correct?
17    A    Correct.
18    Q    Okay.  We're staying in Exhibit 9.  We're
19  now into Section D.  Within Section D, I'm going to
20  Page 19 entitled Diagnostic Services.  Do you see
21  that?
22    A    Yes.
23    Q    Generally speaking, in terms of diagnostic
24  services, and I know we're going back in time, and
25  perhaps this may not have changed a lot over time,

Page 23

1  what diagnostic scans and services were available in
2  the Oklahoma County Jail in August of 2019?
3    A    Same as it's always been.  We have labs,
4  x-rays and ultrasounds that we can -- we can have
5  done in-house.
6        And then, you know, like the labs -- the
7  labs are sent out.  They are drawn, but then they are
8  sent out.  And the x-rays are done in-house, but the
9  radiologist is not in-house, so those reports are
10  usually available the same day, and ultrasounds, too.
11    Q    Are MRIs available in the jail?
12    A    Not in-house.
13    Q    Okay.  So if an MRI needs to be done, the
14  inmate needs to be taken to an outside provider?
15    A    Correct.
16    Q    And what about CT scans?
17    A    Same with those.
18    Q    Okay.  And just to make sure we have a clear
19  record, so if an inmate needs a CT scan, they need to
20  be taken to an outside provider, correct?
21    A    Yes.
22    Q    Staying in Exhibit 9, going to
23  Section E.  Now, within Section E, I'm going to
24  Page 27, the Emergency Services Policy.  Do you see
25  that?

Page 24

1    A    Yes.
2    Q    At the bottom of Page 27, the procedure
3  section notes that, "After notification of emergency,
4  healthcare and/or correctional staff will respond to
5  the area within four minutes."  Do you see that?
6    A    Yes.
7    Q    So this particular policy, would it be fair
8  to say, expects, in some scenarios, for correctional
9  staff to respond to an emergency, if applicable?
10    A    Yes.
11    Q    Okay.  And why is that?
12    A    Well, that's why we do the training, is, you
13  know, so they will know CPR, if they need it, or, you
14  know, what -- how to recognize an emergency.
15    Q    And, again, from Turn Key's perspective,
16  would it be accurate to say it expects the
17  correctional staff to have some baseline level of
18  knowledge to recognize a medical emergency or serious
19  health condition?
20    A    Yes.
21    Q    Okay.  And from Turn Key's perspective, why
22  is that an important expectation?
23    A    Well, because, like I said, they sometimes
24  serve as our eyes and ears because they are more --
25  they are more exposed to the population.

Page 25

1    Q    I'm staying within this Emergency Services
2  Policy, but I'm going to Page 28.  I'm looking at
3  Paragraph 6 here, kind in the middle of the page, and
4  one of the procedures that is provided is the
5  possibility of calling 911.  Do you see that?
6    A    Yes.
7    Q    Okay.  Now, this policy, if it is needed to
8  call 911, Turn Key would expect the medical staff to
9  do that when -- when necessary, correct?
10    A    Usually we don't expect the staff to make
11  the notification, but we usually instruct the
12  security staff, that's within earshot, to do that --
13    Q    Okay.
14    A    -- because we're usually busy, you know,
15  getting the AED on or whatever.
16    Q    So there is some expectation by Turn Key
17  that, in appropriate circumstances, the correctional
18  staff will need to call 911, correct?
19    A    Yeah.  Usually, they are the ones that call
20  911.
21    Q    Okay.  Now, just to be clear, while the
22  correctional staff, kind of talking about this
23  policy, this -- this Paragraph 6 we're looking at,
24  while they are the ones that usually call 911, is it
25  usually the medical staff that makes the initial

Page 26

1  decision to call 911, or can that be different,
2  depending on the situation?
3     A   It can be different, depending on the
4  situation.
5     Q   So you would agree with me that there are
6  some situations at the jail where the situation would
7  warrant correctional staff, A, making the decision to
8  call 911, and, B, actually being the one calling 911,
9  correct?
10    A   Correct.
11    Q   Okay. And so would you disagree with the
12 sentiment that there is never a time where the
13 correctional staff is obligated to call 911?
14    A   I would not agree with that. There are
15 times that I would expect them to call 911.
16    Q   Okay. And just to be -- make sure our
17 record is clear, there are times Turn Key would
18 expect the correctional staff to, A, make the
19 decision to call 911, and, B, actually carrying out
20 the 911 call, correct?
21    A   Yes.
22    Q   Okay.
23    A   My advice has always been, if you would call
24 911 for your family or your neighbor, call 911 for
25 these guys.

Page 27

1     Q   And that would be your advice to, first, the
2  medical staff, correct?
3     A   Oh, absolutely, yes.
4     Q   And that would be your advice to the
5  correctional staff, too, correct?
6     A   Correct.
7     Q   Okay. I'm going to Exhibit 10 to your
8  deposition. These are the -- I'm not going to go
9  through these probably in detail, but these are the
10 nursing protocols that Turn Key produced. Tell me
11 why you reviewed these for today.
12    A   Just in case I get questions.
13    Q   And as I understand it, these protocols,
14 more or less, are premade forms that provide kind of
15 a process for different ailments, more or less?
16    A   Yeah, it allows the nurses to address some
17 simple, minor complaints with over-the-counter
18 medications.
19    Q   And so we have got some processes and
20 checklists provided for things such as dental issues,
21 ear issues, headache, hypertension, things like that?
22    A   Yes.
23    Q   Okay. I'm going to introduce Exhibit 11 to
24 your deposition. I'll represent to you, sir, this is
25 the contract Turn Key had with the County that was in

Page 28

1  force and effect at the time of Mr. Clinton's death.
2  Do you recognize this?
3     A   Yes.
4     Q   And are you generally familiar with the
5  contract that Turn Key had with the County?
6     A   I'm generally, yes.
7     Q   Okay. And I know you're not a lawyer, so
8  I'm not going to ask you lawyer questions.
9     A   Thank you.
10    Q   But I'll ask you, here on Page 2 of the
11 contract, Exhibit 11, Section 1.1, Scope of Contract,
12 do you see that?
13    A   Yes.
14    Q   Okay. And the first paragraph notes that,
15 "Contractor," which is Turn Key, "shall be the sole
16 supplier and/or coordinator of the healthcare
17 delivery system at the facility," a/k/a the jail.
18 "The contractor's responsibility for the medical care
19 of an inmate commences with the commitment of the
20 inmate to the custody of the facility and ends with
21 the release of the inmate." Do you see that?
22    A   Yes.
23    Q   Okay. Now, I know you have already touched
24 on this multiple times, so I don't mean to keep going
25 back to this, but given that Turn Key is the sole

