## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EQULLA M. BROTHERS, as the Personal Representative and Administratrix of the Estate of Daryl Clinton, Deceased, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-21-418-SLP |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; TOMMIE JOHNSON III, in his official capacity as Oklahoma County Sheriff; TURNKEY HEALTH CLINIC, LLC, an Oklahoma limited liability company; DR. KENT KING, individually; and JOHN DOES I-X, individually, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

Before the Court is the Motion for Summary Judgment of Defendant Oklahoma County Sheriff [Doc. No. 74]. Plaintiff has responded to the Motion. *See* Pl.'s Resp. [Doc. No. 80].[1] Defendant has been given the opportunity to file a reply, but has failed to timely do so. *See* LCvR 7.1 (i). For the reasons that follow, Defendant's Motion is DENIED.

## I.    <u>Introduction</u>

Plaintiff, Equlla M. Brothers (Plaintiff), brings this action on behalf of the Estate of Daryl Clinton, deceased (Clinton). On August 6, 2019, Clinton was received into

---

[1] Citations to the parties' briefing submissions reference the Court's ECF pagination.

custody at the Oklahoma County Jail as a pretrial detainee.[2]  Four days later, on August 10, 2019, Clinton went into cardiac arrest at the Jail.  He was taken to St. Anthony Hospital in Oklahoma City.  He was pronounced dead at the hospital in the early morning hours of August 10, 2019.

Plaintiff's sole remaining claim is brought under 42 U.S.C. § 1983 alleging deliberate indifference to Clinton's serious medical needs in violation of his federal constitutional rights.  The claim is brought against the sole remaining Defendant, Sheriff Tommie Johnson, III, in his official capacity (Defendant or Sheriff Johnson).

## II.    Governing Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding whether summary judgment is proper, the court does not weigh the evidence, but rather determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).  If there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, the issue is "genuine."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  "Material" issues of fact include those that, under the substantive law, are essential to the proper disposition of the claim.  *Id.*  The Court construes the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the

---

[2] Defendant refers to Clinton's place of pretrial detention interchangeably as the "Oklahoma County Detention Center" and the "Oklahoma County Jail."  For ease of reference, the Court refers to the place of Clinton's detention as the "Oklahoma County Jail" or simply the "Jail."

nonmovant's favor.  *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citing *Anderson*, 477 U.S. at 248).

### III.   Undisputed Material Facts

As a preliminary matter, the Court notes that Defendant's Motion contains 17 numbered paragraphs of purported undisputed material facts.  In response, Plaintiff has responded to each of Defendant's numbered paragraphs and further submitted 33 numbered paragraphs of additional material facts.  As set forth above, Defendant did not reply and, therefore, has failed to address any of Plaintiff's additional material facts. Therefore, to the extent those facts are properly supported by the record, *see* Fed. R. Civ. P. 56(c)(1), they are deemed undisputed for the purposes of ruling on Defendant's Motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  The Court proceeds to address the following facts as material, undisputed and viewed in the light most favorable to Plaintiff as the nonmovant, unless otherwise indicated.

### A.   Clinton's Arrest and Pretrial Detention

On August 5, 2019, Clinton was involved in a single vehicle automobile accident when he backed his vehicle into a pole at a convenience store with sufficient force so as to cause "extensive rear end damage" to the vehicle.  *See* Incident Report [Doc. No. 74-3] at 6-7.  The Oklahoma City Police Department (OCPD) responded, and Officer Paige Charter conducted an investigation at the scene.  Officer Charter's Incident Report noted that Clinton admitted taking pain medication (Lortab) prescribed to him for a recent,

below-the-knee amputation of his left leg.  Clinton also admitted to having "smok[ed] a joint."  *Id*. at 7.  Clinton gave his consent to take a blood test.  Officer Charter then took Clinton to St. Anthony Hospital (Hospital) for the blood test and for a medical clearance for his detention.  At the Hospital, Clinton told Officer Charter that he had taken multiple Lortabs and knew he should not have been driving.  *Id*.  He also complained of random pain, partial paralysis and other unexplained ailments.  *Id*.

The Hospital ran several tests on Clinton before medically clearing him.  CT scans of Clinton's lumbar spine, head and cervical spine revealed "no acute findings."  *See* Hospital Records [Doc. No. 74-11] at 4-5.  And a CT scan of Clinton's thoracic spine revealed degenerative changes but no fractures or paravertebral abnormalities.  *Id*. at 6. Clinton refused to cooperate in a neurological exam, ripping off medical monitors.  *Id*. at 7.  A physician's assistant observed that Clinton could move his upper and lower extremities and concluded that Clinton appeared to be malingering to avoid jail.  *Id*.