Page 29

1  provider of medical services in the jail, tell me
2  Turn Key's general expectation of the correctional
3  staff in terms of getting medical care to the
4  inmates, making sure there is a continuity of care or
5  supervision. Tell me what Turn Key requires and
6  relies on the County for.
7     A   Well, since we're the vendor, I don't guess
8  we get to require anything of them, but we do expect
9  them to notify us in cases of emergencies or in cases
10 of worrisome situations.
11        You know, if someone is not eating, we
12 typically don't know that if they don't tell us.
13 Somebody's hygiene is going downhill or their --
14 their behavior changes.
15        I mean, just things like that that could
16 prompt us to check things out a little more closely
17 than, you know, just going by the cell and giving
18 them a pill during pill pass.
19        Because, like I said, these security
20 officers have more time with them. They are also
21 more familiar what their normal behavior is if they
22 are seeing them every day. So, yeah, we rely on them
23 to -- to notify us of changes.
24    Q   And what's the general expectation of Turn
25 Key on the detention staff if there is a potentially

Page 30

1  emergent medical situation for an inmate and the
2  medical staff is not meeting the inmate's needs?
3    A   Say that again.
4    Q   Yeah. So what would Turn Key's expectation
5  be of the detention staff if the medical staff is
6  hypothetically not meeting the needs of an inmate?
7    A   To follow the chain of command and go to the
8  next level up, either by -- either by notifying their
9  security chain of command or the medical chain of
10  command.
11    Q   Okay. And so from Turn Key's point of view,
12  it's not proper for the detention staff to simply
13  take the position that, well, we referred an inmate
14  to medical, we have fulfilled our duty?
15    A   Well, I mean, it would depend on the
16  situation, I guess, and the severity of the
17  situation, but, typically, people should follow the
18  chain of command and make sure that others are aware
19  of a situation, not just, you know, one person.
20    Q   Okay. And, again, we have hit on this a bit
21  already, but I just -- I need a clear record since
22  this is my only time to talk to you before trial, so
23  I apologize if I'm -- if I'm partially replowing
24  ground.
25        But given the contractual relationship

Page 31

1  between Turn Key and the Sheriff's Office, Turn Key
2  does have some expectation that the correctional
3  staff be trained and aware to identify and properly
4  supervise detainees with serious -- potentially
5  serious medical needs, correct?
6    A   Yes.
7    Q   Okay. And, similarly speaking, is there
8  some level of expectation from Turn Key that the
9  security staff has some level of training and
10  awareness to recognize and respond to medical health
11  emergencies?
12    A   Yes.
13    Q   Similarly, is there some expectation from
14  Turn Key that the detention staff be trained and be
15  aware on how to make decisions or -- regarding
16  referrals to medical care?
17    A   Well, I know that, you know, they are told
18  to notify medical in certain situations during their
19  training, but I don't know that they are taught, you
20  know, that they should maybe go up the chain of
21  command if they are not getting the response that is
22  expected. I honestly don't know that.
23    Q   And is there some expectation from Turn Key
24  that the correctional staff be trained and be aware
25  that detainees with emergency medical needs are

Page 32

1  receiving timely and appropriate medical attention?
2    A   Yes.
3    Q   Okay. And at some point, is there some
4  expectation from Turn Key that detention staff be
5  aware whether a particular inmate or detainee's
6  condition exceeds the services that can be provided
7  at the jail?
8    A   Yes.
9    Q   Now, generally speaking, it's my
10  understanding that the 13th Floor of the Oklahoma
11  County Jail is the -- is the medical wing; is that
12  correct?
13    A   Yes.
14    Q   Tell me with more specificity about 13B?
15  What's that?
16    A   That's the real medical part. That's where
17  we put, you know, the more -- the people we need to
18  watch more closely, people that are on more than the
19  routine twice-a-day medications or have a more
20  serious condition or need more assistance. They
21  are -- they are closer to medical staff, so they
22  are -- you know, it's -- that's why.
23    Q   And tell me about the decision-making
24  process of bringing an inmate into 13B. Who makes
25  that decision, what's the process look like,

Page 33

1  et cetera?
2    A   The providers, the nurse practitioners or
3  physician are the ones that, you know, designate
4  that's where they need to be.
5    Q   And kind of a similar question, who makes
6  the decision and what's the process like to take
7  someone, an inmate, out of 13B?
8    A   That's supposed to require provider approval
9  as well.
10    Q   Okay. And what about 13D, what's that?
11    A   That's, like, the next level down. If they
12  are not so bad that they need to be that close, but
13  they need to, you know, still be on the same floor,
14  then that's when they are moved down there. They
15  are -- it's kind of, like, a stepdown unit, I guess
16  you could say.
17    Q   And so tell me, generally speaking, when an
18  inmate first comes to the jail and they are getting
19  booked, they come in on the lower level, who makes
20  the decision to put that inmate in 13D? If they are
21  going straight to 13D and not 13B, how does that
22  decision get made?
23    A   Nursing can make that decision or they can
24  consult with a provider if they aren't sure.
25    Q   And just to make sure we have a clear

Page 34

1 record, on these answers when you're saying the
2 "provider", could you tell me who you're talking
3 about?
4    A    Yeah, either the physician or the nurse
5 practitioners or a PA, but we don't have any PAs
6 there, so --
7    Q    Regarding physician care as of August 2019,
8 was it the practice at the Oklahoma County Jail to
9 have a physician always evaluate a detainee when they
10 first presented to the jail?
11   A    No.
12   Q    Regarding physician care as of August 2019,
13 was it the practice at the Oklahoma County Jail to
14 have a physician always evaluate a detainee when the
15 detainee returned from an emergency room or a
16 hospital visit?
17   A    Within seven days, yes.
18   Q    Okay.  Now, a few general questions on
19 Exhibit 11, and I don't have it pulled up, but it's
20 the contract between Turn Key and the County.
21   A    Uh-huh.
22   Q    Are there certain requirements the County
23 imposes onto Turn Key and its staff?
24   A    Yes.
25   Q    Okay.  I'm going to share my screen again,