The Hospital discharged Clinton to the OCPD at approximately 2:06 a.m.  His discharge instructions – reviewed with both Clinton and the accompanying OCPD officer – provided that he was to follow up with a primary care physician for a visit within two days and to return to the Hospital's emergency department if his symptoms worsened. *See* Discharge Instructions [Doc. No. 80-13] at 2-3.

At approximately 2:29 a.m. on August 6, 2019, Clinton arrived at the Oklahoma County jail.  Video footage shows Clinton being assisted and lifted out of the back of the

police car.  *See* Video [Doc. No. 80-15].[3]  Clinton was brought into the jail's intake area, where he slid off his wheelchair and required assistance from staff to sit in place.  While being booked, Clinton continued to struggle to sit upright to the point where he slid off his wheelchair, which caused his pants to fall off his waist leaving his private areas exposed.  *See* Expert Report of Leonard Vare [Doc. No. 80-14] (Vare Report) at 32-35; *see also* Video.  He remained in this state for approximately an hour until the video ended at 4:00 a.m.  *Id*.  Clinton stayed in this same position for the duration of the next security video which lasted for approximately one hour.  *See* Vare Report at 35-36; Video.

At the Oklahoma County jail, medical services are provided by Turn Key Health Clinic, LLC. (Turn Key).[4]  The medical intake unit placed Clinton on "medical status" and he was moved to the 13th floor of the Jail.  *See* Jail Facility Report Form [Doc. No. 74-4]; *see also* Peek Report at 2.[5]  The 13th floor is the medical floor and contains the jail's infirmary unit known as "13 Baker" (13B) and the non-infirmary unit known "13 David" (13D).   During his time at the Jail, Clinton was moved between 13B and 13D.

At approximately 10:48 a.m., on August 6, 2019, Clinton reported that he had not urinated since his arrival at the jail (8 hours earlier).   *See* Peek Report at 2; *see also*

---

[3] *See also* Notice [Doc. No. 83] (Video conventionally filed).

[4] Turn Key and Dr. Kent King were also named as defendants in this action.  Plaintiff's claims against these defendants were previously dismissed with prejudice.  *See* Joint Stipulation of Dismissal [Doc. No. 40].

[5] Sergeant Jennifer Peek of the Oklahoma County Sheriff's Office conducted an internal affairs report following Clinton's death.  *See* Special Investigations Unit Report [Doc. No. 80-16].  Her report is referenced herein as the "Peek Report."

Medical Staff Note [Doc. No. 74-9].   Medical staff gave Clinton a urinal.   *See id*. Clinton's vital signs recorded on August 6, 2019 were unremarkable.   *See* Doc. No. 74-8.

On August 7, 2019, at approximately 12:27 a.m., Clinton again reported issues with urinating, stating that he had not urinated in two days.   Medical staff called Dr. King who authorized Clinton to be catheterized.   *See* Medical Staff Notes [Doc. No. 74-10].

From August 6, 2019, at approximately 7:00 p.m. to August 7, 2019, at approximately 2:20 p.m., multiple officers went in and out of Clinton's 13D cell.   During this entire time, Clinton remained in roughly the same position, lying in his bed.   There is no record of any movement from his bed.   *See, e.g.*, Peek Report at 13-19; *see also* Mulanax Dep. [Doc. No. 80-17] at 15:13-21.

On August 9, 2019, at approximately 7:23 a.m., Clinton did not come to the "bean hole" of his cell door so that medical staff could do a "fingerstick" blood sugar test.   The medical staff noted that Clinton told them he could not get up and had not been able to since his arrival at the Jail.   *See* Medical Staff Notes [Doc. No. 74-10].   The medical notes report that Clinton "refused to get out of bed and come to the door for fingerstick." *Id*.

Mary Mulanax, a corporal working at the Jail in August 2019 (now a lieutenant) conducted sight checks on Clinton every thirty minutes during her 12-hour shift on August 8-9, 2019.   *See* Mulanax Dep. at 15:22-16:17.   On August 8, 2019, Mulanax, reported to the charge nurse, an RN, that Clinton told her that he could not move his arms, use the toilet or eat without assistance.   The charge nurse told Mulanax that Clinton was "just faking it" and to "ignore him."   *See* Jail Facility Report [Doc. No. 74-16].

Mulanax testified that this was "unsettling" because "it's our job to take care of these detainees and inmates." Mulanax Dep. at 16:23-18:1. She could not say whether Clinton had received adequate medical care at that time, but she would have liked the nurse to "at least come over and look at him." *Id*. at 18:12-22.