Page 35

1 still looking at Exhibit 11.  I'm looking at Page 7,
2 Section 1.17, Health Personnel Services Provided.  Do
3 you see that?
4    A    Yes.
5    Q    Now, I do not want to spend all day reading
6 fine print.  I'm not going to drag you through all of
7 that, but take time to read any provision that you
8 need, and I can blow it up for you, but would you
9 agree with me that the County here exercises some
10 level of control and expectation over how Turn Key
11 staff has to do their job under this contract?
12   A    Yes.
13   Q    Okay.  And, in fact, here we're looking at
14 the bottom of Page 7, the contract, in referencing
15 Turn Key, has some requirements here about initial
16 health screenings, correct?
17   A    Yes.
18   Q    Okay.  And the contract, in Section B right
19 under that, also dictates some requirements regarding
20 adequate staffing levels; is that also true?
21   A    Yes.
22   Q    Okay.  Now, from Turn Key's perspective, if
23 it fails to have its employees run their duties as
24 required by contract, what's the expectation of what
25 would happen with the County?

Page 36

1    A    Would you repeat that, please?
2    Q    Yeah, that was a poor question.  I'll ask it
3 a little simpler.  Does Turn Key abide by and follow
4 the standards in this contract that govern how its
5 employees perform their day-to-day functions?
6    A    Yes, to the best of our ability.
7    Q    Okay.  Now, I'm on Page 8 of the contract.
8 I'm looking at this Paragraph G here kind of towards
9 the middle of the page.  Do you see that?
10   A    Yes.
11   Q    Now, this is in reference to Turn Key's --
12 what the County is requiring Turn Key to do at the
13 Oklahoma County Jail, and it mentions, "Operations
14 shall be in compliance with the Oklahoma Jail
15 Standards."  Do you see that?
16   A    Yes.
17   Q    Could you -- are you familiar with those,
18 generally speaking?
19   A    Very generally, yes.
20   Q    Okay.  Tell me your general understanding.
21   A    Just that, you know, people will be treated
22 in a dignified manner and receive healthcare that
23 they need and housed in a reasonably safe
24 environment.
25   Q    Now, and -- and you can answer this, if you

Page 37

1 know it, but those Oklahoma Jail Standards, do you
2 know, do those apply to Turn Key or does Turn Key
3 expect them to apply to it in all of its operations
4 or only if contractually obligated to follow them?
5    A    Oh, no, we only operate in jails.  So, yeah,
6 they would always apply to us in any Oklahoma
7 facility in which we operate.
8    Q    And kind of a similar question for the next
9 item here, the American Correctional Association, the
10 ACA.  Are you generally familiar with that?
11   A    Yes.
12   Q    And is it Turn Key's understanding that
13 that -- the ACA would always apply to its jail
14 operations, or is it governed by contract?
15   A    It's governed by contract, but we follow --
16 we attempt to follow it.  You know, sometimes the
17 operations won't allow you to, because it's kind of
18 geared toward larger facilities, and sometimes very
19 small facilities don't have the physical plant or the
20 staffing to follow those as perfectly, but we still
21 try to follow it in general.
22   Q    Okay.  If Turn Key has a contract with a
23 jail or a municipality and the contract doesn't make
24 any mention of the ACA, does Turn Key still try to
25 follow the ACA or does it treat that as a mandatory

Page 38

1 standard?

2 A We try to.

3 Q Okay.

4 A And, like I said, it depends on the -- you

5 know, the physical structure of the building and the

6 staffing levels and that sort of thing, just how

7 closely you can be, but we still try to follow the

8 principles.

9 Q Okay. And kind of a similar question for

10 the NCCHC, are you familiar with that?

11 A Yes.

12 Q Okay.

13 A Yeah, same -- same -- same goes for that.

14 The -- probably one of the more limiting things is

15 they have some timeframes where certain things are

16 supposed to happen. And if the staffing doesn't have

17 someone there on a daily basis, sometimes you can't

18 follow those perfectly, so you just follow it as

19 closely as you can.

20 Q Okay. And what's -- and I have got to walk

21 these -- through these mechanically, so I apologize,

22 but what's Turn Key's attitude towards the NCCHC

23 standards if it's contracting with municipalities and

24 the contracts make no mention of NCCHC compliance?

25 What's -- what's Turn Key's conclusion on complying

Page 39

1 or not having to comply with the NCCHC standards?

2 A We still try to follow them as closely as

3 possible and our policies and procedures are geared

4 that way so that we are kind of guided by those same

5 principles.

6 Q And lastly on this list, what about the

7 Prison Rape Elimination Act?

8 A Our biggest role there is on our intake

9 screening, we ask questions about -- that would

10 hopefully identify someone as a potential victim or a

11 potential perpetrator, and then we notify security

12 that they may need to house them accordingly.

13 And then if there is a complaint of a rape,

14 then we accommodate their transfer to a SANE nurse,

15 which is a Sexual Assault Nurse Examiner. We don't

16 do the exams ourselves, better to have a third party

17 do that, and these people -- the SANE nurses are

18 trained in that, so we -- we just let them know when

19 they need to go, basically.

20 Q Okay. And similar to before, on the Prison

21 Rape Elimination Act, if that's not covered in any

22 contract with a municipality, does Turn Key see that

23 as that they have to require [sic] with it, or is it

24 similar to the other ones where you -- you try to

25 comply with it?

Page 40

1 A No, we have to, because that one is a law.

2 Q Okay. So that would be different than the

3 ACA and NCCHC standards, correct, in terms of how

4 Turn Key treats it?

5 A Yes, that's correct. And, you know,

6 staffing levels and the building structure and that

7 sort of thing wouldn't impact that anyway, so --

8 Q Regarding detention staff training, is there

9 any expectation by Turn Key that the County itself or

10 the Sheriff's Department would train correctional

11 officers, correctional staff, on certain things?