Later that day, one of Clinton's cell mates, Reginald McCowin, had a "temporary breakdown" regarding Clinton's condition. Mulanax relayed this to medical staff who again told her Clinton was "faking it." *Id*. at 19:9-20:20. No one from medical came to evaluate Clinton. As a result, Mulanax reported the matter to her superiors, Lt. Carter and Sgt. April. *See* Doc. No. 74-16 at 1; *see also* Mulanax Dep. at 12:23-13:8. Sgt. April advised Mulanax that she had submitted a medical movement form to request that Clinton be moved to 13B (the infirmary) for observation, but it was denied because it was not signed by medical personnel. *Id*.; *see also* Mulanax Dep. at 13:9-15, 20:22-22:13.[6]

On August 9, 2019, Clinton repeatedly told Mulanax, and Mulanax directly observed that he could not move his arms or legs. Throughout her shift, she also continued to observe Clinton in the same position. *Id*.; *see also* Mulanax Dep. at 12:23-13:8; 15:13-16:2.

At approximately 11:53 a.m. on August 9, 2019, Clinton was seen by Jacob D. Strohl, M.D. as part of "mental health rounds." *See* Doc. No. 74-20 at 1. Clinton reported to Dr. Strohl "Ya'll need to look at my hands. I can't feel or move them." *Id*. Dr. Strohl noted that Clinton "perseverate[s] over not being able to move hands." *Id*.

---

[6] As Mulanax explained in her report, if Clinton were moved to 13B, there would be a camera in the cell that would possibly catch whether Clinton were faking. *See* Doc. No. 74-16 at 2; *see also* Mulanax Dep. at 13:24-14:5.

But Dr. Strohl conducted only a mental evaluation of Clinton and recorded symptoms of severity with only a moderate to minor impact on his ability to function satisfactorily in his current setting. *Id*. at 2.

On August 10 at 1:06 a.m., Clinton called a detention officer asking the officer to feed him because he could not feed himself. *See* Peek Report at 2-3. Officer Christian Miles responded to the call. *Id*. at 5. He asked the charge nurse, Phyllis Miller, RN (Nurse Miller), to check on Clinton because Clinton had asked to be fed and reported that he could not use his arms. *Id*. Nurse Miller entered the officer's request on Clinton's medical notes, but did not provide any treatment. *See* Doc. No. 74-10.

Approximately three hours later, Miles and detention officer Austin Cook (Cook) notified Nurse Miller that they found Clinton "lying in a pool of urine and feces." *Id*. Nurse Miller again responded that Clinton was faking it. Peek Report at 11. Miles and Cook left Clinton's cell to obtain equipment and supplies to clean him up. When they returned, they found Clinton on the floor and unresponsive. Doc. No. 74-10.

Attempts were made to resuscitate Clinton and a request for emergency services made. Doc. No. 74-10. Clinton was transported to the hospital and died there. The medical examiner's investigation report identifies the manner of death as "accidental" and the probable cause of death as "blunt force trauma of cervical spine." *See* Report of Autopsy [Doc. No. 74-12] at 2.[7]

---

[7] The Medical Examiner's Autopsy Report makes the following "Findings": cervical spine fracture with spinal cord infarction; hemorrhagic cystitis; acute ischemic changes of liver and kidney; duodenal mucosal ulceration and gastrointestinal hemorrhage; cerebral swelling; large serous effusion, peritoneal cavity; serous pleural effusions; subcutaneous edema; coronary artery

Multiple security and medical staff observed Clinton from August 6, 2019, to August 10, 2019.  *See* Peek Report at 17-19 (summary of timelines); *see also id.* at 13-17 (interviews of Harper, Carter, Smith, Hernandez, Mulanax, April, Criss, Flores, Ellis, Johnson, Guzman).  Clinton did not receive follow-up care by a physician within two days of his hospital discharge as directed.  The only consult that occurred was on August 9, 2019, at 11:53 a.m. with Dr. Strohl, which, as set forth above, was limited to a mental health evaluation.

## B.    Inmate Supervision and Medical Care at the Jail

The Jail has a long history of deficient detainee/inmate supervision and medical care for inmates.  Beginning in 1995, a Grand Jury convened in the District Court of Oklahoma County, State of Oklahoma and examined the Jail's poor design and operation. *See* Grand Jury Report [Doc. No. 80-1] at 17-18.  The poor design continues to make it difficult to properly supervise and sight check detainees.  *Id.*; *see also* January 10, 2022, letter to the Oklahoma State Department of Health [Doc. No. 80-23] at 5 (reiterating that the poor design of the Jail "makes providing adequate sight and sound supervision of detainees in their housing units extremely difficult.").