12 A Yes.

13 Q Tell me, generally speaking, Turn Key's

14 expectation on that front.

15 A Well, that they would be trained how to do

16 their job and to also accommodate helping us do our

17 job.

18 Q Does Turn Key have an expectation that the

19 County, the Sheriff's Department, train its detention

20 staff on properly performing site checks?

21 A Yes.

22 Q Okay. And I know I asked you a version of

23 that question earlier, so I apologize. Are you

24 generally familiar with the handover, if you will, of

25 the Oklahoma County Jail from the Sheriff's Office to

Page 41

1 the Jail Trust?

2 A Yes.

3 Q Okay. And do you recall when that formally

4 happened?

5 A I think it was July 1st, 2020, I think.

6 Q Uh-huh.

7 A I may have the year wrong, but it was

8 July 1st, but I think it was 2020.

9 Q Tell me, generally speaking, Turn Key's

10 understanding of why the handover happened.

11 A I know there was some impact from the County

12 Commissioners seeking a trust. I don't know their

13 reasoning, but I know it kind of came from the County

14 Commissioners.

15 Q I'm going to introduce Exhibit 5 to your

16 deposition. I'll represent to you this is the

17 Sentinel Event Review form. Do you see that?

18 A Yes.

19 Q You testified on it earlier, but let's just

20 go back on it real quick. Tell me the scope and

21 purpose of Turn Key's Sentinel Event Review.

22 A It's so we can do the administrative review

23 and the clinical review and the psychological

24 autopsy, if it's indicated, so we can see if there

25 are things we need to do differently, make any policy

Page 42

1 changes, things like that, make sure the person got
2 the care that they needed or not.
3    Q    The -- I'm on Page 2 of Exhibit 5. There is
4 a signature dated September 5th, 2019. Do you know
5 whose signature this is?
6    A    That's my signature.
7    Q    That's your signature? Okay.
8    A    Yes.
9        MR. TABOR: Allie, we're going about an
10 hour. You want a quick break?
11       MS. AH LOY: It's up to Dr. Cooper. Do you
12 need a break or do you want to keep going?
13       THE WITNESS: I could use a short break.
14       MR. TABOR: Okay. We'll go off here for a
15 few minutes.
16 (A break was had from 10:32 a.m. to 10:43 a.m.)
17    Q    (By Mr. Tabor) Back on the record.
18 Dr. Cooper, we had just looked at the Sentinel Event
19 Review that you signed, correct?
20    A    Correct.
21    Q    Okay. I'm next going to share what's being
22 marked as Exhibit 6 to your deposition. I'll
23 represent to you this is the investigative report
24 rendered by the County. You recognize this document,
25 sir?

Page 43

1    A    Yes.
2    Q    Have you reviewed this investigation?
3    A    Yeah, I read it.
4    Q    Okay. Before we discuss anything about
5 Mr. Clinton, I want you to kind of tell me, generally
6 speaking, from Turn Key's point of view, what's the
7 usual mode and practice of the County sharing
8 investigations like this one with Turn Key?
9    A    Usually they share their reports with us.
10    Q    And do they share them pretty quick? I know
11 that's vague. Do they share them without litigation?
12    A    Yes, they -- they have.
13    Q    And why, generally speaking, do they do
14 that, from Turn Key's understanding?
15    A    Well, because we try to function as a team.
16 So, you know, if -- if there is information that you
17 have, it's nice to share with your team.
18    Q    When did Turn Key first get the
19 investigative report we're looking at here,
20 Exhibit 6, regarding the death of Mr. Clinton?
21    A    Oh, only after there was litigation.
22    Q    Okay. Do you know why the investigative
23 report regarding Mr. Clinton was not shared in
24 accordance with the usual, customary relationship?
25    A    I don't know why. I just know it wasn't. I

Page 44

1 was told that they weren't going to share it with us,
2 but I wasn't ever told a reason.
3    Q    And so I want to flesh that out just to make
4 sure I fully understand you. When you say "they
5 weren't going to share it", was there some type of
6 request by Turn Key pre-lawsuit to get it and the
7 County refused to produce it, or did Turn Key just
8 never get it?
9    A    I am assuming that the Health Service
10 Administrator asked for it, because she's the one
11 that told me that they weren't going to share it.
12    Q    I'm introducing Exhibit 13 to your
13 deposition. Doctor, this is a note that Turn Key
14 produced in the case when we are still doing
15 discovery with Turn Key. Do you see that?
16    A    Yes.
17    Q    This is an August 10th, 2019, note or memo
18 from a Sinead Eastman, an RN. Do you see that?
19    A    Yes.
20    Q    Have you seen this document before?
21    A    No, I haven't seen this one.
22    Q    Okay. This is a note, "To whom it may
23 concern." It mentions Mr. Clinton, the decedent in
24 this case. It notes he's being treated at
25 St. Anthony's and it notes, at least Nurse Eastman's

Page 45

1 opinion, "That Turn Key is not able to care for
2 Mr. Clinton at this time. His medical needs are
3 extensive and are best taken care of at a medical
4 facility." Do you see that?
5    A    Yes.
6    Q    And do you also see there is a sticky note,
7 that appears to have been put on this piece of paper,
8 and then it's part of the image?
9    A    Uh-huh.
10    Q    It says, "Approved per Judge Stoner at
11 10:03." Do you see that?
12    A    Yes.
13    Q    Do you have any information about why this
14 note was written, what involvement Judge Stoner had,
15 anything like that?
16    A    Well, it looks like what we call an OR
17 request, and we sometimes submit a request for the
18 courts to consider releasing someone if their medical
19 condition is a little more than we can deal with in
20 the -- or more than we can deal with in our setting,
21 usually when they require hospitalization.
22    Q    Okay.
23    A    And sometimes the courts say yes and
24 sometimes they say no, but this looks like it must
25 have been a previous incarceration. It's dated in

Page 46

1 August, it looks like, 2019, so --

2   Q  Well, I'll represent to you, August of 2019

3 is our -- our timeframe at issue in this case.