The Grand Jury also found operation and staffing issues at the jail to be problematic with the "most serious problem" being "the Sheriff's operation and management style of the facility" and the qualifications/experience of detention staff. Grand Jury Report at 18-20.

---

atherosclerosis, marked; aortic atherosclerosis, marked; diabetic neuropathy; status-post left below knee amputation; status-post recent motor vehicle collision; and status-post resuscitated cardiac arrest.  *Id.*

The Jail was also the subject of an investigation conducted by the United States Department of Justice (DOJ). In a report dated July 2008, the DOJ found that "serious medical needs are not adequately met" and that "[t]he facility does not adequately screen detainees for serious medical problems." *See* DOJ Report [Doc. No. 80-2] at 13.

On November 19, 2012, the National Commission on Correctional Health Care (NCCHC) issued a letter to the Oklahoma County Sheriff's Office regarding a recent site survey. *See* NCCHC Report [Doc. No. 80-3]. The NCCHC found the Jail to be in violation of several standards, including the "Continuity of Care During Incarceration" standard:

> **[P]hysician-ordered diagnostic tests and specialty consultations are not completed in a timely manner**. There is no evidence in the record that the ordering clinician has reviewed the results or does so with the patient in a timely manner. If changes in treatment are indicated, the changes are not implemented, nor is clinical justification for an alternative course noted. **When a patient returns from the emergency room visit or hospitalization, the physician does not see the patient, does not review the discharge orders, and does not issue follow-up orders as clinically indicated. The responsible physician does not review clinical charts to determine if clinically appropriate care is ordered and implemented by attending health staff. The standard is not met**.

*Id*. at 1-2 (emphasis added, in part). In addition, the NCHHC Report found that the standard for Chronic Disease Services has not been met. *Id*. at 3. Specifically, the Report found that "documentation in the health record indicates that clinicians do not follow chronic disease protocols for the **frequency of follow-up for medical evaluation**." *Id*. (emphasis added).

In 2014, the Oklahoma Department of Corrections (ODOC) conducted an audit of the Jail. *See* ODOC Report [Doc. No. 80-4]. The ODOC found many practices that were

not compliant with jail standards including, but not limited to, failure to require additional training each year of employment for correctional staff covering, inter alia, supervision of offenders, rights and responsibilities of offenders, safety procedures, communication skills and mental health. *Id.* at 7.

The Oklahoma Department of Health (OSDH) conducts regular inspections of the Jail. Plaintiff has attached evidence of inspections spanning the time frame 2016 through 2019. *See* Excerpts of OSDH Reports [Doc. No. 80-5]. These inspections include incidents of deaths of detainees at the Jail, including instances where staff had not conducted proper sight checks. *See id.* Plaintiff has also attached evidence of deficient practices reported as part of the Jail's Serious Incident Review (SIR) process. *See* Compilation of SIR Reports [Doc. No. 80-6]. The SIR Reports similarly include deficiencies with respect to sight checks and resulting inmate deaths. *See id.*

In June 2016, a staff meeting was conducted to address "problems and concerns" related to: (1) inmate suicide and deaths; (2) jail staffing; and (3) Armor Healthcare (the provider of healthcare services at that time). *See* Minutes, Command Staff Concerns [Doc. No. 80-7]. The recommendations proffered included the need to "[r]eiterate to existing staff the importance of proper sight checks **and the importance of communicating with supervisors about inmates at risk**." *Id.* (emphasis added).

Plaintiff also points to news reports and litigation as evidence of the high number of deaths and/or inadequate access to medical care at the Jail during the time period 2016 through 2019. *See* Pl.'s Resp., Additional Material Facts 10-11; *see also id.* at 26-27.[8]

In a Memorandum of Understanding (MOU) with the DOJ, the Sheriff and County agreed upon the following mandatory provisions:

> Security Staff Health Care Training:  **The County shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of Detainees with serious medical or mental health needs**.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.
>
> Access to Emergency Care: **The County shall train medical and security staff to recognize and respond appropriately to medical and mental health emergencies.  Furthermore, the County shall ensure that Detainees with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary**.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

*See* MOU [Doc. No. 80-10] at 14, 18 (emphasis added).

Defendant contracted with Turn Key Health to provide medical services at the Jail. *See* Agreement for Comprehensive Health Services Contract [Doc. No. 80-12].  The Agreement was executed by the Oklahoma County Sheriff, Oklahoma County, and Turn

---

[8] Defendant has not replied, and, therefore, has not challenged the admissibility of the news reports. The Court finds the other evidence cited by Plaintiff is sufficient to withstand summary judgment and therefore, the Court notes the evidence, but does not rely upon it for purposes of the summary judgment ruling.