4   A  Okay.

5   Q  Okay. So it's your understanding that this

6 note we're looking at from Eastman would be the

7 process Turn Key sometimes undertakes to get judicial

8 permission to have an inmate kept outside of the jail

9 because the medical condition of the inmate exceeds

10 what can be provided at the jail? Am I understanding

11 that right?

12   A  Yes.

13   Q  Okay. And it appears Turn Key did, in fact,

14 undertake that effort, correct?

15   A  Yes.

16   Q  Okay. Who, generally speaking, is involved

17 in initiating that process? Again, the process here

18 we're looking at in this note, in Exhibit 13. Can it

19 be any nurse, the doctor? Who has to approve the

20 initial reach-out?

21   A  There is no one specifically designated.

22 Usually it's the physician, a nurse practitioner or

23 the Health Service Administrator, and sometimes the

24 DON or Director of Nursing.

25   Q  I'm introducing Exhibit 7 to your

Page 47

1 deposition. These are the cellmate statements. Do

2 you see that?

3   A  Yes.

4   Q  Can you read this one from David Noble?

5   A  Yeah.

6   Q  Okay. Now, were you able to read

7 Mr. Austin's statement?

8   A  This one, I couldn't really make out much.

9   Q  Okay. Were you able to read Mr. McCowin's

10 statement?

11   A  Yeah, most of this one, I could -- I could

12 make out.

13   Q  Okay. Would you agree with me or would you

14 agree with the sentiment that if there is an inmate

15 who is potentially suffering from a really serious

16 medical problem, from Turn Key's perspective, does

17 the correctional staff completely fulfill their duty

18 just by notifying the medical staff?

19   A  Well, like I said earlier, if they, you

20 know, don't get the response that they would expect,

21 they should go up the chain of command.

22   Q  So you would agree with me that there are

23 some scenarios where, if the proper response is not

24 being given to an inmate, Turn Key believes

25 correctional staff would be required to take some

Page 48

1 further action, correct?

2   A  Yes.

3   Q  Okay. And as you described previously on

4 several occasions, that would include reporting the

5 matter up the chain of command for potentially

6 further action to be taken on the detention side of

7 operations, correct?

8   A  Correct.

9   Q  Okay. Are you aware or is Turn Key aware,

10 did the Oklahoma State Department of Health render an

11 investigation into the death of Mr. Clinton?

12   A  They did an investigation. I don't recall

13 it being specifically about Mr. Clinton.

14   Q  Okay. Is Turn Key generally familiar, one

15 way or the other, with prior Oklahoma State

16 Department of Health investigations of the Oklahoma

17 County Jail?

18   A  Yes.

19   Q  Okay. Are you aware, one way or the other,

20 or is Turn Key aware, one way or the other, whether

21 there is a pattern of deficient site checks by the

22 detention staff at the jail?

23   A  I know they are not perfect sometimes.

24   Q  Is it Turn Key's understanding that the

25 Oklahoma State Department of Health has investigated

Page 49

1 and made note of some of its concerns regarding the

2 site check practices of the detention staff

3 previously?

4   A  Yes.

5   Q  Okay. And that would include deficient site

6 check practices before August 2019 --

7   A  Oh, sorry, you're cutting out.

8   Q  Oh, sorry. Am I back?

9   A  Now you're back.

10   Q  Okay. I'll start over. And that would

11 include Turn Key's awareness of deficient site check

12 practices by the detention staff as noted by the

13 State Department of Health before August 2019,

14 correct?

15   A  Yes.

16   Q  Okay. And as you testified to earlier, site

17 checks are important from Turn Key's perspective

18 because I believe, as you noted in part, detention

19 staff can be the eyes and ears in terms of inmate

20 supervision. Am I -- am I understanding that

21 correctly?

22   A  Yes, that's correct.

23   Q  Okay. Now, in the notice, in Exhibit 1 to

24 your deposition, we asked about -- Topic 7 here would

25 be staffing by the Sheriff's Office or the County at

Page 50

1 the Oklahoma County Jail as of August 2019. Do you
2 remember that topic?
3   A   Yes.
4   Q   Tell me, generally speaking, from Turn Key's
5 perspective, what the staffing trends by the County
6 were at the Oklahoma County Jail in August of 2019.
7   A   They were struggling to keep staff levels
8 adequate.
9   Q   Could you be a little more specific?  What
10 do you mean by "struggling" and "adequate"?  What
11 were some of the specific problems?
12   A   I know sometimes they were low on staffing
13 where it made -- you know, made things difficult
14 because their staff were low and their -- you know,
15 it's a nationwide problem to get adequate staffing at
16 jails.
17       But I know sometimes the levels were so low,
18 it was hard for those guys and girls to perform their
19 job functions, passing meds, passing food, that sort
20 of thing.
21   Q   And so we have established that that, from
22 Turn Key's perspective, existed as of August 2019.
23 Tell me, going back, how far would you say that
24 pattern and those concerns existed from Turn Key's
25 perspective?

Page 51

1   A   They have always had difficulty with that
2 from the time we took the contract.
3   Q   And when did Turn Key take over the medical
4 contract, medical services contract for the Oklahoma
5 County Jail?
6   A   Oh, I have forgot what year it was.  I think
7 we have been there four or five years.  I think it's
8 been five.
9   Q   And I'll represent to you, at least the
10 contract we got in the case, at least the one we have
11 was -- appeared to initially be executed in June of
12 2018.  Does that sound right to you?
13   A   Yeah, that -- that sounds right.
14   Q   And, of course, it's been extended and
15 renewed since that time, correct?
16   A   Yes.
17   Q   Is Turn Key still the medical provider at
18 the Oklahoma County Jail?
19   A   Yes.
20   Q   Okay.  So to make sure I understand your
21 testimony, from Turn Key's perspective, it believes
22 that there has been deficient staffing by the County
23 for detention staff at the Oklahoma County Jail at
24 least since Turn Key took over the medical services
25 contract in June of 2018.  Am I understanding your