Key.[9]  Defendant testified that pursuant to the terms of the Agreement, Turn Key was solely responsible for any "medical duties" and detention staff were not expected to render medical care or make medical-related decisions.  Def.'s Dep. at 32:21-34-5.[10] Defendant further testified that detention staff did not get "any training specific to medical signs or anything like that."  Instead, the only training involved "mental health emergencies."  *Id*. at 37:19-38:2.

Defendant further testified, however, that detention staff were trained to "notify medical, and if they felt there wasn't medical care being provided, then to involve their shift commander [a]nd the shift commander would then work with the charge nurse on what needs to happen."  *Id*. at 38:3-12.  Defendant agreed that "there was some . . . follow up expected of the detention staff to potentially do something if it was deemed the medical staff was not doing their job."  *Id*. at 38:13-17.

Christopher Hendershott was formerly a lieutenant at the Jail during August 2019. He was on shift when Clinton was found unresponsive.  *See* Peek Report at 11.  He testified that prior to August 2019 detention officers were not conducting proper sight checks.  According to Hendershott, the jail was "extremely shorthanded" and some officers "just neglected their duties."  These issues had occurred way back to the 1990s

---

[9] The Agreement sets forth the governing time period as "July 1, 2018 – June 30, 2019."  In the Fed. R. Civ. P. 30(b)(6) deposition of Ernest Eugene "Gene" Bradley, the designee of the Sheriff in his official capacity, Bradley testified that the Agreement with Turnkey was extended through June 30, 2020.  *See* Def.'s Dep. [Doc. No. 80-11] at 31:4-10; 32:12-17.

[10] Plaintiff points to the Agreement with Turn Key as evidence of the Sheriff's improper attempt to delegate his duty to provide adequate medical care to detainees at the Jail and consequently as evidence of the "systemic failures" at the Jail.  *See, e.g.*, Pl.'s Resp., Statement of Additional Material Facts, ¶ 14.

when he started working at the Jail and continued through December 2019 when he last worked at the Jail.   Hendershott Dep. [Doc. No. 80-18] at 16:15-17:17.   Hendershott raised concerns to his captains about these matters "almost weekly."  "The captains knew that [they] were shorthanded.  They knew the sight checks weren't getting done properly, and it just was going on repeat after repeat."  *Id*. at 17:18-18:7.   Hendershott also had concerns about the medical needs of inmates being met.  He believed the medical staff hired by the Sheriff "just didn't seem like they cared", didn't seem like they believed anything the inmates said" and that Turn Key had "a lot of nurses [that] shouldn't be in the nursing profession."  *Id*. at 20:1-15.   Hendershott testified that detention staff have a duty to make sure an inmate gets proper medical care if medical staff are not doing their job or neglecting an inmate.  *Id*. at 14:24-15:12.   Hendershott further testified that during his time at the Jail, there were constant inmate complaints about the quality of care provided by Turn Key and that when Hendershott raised concerns, his captains did not address them.  *Id*. at 20:16-21:7.

## IV.   Discussion

### A.    Law Governing Plaintiff's § 1983 Claim

#### 1.    Deliberate Indifference to Medical Needs of Pretrial Detainees

Clinton was a pretrial detainee at the time of the alleged violation of his constitutional rights.  Plaintiff's claim, therefore, is governed by the Due Process Clause of the Fourteenth Amendment, but the same standard applies to his claim as that applied to claims brought by convicted prisoners under the Eighth Amendment.  *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022).

To establish deliberate indifference to a pretrial detainee's serious medical needs, a plaintiff must establish both an objective component, i.e., the severity of the harm suffered, as well as a subjective component, i.e., "whether the defendant knew of and disregarded the serios risk to the inmate's health." *Id.* at 1043–44. Because Defendant only addresses the subjective component in moving for summary judgment, the Court's analysis is limited to that component. *See* Def.'s Mot. at 18 (assuming, but not addressing, whether Plaintiff could establish the objective component of her deliberate indifference claim).[11]

The subjective component focuses on "evidence of the prison official's culpable state of mind" and is satisfied if the record evidence shows that "the official knows of and disregards an excessive risk to inmate health or safety." *Prince*, 28 F.4th at 1045–46 (internal quotation marks and citation omitted). "An official's state of mind can be inferred from circumstantial evidence." And, in some circumstances, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 1046 (internal quotation marks and citation omitted).