Page 52

1 testimony correctly?
2   A   That is correct.
3   Q   Would you say Turn Key still has those
4 concerns sitting here today in 2023?
5   A   Yes.
6   Q   Okay.  From Turn Key's perspective, if there
7 is deficient staffing, understaffing, as you have
8 described here today, what difficulties does that
9 place on the existing detention staff at the jail
10 from Turn Key's perspective?
11   A   Well, it's the -- it's the detention
12 staffing that I'm talking about.  So it means that
13 they are, you know, shorthanded, which makes it
14 difficult to perform the duties that they are
15 expected to do, which is, you know, passing meal
16 trays, collecting garbage, doing site checks, helping
17 medical pass out medications, get people to their
18 appointments, all those -- all those jobs that those
19 people do.
20   Q   So it would put a strain, if you will, on
21 the existing detention staff who are there working at
22 the jail, correct?
23   A   Yes, that's correct.
24   Q   Okay.  Now, kind of a similar question for
25 you, Dr. Cooper, if -- as you have testified about

Page 53

1 the trends of staffing concerns at the jail on the
2 detention staff, how does that -- how do those
3 stressors and shortcomings impact the medical staff?
4 How does it -- how does it impact them?
5   A   It makes it difficult sometimes to get
6 access to the people we need to get access to.  You
7 know, in this particular building that's 13 stories
8 tall, the inmates have to be moved up and down the
9 elevator to get to medical.  So it takes an officer
10 to transport them up and down the elevator to get
11 them to their appointments.  So if they are
12 shorthanded, that can sometimes be delayed.
13       And then, also, the officers have to escort
14 the medical personnel that are passing medications on
15 the units, because that is done on the units, but
16 they have to have an officer escort them to give them
17 access to the people, and that can be -- that can be
18 a hindrance sometimes when they are short-staffed.
19   Q   So if I'm understanding you right, if the
20 County has a pattern of poor staffing, understaffing,
21 that can come back and have a negative effect on the
22 medical care that's being rendered at the jail by the
23 medical staff, correct?
24   A   It makes it more challenging, yes.
25   Q   Now, in our notice, kind of a related topic

Page 54

1  we asked about -- I'll share it so I'm not just
2  reading it out to you.
3       Item No. 8 in our notice, we asked Turn Key
4  about proposals or discussions Turn Key had with the
5  Sheriff/County from January of 2014 through January
6  of 2020 regarding alternatives for medical staffing
7  and healthcare at the Oklahoma County Jail.  Tell me
8  about that.
9       A   The -- the only one I recall was pretty
10  early after we took the contract over and realized
11  there were challenges, especially with passing
12  medications, and doing some nursing duties, like
13  wound care, finger-stick blood sugar checks and that
14  sort of thing.
15       So we did propose one time that we were
16  able -- that we should be able to increase our
17  medical staffing so that we could perform more
18  functions on the units to reduce the need to
19  transport people up and down the elevator to medical.
20       That's the -- that's the only one that I
21  recall during this time period.  And Tammy Hill, the
22  person that was the Health Service Administrator at
23  the time, that was the phone conversation I had with
24  her, was to verify that.
25       Q   Regarding staffing on this topic, has Turn

Page 55

1  Key ever made any requests, demands, made any
2  communications to the County, asking it to improve
3  its staffing patterns?
4       A   Yes.
5       Q   Tell me about that.
6       A   Well, on multiple occasions when -- when it
7  got difficult to pass medications is the -- was the
8  one thing that was always the most difficult, we
9  asked them several times to try to improve their
10  staffing.
11       And I know they made a lot of attempts, you
12  know, giving pay raises and that sort of thing, but
13  it still continued to be, you know, challenging, but
14  it did get better than it did -- than it was
15  initially.
16       Q   Is it still a topic of concern from Turn
17  Key's perspective here today?
18       A   It's much better than it was.  I don't know
19  that it's a hundred percent better, but I haven't
20  been reached out in panic mode about not being able
21  to get meds to people and things like that recently.
22  So I can't say for sure how much better it is, but I
23  know it is better.
24       Q   Has Turn Key ever had -- I know I have kind
25  of asked you this already.  Regarding staffing, has

Page 56

1  Turn Key had prior concerns of the Sheriff's Office
2  or County regarding the adequacy of how the detention
3  officers are performing their jobs, the existing
4  detention officers who are coming to work, who are
5  showing up?
6       A   I think the way I worded it was we knew they
7  were kind of stretched thin because they were
8  short-staffed, so they were trying to do more
9  functions than would typically be expected of them.
10       Q   And just to make sure we have a clear
11  record, if I didn't shore this up with you already,
12  those concerns of you -- as you have described
13  existed in August of 2019, correct?
14       A   Yes.
15       Q   And they existed before August 2019,
16  correct?
17       A   Correct.
18       Q   And Turn Key communicated its concerns about
19  those staffing issues, you have just testified to, to
20  the County before August 2019, correct?
21       A   Correct.
22       Q   As of August 2019, from Turn Key's
23  perspective, could you tell me, what were the general
24  capacity trends at the Oklahoma County Jail?
25       A   What do you mean by "capacity trends"?

Page 57

1       Q   The inmate population in terms of whether
2  the jail was under-crowded, over-crowded, et cetera.
3       A   I know when we first took the contract over,
4  that they were telling us the population was down
5  because they were incarcerating less people for minor
6  crimes, so I know the trend was to try to keep the
7  population down.
8       I know it was several hundred less than it
9  had been in the past, according to the people that
10  were telling us this when we first started there.
11  Now, what the trend was between '18 and '19, I -- I
12  don't know.
13       Q   At any point in time during the lifeline of
14  the Turn Key contract, did Turn -- are you aware, one
15  way or the other, whether at any given time the jail
16  has been, from Turn Key's perspective, over-crowded?
17       A   No.
18       Q   Okay.  Now, one of the items we asked you
19  about in the deposition notice was Turn Key's
20  knowledge of issues regarding detainees or inmates at
21  the jail being able to compromise lock systems.  Tell
22  me about that.
23       A   It was kind of common knowledge within the
24  staff there that there were problems with the locks,
25  and I know they were able to replace some.