## 2. Section 1983 Official Capacity Claim Against a County

Plaintiff's claim against Defendant, in his official capacity as Oklahoma County Sheriff, is effectively a municipal liability claim. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978). Generally, a municipality may not be held liable absent an

---

[11] Although the Court need not address this issue, as the Court noted in ruling on Defendants' Motion to Dismiss, "[a]n inmate's death meets [the objective component] requirement without doubt." *See* Order [Doc. No. 9] at 9, n. 6 (quoting *Burke v. Regalado*, 935 F.3d 960, 994 (10th Cir. 2019)).

underlying constitutional violation by one of its officers. *Donahue v. Wihongi*, 948 F.3d 1177, 1199 (10th Cir. 2020) (internal quotation marks omitted). In moving for summary judgment, Defendant appears to primarily rely upon this principle. *See* Def.'s Mot. at 18 ("[L]acking from the proof is any evidence that any County employee knew of and disregarded a substantial risk of serious harm to decedent's medical condition.").

However, in response to Defendant's Motion, Plaintiff argues that the violation of Clinton's constitutional rights resulted from "systemic failures" at the Oklahoma County jail. The Tenth Circuit has held that "while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023) (citing *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191-92 (10th Cir. 2020) (additional citations omitted)).

Under either theory, a plaintiff must establish a causal connection between the policy or custom and the constitutional violation by a prison official or a systemic violation carried out by multiple actors. *Lucas v. Turnkey Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023). Thus, to establish municipal liability, a plaintiff must show: "(1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Id.* at 1145.

An official policy can exist based on any of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the

ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (citation omitted).

### B.     Discussion

#### 1.     Deliberate Indifference of Detention and Medical Staff

As stated, Defendant's summary judgment motion is directed to an alleged lack of evidence that any detention staff acted with deliberate indifference.  Defendant argues that: (1) "[t]here is no proof that any detention officer failed to obtain medical services for Clinton"; (2) [t]here is no proof that any medical services were thwarted by detention officers"; and "[t]here is no proof that any medical services were withheld".  Def.'s Mot. at 19.  Additionally, Defendant argues "[t]here is no proof the detention officers had any idea Clinton suffered from anything other than diabetes, an amputated leg, and drug abuse." *Id*. at 20.  According to Defendant, "the undisputed evidence shows that every time a circumstance arose the detention officers engaged the outside contractor's medical professionals." *Id*. at 18.  Defendant only cursorily deals with the conduct of the medical professionals.   Defendant argues "the medical contractor's employees treated the symptoms they saw." *Id*. at 20.

But the Court finds the record contains disputed issues of material fact with respect to these matters.  As to the conduct of detention officers, the factual record supports a reasonable inference that Clinton's need for medical care was obvious.  He could not urinate.  He could not sit upright.  He told detention staff that, initially, he

could not move his hands, and later, that he could not move his arms.  He could not come to the cell door for a needle stick.  He could not feed himself.  A cellmate attempted to help feed Clinton.  Detention staff found Clinton covered in urine and feces.

The record shows that certain detention staff reported these matters to medical personnel and were repeatedly told that Clinton was faking it.[12]  But, given the obviousness of Clinton's condition, a factual issue exists as to whether it was reasonable for detention staff to rely on the opinion of medical personnel.  *See, e.g., Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 404 (10th Cir. 2009) ("[I]t has been clearly established for over a decade that unreasonable reliance on the advice of a medical professional will not excuse deliberate indifference to a prisoner's serious medical needs.").  And, consequently, a question of fact exists as to whether the detention staff failed in their gatekeeping duties.  *See, e.g.*, *Burke v. Regalado*, 935 F.3d 960, 992-93 (10th Cir. 2019); *Sealock v. Colorado*, 218 F.3d 1205, 1210–11 (10th Cir. 2000).[13]

---

[12] Several detention officers observed Clinton's condition and his requests for help, but simply deferred to the medical staff who reported Clinton to be faking.  *See* Peek Report at 13-17; *see also* Pl.'s Resp. at 30 (summarizing detention officers' interactions with Clinton and knowledge of his complaints that he could not move or care for himself).