Page 58

1    When I was visiting there one day, they told
2  me that they had gotten some of them replaced with
3  more reliable locks, and the plan -- and the plan was
4  to replace the others.
5    I don't know what the -- I don't know if
6  they were able to get the rest of those changed out
7  or not, but I know at one time they were working on
8  it.
9    Q   I'm introducing Exhibit 3 to the deposition.
10 It's the Medical Examiner's report.  Do you see that,
11 Doctor?
12   A   Yes.
13   Q   And you reviewed this to prepare for today,
14 right?
15   A   Yes.
16   Q   I'm on Page 1 of the report and the Medical
17 Examiner identified Mr. Clinton's probable cause of
18 death as blunt force trauma of cervical spine.  Do
19 you see that?
20   A   Yes.
21   Q   Sitting here today, does Turn Key have any
22 basis to doubt the conclusions of the Medical
23 Examiner?
24   A   No.
25   Q   And just for housekeeping purposes, I have

Page 59

1  introduced the Turn Key medical records that were
2  produced to me at your deposition.  Do you see that
3  on your screen?
4    A   Yes.
5    Q   Okay.  And, to your understanding, these
6  would be a full and accurate log of Mr. Clinton's
7  Turn Key medical records --
8    A   Yes.
9    Q   -- from August 2019?
10   A   Yes.
11   Q   Okay.  I'm introducing Exhibit 4 to your
12 deposition that was produced ahead of the deposition,
13 and these are the St. Anthony's records.  Do you see
14 that?
15   A   Yes.
16   Q   Now, this is what Turn Key gave me, but I
17 believe you made a mention earlier, you said on
18 St. Anthony's records, you just reviewed, what was
19 it, the CT impressions?
20   A   Yes.
21   Q   Okay.  And that would have been the CT
22 impressions of Mr. Clinton after he left the jail
23 during the timeframe at issue; is that right?
24   A   It was before he was placed into custody.
25   Q   Sorry, yes, before -- when he was screened

Page 60

1  at SSM before being admitted, correct?
2    A   Correct.
3    Q   Okay.  And SSM, more or less, cleared
4  Mr. Clinton to be able to be incarcerated at the
5  Oklahoma County Jail, correct?
6    A   Correct.
7    Q   So with Mr. Clinton's CT and his
8  pre-incarceration records at St. Anthony's in mind,
9  has Turn Key, one way or another, made any
10 determination on what caused or worsened
11 Mr. Clinton's blunt force trauma to his cervical
12 spine?
13   A   We haven't determined anything.  We -- you
14 know, we were told -- and I was told not by the
15 original source.  It was during the Sentinel Event
16 Review.  I think it was the Health Service
17 Administrator.  It might have been the other
18 physician.
19    But someone told me that they were told he
20 looked like he had been in a fight and had bruising
21 on his face and head, so that's -- that's the thing
22 I'm not clear about, because the Medical Examiner's
23 report does mention some hemorrhage in the tissues,
24 and I don't believe that that was noted anywhere
25 prior, you know, when he first came in.

Page 61

1    Q   And so Mr. Clinton's condition, as described
2  by the Medical Examiner's report, which you reviewed,
3  would it be fair to say that condition is very
4  different from the condition Mr. Clinton was in when
5  he presented for his CT at St. Anthony's before going
6  into the jail?
7    A   Well, it's not documented that he had
8  bruising at that time, that I saw, but I just read
9  the CAT scan report, but there was no mention of that
10 on the CAT scan report.
11   Q   I'm introducing Exhibit 8 really quickly,
12 Doctor.  This was given to me by Turn Key ahead of
13 your deposition.
14    MR. TABOR:  Oh, this may be the duplicate,
15 Allie.  Sorry about that.  My bad.
16   Q   (By Mr. Tabor)  I'm introducing Exhibit 12.
17 I'll represent to you, Doctor, this is the first
18 amendment to the Turn Key contract with the County,
19 which, among other things, extended the service term
20 of the contract.  Do you see that?
21   A   Yes.
22   Q   Okay.  And as I understand it, as you have
23 testified earlier, Turn Key is still the medical
24 provider at the jail, correct?
25   A   That's correct.

Page 62

1    Q    And so Turn Key has contended to extend its

2    initial contract it entered into with the County,

3    correct?

4    A    Correct.

5    Q    The medical staff at the jail that Turn Key

6    provides, you know, other than being medical

7    professionals, are they denoted any differently from

8    the detention staff, from the inmate's perspective,

9    that they are employed by Turn Key and not the

10   County?  Is there any type of notice given to the

11   inmate on that front?

12   A    Other than their nametag, that should say

13   Turn Key on it, but I don't -- I don't know that it's

14   in the inmate handbook or anything like that.

15   Q    But, generally speaking, on the day-to-day

16   practices of the Turn Key staff, from the inmate's

17   perspective, does -- does the Turn Key staff appear

18   to be rendering services to the inmates on behalf of

19   the County?

20   A    Indirectly, yeah.

21   Q    And do you believe that would be a

22   reasonable conclusion by the inmates, that the

23   medical staff is giving them medical services on

24   behalf of the County?

25   A    Yes.

Page 63

1    Q    Okay.

2         MR. TABOR:  I'm going to look over a few

3    things real quick, Doctor.  Let's take another brief

4    break, if that's okay with you.

5         THE WITNESS:  Okay.

6    (A break was had from 11:16 a.m. to 11:20 a.m.)

7         MR. TABOR:  Go back on the record.

8    Dr. Cooper, I have no further questions at this time.

9    I'll pass the witness.

10        CROSS EXAMINATION

11   Q    (By Mr. Heggy)  Doctor, my name is Assistant

12   District Attorney Rod Heggy.  I am -- I have been

13   assigned by the District Attorney to defend the

14   Oklahoma County Defendants in this case.

15        I just have a couple of questions.  First of

16   all, would you explain what the emergency response or

17   triage, if I'm not misusing that term, capabilities

18   of Turn Key are inside the Oklahoma County Jail at

19   any particular time, but 2019 specifically?

20   A    If -- if an officer brings an arrestee in,

21   we do a prescreen, where we do vital signs and then

22   just take a quick look, do they look okay.