[13] In *Burke*, as here, the inmate complained of paralysis to a nurse and two detention officers but they failed to act on his "obvious need for medical attention."  *Id.* at 994–95.  The Tenth Circuit held this was sufficient evidence to show that a subordinate of the Sheriffs violated [the inmate's] constitutional rights."  *Id.* at 995.  The Tenth Circuit cited with approval the Fifth Circuit's decision in *Benavides v. Cnty. of Wilson*, 955 F.2d 968 (5th Cir. 1992).  In *Benavides*, an inmate banged his head and shoulder on a cell door and ultimately suffered a "fractured spinal column that rendered him a permanent quadriplegic."  *Id.* at 970.  The inmate told detention officers who came to check on him several times that "he was paralyzed and request[ed] hospitalization" and "that he could not move and wished to go to the hospital."  *Id.*  But the detention officers "left him lying in his cell."  The Fifth Circuit held that a jury could reasonably conclude that the detention officers purposefully deprived the inmate of "due process of law and his right to be free from cruel and unusual punishment under the [E]ighth [A]mendment."  *Id.* at

Defendant further argues that "the medical professionals contracted by the Oklahoma County jail made a good faith effort to diagnose and treat [Clinton's] medical condition" and that there is "no evidence in the record to the contrary." Def.'s Mot. at 23. Again, the Court disagrees. As the Tenth Circuit recently reiterated, "deliberate indifference may arise from a failure to treat <u>properly</u>, which implies the presence of some degree of treatment at a minimum." *Lucas*, 58 F.4th at 1138 (emphasis in original) ("The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises. (emphasis in original)). The record contains disputed issues of material fact as to the diagnosis and treatment provided to Clinton. Medical personnel repeatedly insisted that Clinton was just "faking it." Yet, Clinton exhibited severe symptoms that, as discussed, were obvious to a layperson as necessitating medical treatment, particularly given the pre-existing conditions of Clinton (including his recent amputation) upon his arrival at the Jail.

Moreover, *Defendant's own expert* has opined that as of August 9, 2019, or August 10, 2019, Clinton should have been seen by an "advanced-level provider" but was not. *See* Dep. of Paul Adler, D.O. [Doc. No. 80-21] at 33:1-7, 47:17-20, 49:21-50:6. Dr. Adler specifically testified that "[s]omeone by the 9th should have seen [Clinton] and ordered an x-ray of his cervical spine." *Id*. at 50:5-6. And furthermore, medical

---

972. Although the Fifth Circuit found no liability against the sheriff in his official capacity based on any unconstitutional policy, the case did not involve allegations of systemic failures at the jail, as alleged here.

professionals at the Jail disregarded the instructions provided by the Hospital on Clinton's discharge that he receive follow-up care within two days. *Compare Prince*, 28 F.4th at 1046 (finding that nurse knew of and disregarded substantial risk of serious harm where detainee's symptoms were so obvious that even a layperson would have recognized the need for medical treatment and noting, in part, that emergency room physicians had mandated follow-up care with a primary care physician, but no such follow-up care was provided).

In sum, disputed issues of material fact exist as to the deliberate indifference of detention officers and medical personnel at the jail.[14]  Thus, Defendant is not entitled to summary judgment on grounds that, as a matter of law, Plaintiff cannot establish the subjective component of her deliberate indifference claim.[15]

---

[14] Although not directly argued by Defendant, to the extent Defendant purports to contend the Sheriff is relieved of any liability for conduct of Turn Key medical personnel, such a contention is incorrect.  *See, e.g., Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs of Cleveland Cnty.*, 237 P.3d 134, 142 (Okla. 2010) (explaining that "[u]nder Oklahoma law, the sheriff is the final policymaker for a county jail," and is responsible for providing medical care to those in custody at the county jail) (citing Okla. Stat. tit. 19, § 513; Okla. Stat. tit. 57, §§ 47, 52)); *see also Buchanan v. Turn Key Health Clinics, LLC*, No. 18-CV-00171-JFH, 2022 WL 2070493, at *6 (E.D. Okla. June 8, 2022) (finding that Turn Key employees "may be considered subordinates of the Sheriff" for purposes of *Monell* liability as "[t]he Supreme Court has made clear that the provision of medical care by an independent contractor does not prevent finding a jail official liable under § 1983") (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)).

[15] Defendant's legal analysis is premised principally on his factual claim that there was no underlying constitutional violation by a subordinate of Sheriff Johnson.    Accordingly, the Court's analysis has focused on the deliberate indifference of those subordinates.  But the Court finds that the record further contains disputed issues of material fact with respect to the Sheriff's deliberate indifference.  *See Burke*, 935 F.3d at 1000 (evidence that sheriff "neglected to remedy deficient medical care" as demonstrated through outside auditors' reports informing sheriff of understaffing, inadequate training and poor follow-up care "would permit a reasonable jury to find he was deliberately indifferent to the risk that poor care would result in [inmate's] constitutional injury.").  Although only an official capacity / municipal liability claim remains,