23        And then we have a set of criteria, we call

24   a fit criteria, is are they fit for incarceration,

25   and there is a list of things that, you know, mean

Page 64

1    that they need to be sent to the hospital to be

2    evaluated and cleared for incarceration, and one of

3    those is a motor vehicle accident, chest pain, lots

4    of things.

5         So the prescreener takes a look at that, and

6    they will tell the officer, "This person is going to

7    have to go get cleared from the hospital before we

8    will take them in."

9         And that -- I don't mean -- I don't think

10   Mr. Clinton even got to the prescreening.  I didn't

11   see that.  I think the officer just realized we're

12   going to have to clear him, because he was in a car

13   wreck, and took him and got -- got cleared prior to

14   incarceration.

15        Then when they come in, we do a

16   medical/mental health screening, where we ask

17   questions about their history, do a set of vital

18   signs, take a quick look at them, and then can base

19   what we need to do next, do they have a history of a

20   chronic illness that needs to be followed up with a

21   provider, do they need medications ordered and that

22   sort of thing.

23        And then they are designated where they can

24   be housed, do they need to be on a medical floor, do

25   they need to be in general population, do they need

Page 65

1    to be on suicide watch, that sort of thing.

2    Q    Now, if -- if there is a medical emergency,

3    what is their triage capability?

4    A    Capability?  I mean, it's limited by what

5    testing we can do.  So if they are having an

6    emergency and they need prompt lab work done or some

7    test, like a CAT scan or MRI, or prompt x-ray even,

8    then we just have to triage them to go out to get

9    that done, because what we can do in-house has to be

10   scheduled and -- because those people are not there

11   around the clock.  They are only there on certain

12   days of the week and that sort of thing.

13   Q    And who makes the decision as to whether or

14   not any of those services you have just described

15   would be needed?

16   A    The provider, which is -- would be either a

17   nurse practitioner or a physician.

18   Q    Now, if an ambulance is called, excuse me,

19   does Turn Key participate in the attempt to stabilize

20   the person for whom the ambulance has been called so

21   they will survive the ride to the hospital?

22   A    Yes.

23   Q    And do the detention officers assist the

24   medical staff in doing that?

25   A    Yes.

Page 66

1    Q    Now, they -- their training is, as I
2  understand it, limited to first aid, CPR and maybe
3  the AED -- but they wouldn't take over the triage
4  from an RN or an LPN, would they?
5    A    Typically, no.  Typically, no.
6    Q    And you would expect that the medical
7  decision making would remain, generally speaking,
8  with the medical staff in all but the most
9  extraordinary circumstances; isn't that right?
10    A    I would, yes.
11    Q    And, in fact, you would probably take a
12  pretty dim view of a detention officer, or myself as
13  a lawyer, if I tried to overrule your medical
14  judgment or the medical judgment of the doctor on
15  site, the RN on site, or even the LPNs on site,
16  right?
17    A    It would depend on the situation, but, yeah,
18  typically, I would kind of frown on that.
19    Q    Now, with regard to Mr. Clinton, you limited
20  your review to certain lab tests -- or, rather,
21  certain tests that were performed or studies that
22  were done on him at St. Anthony's Hospital, correct?
23    A    Correct.
24    Q    As we sit here now, not having reviewed the
25  entire record, do you know how many tests, laboratory

Page 67

1  or other research, was done on Mr. Clinton before he
2  arrived at the Oklahoma County Jail?
3    A    No.  No, I do not.
4        MR. HEGGY:  I pass the witness.
5        MR. TABOR:  I have nothing further.
6        MR. HEGGY:  Signature?
7        MS. AH LOY:  Yeah, he will review and sign.
8        MR. TABOR:  Okay.
9        MR. HEGGY:  Thank you, Doctor.
10        MR. TABOR:  Thank you, Dr. Cooper.
11    (Videoconference Deposition concluded at 11:27 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                           J U R A T

2              I, WILLIAM ALLEN COOPER, D.O., state under

3    oath that I have read the above and foregoing

4    Videoconference Deposition in its entirety and that

5    the same is a full, true, and correct transcription

6    of my testimony so given except for the corrections

7    noted.

8

9    (_____)   CORRECTIONS ATTACHED

10   (_____)   NO CORRECTIONS

11

12                          _____

                            WILLIAM ALLEN COOPER, D.O.

13

14              SUBSCRIBED AND SWORN TO BEFORE ME, the

15   undersigned Notary Public in and for the State of

16   _____, on the _____ day of

17   _____, 2023.

18

19                          _____

                            Notary Public

20

21   My Commission Expires: _____

22   Reported By:  Theresa L. McDaniel, C.S.R.

23

24

25

```
1              E R R A T A   S H E E T

2    WITNESS:    WILLIAM ALLEN COOPER, D.O.

3    DATE:       MARCH 14, 2023

4    STYLE:      EQULLA M. BROTHERS vs.
                 TOMMIE JOHNSON, III
5                CASE NO. 5:2021-cv-418

6    REPORTER:   THERESA L. McDANIEL, C.S.R.

7    PAGE   LINE    CORRECTION

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25   _____  _____  _____
```

```
 1                  C E R T I F I C A T E

 2   STATE OF OKLAHOMA      )
                           )   SS:
 3   OKLAHOMA COUNTY        )

 4            I, Theresa L. McDaniel, Certified Shorthand

 5   Reporter within and for the State of Oklahoma,

 6   certify that the above-named witness was by me sworn

 7   to testify to the truth; that the Videoconference

 8   Deposition was taken by me in stenotype and

 9   thereafter transcribed and is a true and correct

10   transcript of the testimony of the witness; that the

11   Videoconference Deposition was taken by me on March

12   14, 2023, in the City of Oklahoma City, State of

13   Oklahoma; that I am not a relative, employee,

14   attorney or counsel to any party in this case or a

15   relative or employee to any counsel in this case or

16   otherwise financially interested in this action; and

17   that the witness elected to exercise their right to

18   review the Videoconference Deposition transcript

19   prior to its filing.

20            IN WITNESS WHEREOF, I have hereunto set my

21   hand and official seal this 16th day of March, 2023.

22                         _____
                           THERESA L. McDANIEL, C.S.R.
23                         Certificate No. 995
                           Expires: December 31, 2023
24

25
```