## 2.      Systemic Failures at the Jail

Defendant further moves for summary judgment on grounds that "Plaintiff failed to prove a single specific policy of the Sheriff was constitutionally deficient and impacted medical care of the Plaintiff's deceased."  Mot. at 24.  But in responding to Defendant's Motion, Plaintiff does not rely on evidence of a "single specific policy."  Instead, Plaintiff submits evidence to show systemic failures at the Oklahoma County Jail.[16]  As set forth, that evidence includes years of repeated deficiencies at the Jail with respect to staffing, proper monitoring of inmates, access to medical care (including follow-up care), and proper training of detention staff with respect to medical care and medical emergencies.  *Compare Burke*, 935 F.3d at 998–1001 (jail inspections evidence that the jail's medical operation was understaffed, staff were inadequately trained, and jail personnel failed to timely address or follow-up on inmates' medical issues identified "recurring issues with the jail's medical care" and supported a policy of custom of deficient medical care); *Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 871 (10th Cir. 2013) (evidence that the County was notified by the DOJ and other entities that deficiencies in the jail's medical care posed a serious risk to prisoner health and safety provided basis for a reasonable jury to conclude that the Oklahoma County

---

"both supervisory and municipal liability" require a showing of deliberate indifference.  *Id.* at 999.

[16] The Court notes that Plaintiff relies, in part, on the expert opinion of Leonard Vare, M.D. Defendant has filed a *Daubert* motion to exclude Dr. Vare's opinion.  The Court further notes that Plaintiff relies, in part, on the expert opinion of Brian Callaghan, M.D.  Defendant has filed a motion to strike Dr. Callaghan's Expert Report [Doc. No. 76].  The Court has denied each of these motions.  *See* Orders [Doc. Nos. 98-99]. Regardless, the Court finds disputed issues of material fact exist independent of the opinions of either of these experts.

sheriff was "on notice of constitutional deficiencies in the care of seriously ill detainees and that his failure to take appropriate measure to remedy these deficiencies constituted deliberate indifference").[17]  Plaintiff also points to a significant number of inmate deaths at the Jail and evidence from which to draw a reasonable inference that those deaths resulted from the deficiencies.  And Plaintiff points to evidence of the sheer number of medical and detention staff made aware of Clinton's condition, but who failed to step in and provide medical care for Clinton.

Similarly, Plaintiff has provided sufficient evidence of a causal connection between the systemic failures and Plaintiff's death.  The nature of the historic deficiencies and failures at the Jail correspond to the deficiencies and failures which occurred in relation to Clinton's monitoring and medical care.  *See Burke*, 935 F.3d at 1000 (a reasonable jury could find jail's policy or custom of deficient medical care resulted in inmate's death" as events leading to death were "consistent with the chronic deficiencies" identified in the jail-inspections evidence); *see also Prince*, 28 F.4th at 1051 ("a Sheriff's 'continuous neglect' of medical conditions similar to those in this case could lead a reasonable fact finder to infer causation of a plaintiff's injury sufficient to defeat summary judgment"); *Layton*, 512 F. App'x at 872 ("[A] reasonable jury could find that the County and [the sheriff] were on notice as to the problems with the jail's medical-care system, and that had they taken any number of possible remedial actions – many of which were explicitly identified by the DOJ and OSDH – [the inmate's] condition would not

---

[17] As Plaintiff notes, some of the evidence at issue in *Layton* concerning audits of the Jail is also offered in this case.

have deteriorated and his death could have been avoided by timely medical intervention.").

Moreover, evidence of causation is presented through the opinion of Defendant's own expert, Dr. Adler, that as of August 9, 2019, Clinton should have been seen by an advanced level healthcare provider and an x-ray of Clinton's cervical spine should have been ordered.  And, finally, Plaintiff's medical expert, Brian Callaghan, M.D., opined that Clinton exhibited clear signs of symptoms of a cervical cord injury at the Jail, clear signs of a worsening of that condition, that it was clear that Clinton was not faking or malingering, and that the failure to timely and properly identify and treat Clinton's worsening condition led to his cause of death as determined by the medical examiner. *See* Callaghan Report [Doc. No. 80-20] at 2.

Because Defendant did not file a reply, Defendant has failed to address any of the significant evidence Plaintiff has submitted to demonstrate systemic failures at the Jail. Under these circumstances, disputed issues of material fact preclude summary judgment as a matter of law in favor of Defendant.

## V.    Conclusion

IT IS THEREFORE ORDERED that Defendant Oklahoma County Sheriff's Motion for Summary Judgment [Doc. No. 74] is DENIED.

IT IS SO ORDERED this 15th day of June, 2023.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE